# United States Tax Court

T.C. Memo. 2025-34

GWA, LLC, GEORGE A. WEISS, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 6981-19.                          Filed April 16, 2025.

_____

*Eric J. Albers-Fiedler*, *William F. Nelson*, *Drew A. Cummings*, *Thomas V. Linguanti*, *Sheri A. Dillon*, *James G. Steele III*, *Jennifer E. Breen*, and *Maya A. Hairston*, for petitioner.

*Lisa M. Goldberg*, *Elizabeth P. Flores*, *Michael A. Sienkiewicz*, *Byron M. Huang*, and *Oleida Sullivan*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 4

FINDINGS OF FACT ........................................................................ 7

I.    Introduction ........................................................................ 7

II.   GWA, LLC .......................................................................... 8

III.  GWA's Desire for Leverage ............................................... 9

IV.   GWA's Affiliates ............................................................... 11

V.    "Specially Tailored Financial Instruments" ............................... 11

VI.   Features of Standard Call Options ............................................. 13

VII.  The RBC Transactions ............................................................... 16

**Served 04/16/25**

**[*2]**

VIII. Deutsche Bank's "Managed Account Product Structure" .......... 19

IX. GWA's Negotiations with Deutsche Bank ................................ 20

X. The Investment Advisory Agreement ........................................ 23

XI. Term of Barrier Contract #1 ................................................. 24

XII. Payout on Barrier Contract #1 .............................................. 25

XIII. Trading and Management of the Securities Basket .................. 27

XIV. Related Agreements ............................................................. 28

XV. Barrier Contract #2 ............................................................. 29

XVI. Weiss Multi-Strategy Advisors ............................................. 30

XVII. Termination of Barrier Contract #2 and Execution of
Barrier Contracts #3 through #6 ........................................... 32

XVIII. Cross Trading and Position Journaling ................................... 33

XIX. Replacement of Barrier Contracts #3 through #6 by
Barrier Contracts #7 through #10 ......................................... 34

XX. Financial Turbulence and "New MAPS" ................................. 35

XXI. Termination of Barrier Contract #1 ....................................... 37

XXII. Termination of Barrier Contracts #7 through #10 ................... 38

XXIII. IRS Legal Advice Memorandum ............................................ 39

XXIV. Mark-to-Market Election ..................................................... 40

XXV. Supervisory Approval of Penalties ........................................ 42

XXVI. Issuance of the FPAAs ........................................................ 43

OPINION ..................................................................................... 44

I. Burden of Proof ................................................................... 44

II. Expert Testimony ................................................................. 44

3

[*3]

III. Proper Characterization of the Barrier Contracts ..................... 45

    A. Economic Realities of the Barrier Contracts ................... 46

        1. Consideration ..................................................... 47

        2. Pricing .............................................................. 49

        3. Option Term ...................................................... 52

        4. Reference Property .............................................. 52

        5. Early Termination .............................................. 55

        6. Treatment of Dividends ....................................... 59

        7. Absence of Risk to Deutsche Bank ........................ 60

        8. Lack of "Optionality" for GWA ............................ 67

    B. Ownership of the Underlying Securities ......................... 70

        1. Risk of Investment Loss ...................................... 72

        2. Opportunity for Investment Gain ......................... 74

        3. Control over Investment Assets ............................ 76

        4. Other Benefits and Burdens of Ownership ........... 79

        5. Ability to Extract Cash ....................................... 82

        6. Other Benefits ................................................... 86

        7. Conclusion ......................................................... 87

    C. Petitioner's Leverage Theory ......................................... 88

IV. Mark-to-Market Election ............................................................ 92

    A. Statutory and Regulatory Background ............................ 93

    B. GWA's Mark-to-Market Election .................................... 95

    C. OGI's Alleged Mark-to-Market Election ......................... 98

4

**[\*4]**

D. Validity of the Election.................................................. 109

V. Change in Accounting Method.............................................. 114

    A. Governing Legal Principles........................................... 115

        1. Purpose and Operation of Section 481 ............... 115

        2. Changes in Accounting Method.......................... 116

    B. Analysis.................................................................... 117

    C. Petitioner's Arguments................................................ 121

VI. Penalties ...................................................................... 127

    A. Penalty Approval ....................................................... 127

    B. Accuracy-Related Penalties.......................................... 129

        1. Negligence ..................................................... 129

        2. Substantial Understatement of Income Tax....... 133

    C. Applicability of Penalties to Section 481(a) Adjustments................................................................ 134

APPENDIX.......................................................................... 137

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: This case involves GWA, LLC (GWA), a TEFRA partnership, of which George A. Weiss, a hedge fund manager, is the tax matters partner.[1] In the 2000s GWA executed with Deutsche Bank AG (Deutsche Bank) ten transactions to which we will refer as the Barrier Contracts. GWA was the nominal buyer and Deutsche Bank was the

---

[1] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including GWA.

[*5] nominal seller.  GWA treated the Barrier Contracts as call option contracts under sections 1234 and 1234A.[2]

Each Barrier Contract referenced a basket of securities, and the payout on each "option" depended on the value of those securities on the expiration date.  The securities were nominally owned by a Deutsche Bank affiliate.  But GWA directed trading in the securities basket on a daily or hourly basis, employing the same complex strategies it used in its other portfolios.

For each Barrier Contract, GWA racked up large trading gains in the underlying securities basket.  But for Federal tax purposes it took the position that these profits were not taxable on an annual basis as short-term gains.  Rather, it contended that tax on its profits should be deferred until it exercised or terminated the "option."  Because each "option" had a term of 12+ years, the tax deferral could continue for quite a while.  And the tax would then be imposed, not at ordinary income rates, but at the lower rates applicable to long-term capital gains.

In 2010 the Internal Revenue Service (IRS or respondent) published a memorandum identifying transactions resembling the Barrier Contracts as abusive.  The Senate Permanent Subcommittee on Investigations (PSI) subsequently opened an investigation into these transactions.  The PSI conducted interviews, held hearings, and collected more than one million pages of documents from five custodians, including Deutsche Bank and GWA.

On July 22, 2014, the PSI completed its investigation and published a 96-page report, concluding that Deutsche Bank had promoted the Barrier Contracts to help hedge funds "avoid [F]ederal taxes and leverage limits on buying securities with borrowed funds."  Staff of S. Perm. Subcomm. on Investigations, 113th Cong., Abuse of Structured Financial Products: Misusing Basket Options to Avoid Taxes and Leverage Limits 1 (Comm. Print 2014).  The PSI estimated that Deutsche Bank helped GWA and other funds avoid more than $3 billion in Federal income tax.  The PSI specifically identified GWA as one of "the two largest participants" in this endeavor.

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round monetary amounts to the nearest dollar.

**[\*6]**    The IRS selected GWA's 2009 and 2010 returns for examination. On December 3, 2018, it issued petitioner a Notice of Final Partnership Administrative Adjustment (FPAA) for each year. The FPAAs determined (among other things) that, for Federal income tax purposes, the Barrier Contracts were not "options" and that GWA was, in substance, the owner of the basket securities. The FPAAs determined total ordinary income adjustments in excess of $500 million for 2009 and 2010, plus accuracy-related penalties for each year.

On May 1, 2019, petitioner petitioned this Court for readjustment of the partnership items. The case presents three principal questions, which are interrelated in terms of their bottom-line tax effects:

● Whether the "option" form of the Barrier Contracts should be disregarded, with GWA being treated, in substance, as owning the basket securities for Federal income tax purposes.

● Whether a "mark-to-market" election that GWA made on its 1998 tax return required that it mark to market the basket securities (or the "option") on an annual basis under section 475(f)(1), with the result that any gain or loss would be taxed annually as ordinary income or loss under section 475(d)(3)(A) and (f)(1)(D).

● If respondent's position on one or both of the foregoing questions is sustained, whether the Commissioner's action constitutes a change to GWA's method of accounting to clearly reflect income under section 446, requiring one or more section 481 adjustments to prevent amounts from being duplicated or omitted.

We answer these questions as follows:

● The Barrier Contracts were not "options," and GWA in substance was the owner of the basket securities.

● GWA made a mark-to-market election on its 1998 tax return, but this election was invalid because it purported to cover only a subset of the securities trading activities in which GWA then engaged (or might in future engage).

● The Commissioner's adjustments to GWA's income, premised on the determination that it owned the basket securities, constituted a change in method of accounting that necessitates an adjustment under section 481 to prevent omission of income.

**[\*7]**                     FINDINGS OF FACT

The following facts are derived from the Pleadings, 12 Stipulations of Facts with attached Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. GWA had its principal place of business in Connecticut when its Petition was timely filed. Absent stipulation to the contrary, this case would be appealable to the U.S. Court of Appeals for the Second Circuit. *See* § 7482(b)(1)(E), (2).[3]

I.    *Introduction*

George Weiss has been a financial services professional for more than 50 years. He is a graduate of the Wharton School and holds numerous professional licenses. In 1978 he founded George Weiss Associates, Inc. (Weiss Associates), a Connecticut corporation, and has been its sole shareholder ever since. During its earliest years Weiss Associates engaged in securities trading and brokerage with a primary focus on domestic utility companies. Its main clients were Connecticut-based financial institutions and insurance companies that sought reliable, if conservative, returns.

In 1986 Weiss Associates began offering investors the opportunity to participate in a hedge fund. A hedge fund is a pool of money invested in stocks and other securities to which managers apply complex trading and risk management techniques. Investing in hedge funds appeals to investors seeking to outperform market averages, while protecting against the risk of large losses during market downturns.

The hedge fund that Weiss Associates offered to investors employed a "relative value long/short strategy," in which pairs of stocks, typically from the same industry, were bought and sold in roughly equal

---

[3] On April 29, 2024, GWA and certain of its affiliates filed a chapter 11 petition for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York. A bankruptcy petition operates as a stay of "the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation." 11 U.S.C. § 362(a)(8). That provision does not apply here because this case does not concern "a tax liability" of GWA. As a TEFRA partnership, GWA has no entity-level tax liability. Rather, this case relates to the tax liabilities of GWA's partners, who will be affected by any adjustments to GWA's partnership items. *See* § 701; *1983 W. Rsrv. Oil & Gas Co. v. Commissioner*, 95 T.C. 51, 56–60 (1990) (holding that a partnership's petition for bankruptcy did not stay a TEFRA partnership proceeding because it was not a proceeding "*concerning the debtor*"), *aff'd*, 995 F.2d 235 (9th Cir. 1993) (unpublished table decision). Petitioner has confirmed that none of GWA's partners has filed for bankruptcy.

[*8] dollar amounts. A "long" position refers to a security that an investor buys and holds for a period of time, generally because the purchaser believes that the security will increase in value. A "short" position refers to a transaction where the investor borrows a security and then sells it, generally in the belief that it will decrease in value.

Implementing this strategy, Weiss Associates acquired long positions in stocks it believed were undervalued and took short positions in stocks it believed were overvalued. The strategy identified pairs of companies whose stock performance was expected to correlate generally (because in the same industry), but not perfectly, and sought to exploit temporary differences in the price movements of these stocks. Weiss Associates expected its long/short strategy to earn investors stable annual returns in the range of 6–7%.

As of the mid-1990s Weiss Associates had $1.7 billion in assets under management and was one of the largest hedge fund organizations in the world. The firm gradually diversified its utilities-focused approach to encompass other types of securities that could be "paired" in a manner consistent with its long/short strategy.

II.    *GWA, LLC*

Mr. Weiss and his colleagues eventually began investing their own money—referred to as "inside money" or "proprietary capital"—using the same long/short strategy that Weiss Associates used to generate returns for third-party investors. In 1996 Mr. Weiss caused GWA to be formed as a vehicle for such investment. Although this "inside money" venture was originally expected to be temporary, it proved so lucrative that it became a major focus of Mr. Weiss and his colleagues during the 1990s and 2000s.

Mr. Weiss was GWA's sole manager, and he held (directly or through affiliates) majority ownership of GWA at all relevant times. GWA's operating agreement gave him plenary discretion to decide who else could be a member. He used this authority to reward and retain key employees of Weiss Associates by offering them a stake in GWA.

Prospective members of GWA were generally required to have a specified level of industry experience and meet certain income thresholds. Members were generally forbidden to transfer their membership interests without Mr. Weiss's consent, and they were required to sell their interests back to the firm if their employment with GWA or one of its affiliates ended. GWA had fewer than 50 members at all times.

**[*9]**     Frederick Doucette was a longstanding associate of Mr. Weiss. He joined Weiss Associates in 1990, became a member of GWA in 2003, and eventually served as its president and chief operating officer (COO). In that capacity he was responsible for overseeing GWA's legal, compliance, technology, accounting, and tax functions. He and Mr. Weiss provided extensive testimony during the trial of this case.

Mr. Weiss focused his attention on the firm's investment portfolios, leaving stewardship of GWA's day-to-day operations to Mr. Doucette. Mr. Weiss chaired the firm's executive committee, which was responsible for making final decisions on new products and approving portfolio strategies, and its allocation committee, which was responsible for allocating investment dollars among the various portfolio managers. GWA's portfolio managers were New York based and reported to Mr. Weiss directly.

III.     *GWA's Desire for Leverage*

Like many hedge funds, GWA earned revenue by charging fees to investors under the "two-and-twenty" model. Under this fee structure, the hedge fund levies a flat management fee, calculated as 2% of the assets under management, and a performance fee, calculated as 20% of the annual gain enjoyed by the fund. Investment managers are incentivized to grow their assets under management because doing so offers a greater opportunity for fees. But the long/short strategies employed by GWA generated modest (albeit stable) returns relative to the amount of capital invested. To achieve greater profits, GWA's managers looked for ways to enhance their exposure to financial markets by increasing the quantum of capital invested.

A common technique that hedge funds employ to increase their market exposure is to borrow money. The term "leverage" refers to this tactic of using borrowed capital to increase market exposure and (it is hoped) investment returns. Obtaining leverage was key to the profitability of Weiss Associates and GWA. Mr. Doucette had primary responsibility for investigating ways to secure greater leverage.

Prime brokerage is a major resource available to investment managers seeking leverage. In a prime brokerage account, the broker lends the customer cash, which the customer can then use to purchase stocks or other securities. Prime brokers derive revenue by charging interest on loans to customers and by offering customers fee-based services, such as trade executions and cash management. They may also "internalize"

**[\*10]** the equities that are held long in customers' accounts and derive revenue by lending those equities to other investors intending to sell them short. Prime brokerage is an established business for global financial firms, which compete for hedge fund customers by negotiating rates on lending, fees for services, and the amounts of leverage they are willing to make available.

A risk faced by prime brokers who offer leverage is that the customer may be unable to repay the loan if market conditions deteriorate. To protect themselves against this risk, prime brokers require customers to supply collateral in the form of cash or securities, commonly known as "margin." A loan that is made available in a prime brokerage account is usually called a "margin loan." Prime brokers monitor the amount of margin in a customer's account daily. If the margin's value falls below a set level, the broker will require the customer to contribute additional cash or securities (or to sell stock to reduce the margin debt). This is dubbed a "margin call," a call no investor wants to receive.

Beginning in the 1930s, rules issued by the Federal Reserve Board—commonly called Regulation T and Regulation U—placed limits on the amount of leverage that prime brokers and other lenders could offer customers. *See* 12 C.F.R. §§ 220.12, 221.7 (1998). Regulation X extended the limits imposed by Regulations T and U to cover credit from foreign lenders. *See* 12 C.F.R. § 224.3 (1998). Under these rules customers investing in U.S. equities had to supply margin equal to 50% or more of the value of the securities in the account. In other words, the customer was required to maintain a leverage-to-collateral ratio that did not exceed two to one. These margin restrictions prevailed through at least December 12, 2006.

Beginning in early 2007 the rules surrounding portfolio margin requirements changed. Whereas Regulations T and U had imposed fixed margin requirements on most prime brokerage accounts, the new rules were more flexible and keyed allowable leverage to portfolio risk. In February 2007 a pilot regulatory program permitted member firms to receive up to 6.5 times leverage on equities in their prime brokerage accounts. *See* Notice of Filing and Immediate Effectiveness of Proposed Rule Change Relating to Making the Portfolio Margin Pilot Permanent, Exchange Act Release No. 34-58251, 73 Fed. Reg. 45,506, 45,507 (July 30, 2008). This pilot became permanent in mid-2008. *See ibid.*

Investment managers who were designated "specialists" or "alternate specialists" on major U.S. stock exchanges were exempt from some

[*11] margin requirements. Weiss Associates took advantage of this exemption in 1996 when it became an alternate specialist on the Philadelphia Stock Exchange. Through a joint back-office agreement with Merrill Professional Clearing Corp. (Merrill Pro), Weiss Associates could enjoy leverage of 20 to 1 on the 150 stocks for which it ultimately served as an alternate specialist. But this benefit was available only for trading in those 150 stocks, and GWA viewed the interest rate charged by Merrill Pro (sometimes approaching 10%) as rather high.

IV.    *GWA's Affiliates*

GWA conducted a portion of its trading activity through affiliates. One such affiliate was George Weiss & Co., LLC (Weiss & Co.), a broker-dealer and securities trader treated as a partnership for Federal income tax purposes. GWA had a controlling interest in Weiss & Co. during 1997 and 1998. Like Weiss Associates, Weiss & Co. had a joint back-office agreement with Merrill Pro that enabled it to obtain extra leverage in its portfolios.

GWA conducted another portion of its securities trading business through OGI Associates, LLC (OGI), a Connecticut company. OGI was formed in 1994 for the purpose of trading in securities using GWA's proprietary capital, which it did at all relevant times. As of May 28, 1998, GWA was OGI's sole member, and Mr. Weiss was its sole manager.

OGI was a single-member limited liability company (LLC) wholly owned by GWA, and OGI did not elect to be classified as a corporation. For Federal tax purposes, therefore, OGI was "[d]isregarded as an entity separate from its owner." *See* Treas. Reg. § 301.7701-3(b)(1)(ii). As a rule, "if [an] entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner." *Id.* § 301.7701-2(a).

In 1998 OGI entered into an investment banking services agreement with Weiss Associates. Under this agreement Weiss Associates committed to "perform investment operations and investment banking functions for [OGI], using whatever leverage is available under regulatory constraints." OGI maintained a prime brokerage account at Deutsche Bank during all relevant years.

V.    *"Specially Tailored Financial Instruments"*

GWA's Operating Agreement, dated March 11, 1998, expressed a commitment to employing a leveraged investment strategy focusing on

[*12] stocks of utilities, financial institutions, and companies in other industries. This strategy included investment in "specially tailored financial instrument[s]" (STFIs). The Operating Agreement defined STFIs as "investment[s] . . . pursuant to which, through the use of an option, swap, or other derivative structure . . . [GWA] obtains or increases *a desired amount of leverage and/or deferral of income*." (Emphasis added.)

As indicated in the Operating Agreement, GWA pursued STFIs for two major reasons. First, they offered access to leverage at levels greater than those available through traditional prime brokerage. Second, they portended the hope of deferring income by converting short-term trading profits into long-term capital gains taxable at much lower rates many years down the road.

From 1998 through the tax years in issue, GWA invested hundreds of millions of dollars in STFIs that it characterized as "call options." GWA initially invested in this type of product with Royal Bank of Canada (RBC) and later with Deutsche Bank. These products lacked many (or most) features of standard call options. And the products GWA purchased from Deutsche Bank included stop-loss features or "barriers" that significantly reduced, if they did not entirely eliminate, the risks that buyers and sellers of call options typically face.

The putative "call options" had long terms, with expiration dates ranging from 5 to 12 years into the future. The asset underlying each "option" was a basket of securities that included hundreds or thousands of different stocks ("basket securities"), which could vary from day to day (or hour to hour). The basket securities were nominally owned by the bank. But GWA was entitled to trade the basket securities as it wished, subject to very minor constraints. And it traded them with great gusto, employing the same long/short strategies that its affiliates deployed in their other portfolios.

If GWA's investment strategy was successful, its annual trading profits would increase the value of the securities in the underlying basket. But if GWA did not exercise its "option" on the basket securities until maturity, the accumulated trading profits could escape taxation for many years, and would ultimately be taxed, not at ordinary income rates, but at more favorable long-term capital gain rates. And because the basket securities were not held in a prime brokerage account titled to GWA, regulatory limits on leverage would not apply.

[*13] VI.   *Features of Standard Call Options*

A call option is a contract that provides the buyer (optionee) the right, but not the obligation, to purchase an asset from the seller (optionor) at a specified price, known as the "strike price." The underlying asset is typically stock, but it could be a bond, a commodity, a derivative, or anything else of value. For simplicity, we will describe the features of call options assuming that the underlying asset is corporate stock.

A call option enables the optionee to secure exposure to a stock's upside potential without requiring him to pay the full price of the stock. The price paid by the optionee is called the "premium." The premium compensates the optionor for giving the optionee the opportunity to purchase the stock—i.e., to "call" it away from the optionor—if it closes above the strike price before the option expires.

During the option period, the optionee has no ownership of (or control over) the stock. The owner of the stock—typically the optionor, except in the case of a "naked" call option—remains entitled to receive all dividends (or other distributions) paid on the stock during the option period. The owner of the stock likewise retains all other rights incident to ownership of the stock, e.g., the right to vote the shares at annual meetings and the right to sue the company in a shareholder derivative action. For Federal income tax purposes, gain or loss is generally realized only when the call option is sold, is exercised, or expires worthless.

A standard call option provides the optionee with asymmetric exposure. The optionee participates in gains if the stock climbs above the strike price. But if the stock declines in value, the optionee has no loss exposure beyond the price he paid for the option. For this reason, the optionee is said to enjoy "downside protection," as compared with an investor who owns the stock outright. Conversely, the optionor bears "upside risk," i.e., the risk that the stock will increase in value and be taken away from him for less than it is then worth. In that event, the optionor will keep the option premium, but he will experience an economic loss versus the position he would have occupied if he had never written the option and simply held the stock.

A call option is said to be "at the money" when the stock is trading at the strike price, "in the money" when the stock is trading above the strike price, and "out of the money" when the stock is trading below the strike price. If the option is "out of the money" on the expiration date, it

[*14] expires worthless. If the option is "in the money" on the exercise date, it may be "cash settled" or "physically settled."

If the optionee were to choose physical settlement upon exercise of a call option, he would pay the strike price and receive the optioned shares, typically by debit/credit to his brokerage account. But publicly traded options in financial markets are almost always "cash settled." In that event, the optionee receives cash equal to the value of the option on the exercise date. That value normally equals the amount by which the price of the stock on the exercise date exceeds the strike price, multiplied by the number of optioned shares.

In U.S. financial markets, the optionee typically can exercise a call option at any time up to the option's expiration date. These contracts are called "American-style" options. A "European-style" option is one that the optionee can exercise only on the expiration date specified in the contract.

"Optionality" measures the degree of certainty that an optionee will or will not exercise the option. An option has low optionality where the likelihood of the optionee's exercising it approaches 0% or 100%. A call option so far in the money that it is virtually certain to be exercised—a so-called "deep-in-the-money" option—has optionality that approaches zero. The same is true for an option so far out of the money that no rational investor would be likely to exercise it.

The price of a call option represents the premium the optionor demands for granting the option. This premium reflects the risk to the optionor that the stock will close above the strike price at expiration. In a standard call option the premium is paid to the optionor at the outset of the contract and is never refunded or returned to the optionee.

The premium that an optionor demands for granting an option is the sum of its "intrinsic value" and its "time value." An option's "intrinsic value" is its current value assuming it were to expire immediately. An option that is out of the money has zero intrinsic value—no rational optionee would exercise such an option because he would lose money by doing so.

An option's "time value"—sometimes called its "extrinsic value"—is essentially a measure of its optionality. The time value is greatest when there is significant uncertainty as to whether the option will expire in or out of the money. An option typically loses time value as it approaches its expiration date because the choice about whether to

**[*15]** exercise becomes increasingly clear. A deep-in-the-money call option will have time value close to zero because it is virtually assured that the optionee will exercise it. In this circumstance, the option's value consists entirely of its intrinsic value.

The following example illustrates how a standard call option is priced. Assume the optionor writes a call option on 100 shares of Corp. A stock, currently trading at $103 per share. Assume that the strike price is $100 and the option expires in 120 days.

This option has an intrinsic value of $300—its value if it were to expire immediately ($3 × 100 shares). The optionor will of course demand additional premium to account for time value—the possibility that the stock will close substantially above $100 per share during the ensuing 120 days, causing the optionee to exercise the option. Calculation of the time value will depend on numerous factors, including the number of days left before expiration, the price volatility of Corp. A stock, prevailing interest rates, etc. If the time value determined by buyers and sellers in the marketplace is $350, the option's total value (and thus its premium) will be $650.

Greek-letter variables, called "the Greeks," are commonly used to express different components of risk in the options market. Risk informs an option's time value and thus the premium that an optionor should demand. Rho ($\rho$) measures an option's sensitivity to interest rates. Theta ($\theta$) measures sensitivity to changes in the time remaining until expiration. "Vega" (not actually a Greek letter) measures an option's price sensitivity to expected volatility in the price of the underlying asset.

Delta ($\delta$) measures an option's sensitivity to changes in the price of the underlying asset. Gamma ($\gamma$) is the mathematical derivative of delta. Gamma measures an option's sensitivity to *changes in the rate of change* in the price of the underlying asset.

Delta is measured on a scale of 0 to 1. As the delta of an option approaches 1, its value begins to change dollar for dollar with changes in the value of the underlying asset. The pricing relationship between a "delta-1" option and its underlying asset is thus said to be "linear." An option so far in the money that its time value is zero will have a delta of 1 because it is virtually certain to be exercised.

Since the 1980s, sophisticated actors have fashioned derivative products that modify some features of standard options. These products

[*16] are traded over the counter (OTC), rather than on centralized exchanges, and they are commonly called OTC derivatives. OTC derivatives include "exotic" options that alter certain features of standard options to modify the payoffs and risks to the parties.

One type of nonstandard option is the "knock-out barrier option." An option with a knockout feature will pay out to the optionee only if the value of the underlying asset has not hit a specified price barrier during the option's life. If a "down-and-out" barrier option hits a barrier and "knocks out," it will never come back to life, even if the underlying asset ultimately closes above the strike price. Some options with a knockout feature provide that the optionor will make a cash payment to the optionee, generally called a "rebate," if the option hits a barrier and "knocks out" before the normal expiration date.

VII.    *The RBC Transactions*

Beginning in the 1990s or earlier, RBC offered customers a financial product that it styled as a "cash-settled, out-performance, index call option." In exchange for the payment of a "premium," the buyer would be entitled to receive, at the contract's expiration, a cash payment that would depend on the performance of an underlying basket of securities.

The cash that RBC would pay the customer at expiration was determined by the amount by which the "Reference Index" exceeded the "strike price." The "Reference Index" was defined as the difference in the percentage changes of two price indices, multiplied by 100. "Index #1" was a basket of securities titled to an RBC affiliate but managed and traded by an investment advisor selected by the customer. "Index #2" was the S&P 500 Index.

In late 1997 GWA entered into negotiations with RBC about investing in this derivative product. Mr. Doucette was chiefly responsible for negotiating on GWA's behalf. RBC proposed that the amount of capital it would make available for investment in Index #1 would equal ten times what GWA would be expected to pay in "premium." In effect, RBC offered GWA leverage of 10 to 1.

Mr. Doucette viewed the RBC product as a way of expanding GWA's investment in the same long/short strategies it was already pursuing, but with certain advantages. Whereas GWA faced margin restrictions on its prime brokerage investments, it would be eligible for "ten times leverage" through the RBC product. The RBC product would enable GWA to "lock in" the contractual terms for a defined period,

[*17] whereas prime brokers could change on short notice the terms on which they extended financing. And although RBC offered only half the leverage GWA enjoyed as an alternate specialist on the Philadelphia Stock Exchange—10 to 1 versus 20 to 1—the RBC product offered access to a wider array of securities.

On April 15, 1998, GWA and RBC entered into the first of six transactions involving this derivative product. For every $10X of "option premium" paid by GWA, RBC deposited $100X into a Merrill Lynch prime brokerage account titled to an RBC affiliate. For the first transaction the parties agreed on a "premium" of $10.5 million, and RBC accordingly deposited $105 million into the prime brokerage account. The value of the securities ultimately held in this account became "Index #1."

The "strike price" for this putative call option was the *negative* of the premium. Since the "premium" was $10.5 million, the strike price was −$10.5 million. This structure ensured that 100% of the "premium" would be returned to GWA upon termination or exercise of the "option."[4]

Because the "option premium" was returned to GWA, RBC's compensation as the putative "optionor" consisted essentially of interest. GWA was obligated to pay RBC a fee that was equivalent to interest on the $105 million RBC had placed into the basket. And RBC could earn interest on the $10.5 million "premium," which resembled an ordinary bank deposit (or contribution to an investment account). In economic terms, the $10.5 million "bank deposit" served as collateral for a $105 million loan.

This first "option" had a five-year term, with a stated expiration date of April 15, 2003. The product was described as a European-style option, so that GWA supposedly could not exercise it before the expiration date. But an earlier termination could be triggered by an "extraordinary event." One such trigger was a "cash event." A cash event would occur if the securities in the prime brokerage account were liquidated,

---

[4] As a simplified example, assume that the value of Index #1, managed by GWA's advisor, had risen by 35%, while the S&P 500 Index had risen by 20%, as of the expiration date. The "Reference Index" would thus equal $15 million, and this amount would exceed the "strike price" by $25.5 million ($15 million minus negative $10.5 million). GWA would thus get its entire premium back and keep the $15 million surplus. Conversely, assume that the value of Index #1 had risen by only 15%, while the S&P 500 Index had risen by 20%. The "Reference Index" in this instance would be negative $5 million, resulting in a $5.5 million excess over the "strike price" (negative $5 million minus negative $10.5 million). GWA would again get its entire premium back, less the $5 million deficit.

[*18] leaving the account consisting solely of U.S. dollar cash equivalents.

GWA in effect selected itself to trade the securities in the prime brokerage account. Mr. Doucette and two other members of GWA formed Quaker Partners, LLC, to serve as investment advisor for Index #1. Quaker Partners had no employees, so it delegated to Weiss Associates all rights to manage the account. Weiss Associates managed the account using the same long/short strategies that GWA's affiliates deployed in their other portfolios. RBC was aware that the account was being "managed by GWA."

Quaker Partners could terminate the investment management agreement after one year. Termination of the agreement would trigger liquidation of the assets in the prime brokerage account, causing a "cash event." In effect, GWA thus could unilaterally terminate the five-year "option" after one year.

Between May 1998 and March 2001 GWA and RBC executed five more "call options." The "premiums" paid by GWA ranged from $5.5 million to $20 million, and the cash deposited by RBC in the underlying prime brokerage account concomitantly ranged from $55 million to $200 million. In each case the "strike price" for the "option" was the *negative* of the "premium," guaranteeing that the "premium" would be refunded to GWA at expiration.

Two of the five contracts had the same stated expiration date as the first contract (April 15, 2003). The other three had stated expiration dates between April 2005 and March 2006. Although RBC was the nominal owner of the securities in the reference baskets underlying the "options," GWA received settlement payments for class action lawsuits filed against companies that issued those securities.

GWA discussed its investment in STFIs, including the RBC product, in a May 2001 private placement memorandum (PPM). The PPM noted that GWA was "seeking to achieve a profit from [STFIs] by employing the same strategies as are currently employed in [its] Leveraged Investment Strategy," i.e., the long/short strategy. It noted that these investments "may be made in a manner designed to lessen and/or defer the taxation of income on such investments, or to otherwise tax advantage such investments." But it warned investors that "[t]here is no assurance that such position will be sustained" by the IRS and that investors could be liable for interest and penalties if these tax results could

**[\*19]** not be achieved. GWA estimated that, as of 2000, its trading gains in the portfolios underlying the RBC "options" had reached into the tens of millions of dollars.

## VIII. *Deutsche Bank's "Managed Account Product Structure"*

In the late 1990s Deutsche Bank was building a prime brokerage business designed to attract hedge fund customers. It accordingly developed financial products offering greater leverage than was available through margin-restricted accounts. For example, customers could obtain up to 200 times leverage from Deutsche Bank through interest rate swaps and repurchase agreements. Deutsche Bank's Global Prime Finance division (GPF) managed the prime brokerage business and offered standard prime brokerage services to customers.

Beginning in 1998 Deutsche Bank developed a Managed Account Product Structure, or "MAPS," which was marketed by GPF. It characterized MAPS as involving "barrier call options," to which we refer as Barrier Contracts. GPF marketed this product to hedge fund customers as an "amortizing call option [that] provides delta-1 exposure to [an] underlying reference portfolio" of securities. A customer's "delta-1 exposure" to the reference basket ensured that changes in the value of the basket securities would be reflected dollar for dollar in the value of the "option."

The customer would be required to pay a "premium" when purchasing the "barrier call option." The "premium" would purportedly be priced according to the investment strategy used to manage the basket securities, including the volatility and liquidity of the assets. In practice, the "premium" was almost always 10% of the "notional amount," i.e., the amount of cash Deutsch Bank made available to the customer for investment in the securities basket.

The customer could choose the initial composition of the securities portfolio, and Deutsche Bank's London branch would purchase those securities and place them (at least notionally) into the basket. Although the securities were titled to Deutsche Bank, the customer could appoint the investment advisor, who would direct all trading activity in the account. At the termination of the contract, the customer would be entitled to receive a cash settlement amount corresponding to the gains that had accumulated in the basket.

The Barrier Contract had a knockout feature such that, if the value of the basket fell below a specified barrier, the contract would be

**[*20]** terminated and the securities would be liquidated. But Deutsche Bank built in a fail-safe mechanism that kicked in before that point was reached. If the value of the portfolio fell to a level that approached the knockout barrier, Deutsche Bank could demand payment of an "additional premium." The demand for "additional premium" resembled an anticipatory margin call in a traditional prime brokerage account.

If the customer declined to supply additional premium, Deutsche Bank could immediately terminate the contract and the securities would be liquidated to cash. These features were designed to ensure that the Barrier Contract would be terminated, and the underlying assets converted to cash, before investment losses in the reference basket exceeded the "premium" paid by the customer. Deutsche Bank was thus insulated from downside risk on the investment portfolio.

As with the RBC product, the "premium" paid for the "barrier call option" did not constitute compensation to Deutsche Bank because the premium was ultimately refunded to the customer. *See infra* pp. 25–26, 47–49. Deutsche Bank derived revenue from the Barrier Contracts in three ways. First, it levied a trade fee, called a "ticket charge," for each trade executed in the reference basket. Second, it levied a financing fee keyed to the amount of capital actively invested in the basket, minus the stated premium. This fee was the economic equivalent of the interest that a prime broker charges customers for a margin loan.[5] Third, Deutsche Bank was free to earn interest on the "option premium" before that sum was returned to the customer. As with the RBC product, the "premium" thus resembled a bank deposit that served as collateral for a margin loan.

IX.     *GWA's Negotiations with Deutsche Bank*

Mr. Doucette commenced negotiations with Deutsche Bank about MAPS in September 2002, roughly six months before GWA's first three RBC contracts were set to expire. He understood that MAPS, like the RBC product, offered "all the benefits of prime brokerage with the benefits of tax deferral [and] long-term treatment." But whereas RBC charged its financing fee on 100% of the investment capital that it supplied through the prime brokerage account, Deutsche Bank charged its financing fee only on the portion of the capital that was actively invested in the reference basket. This fee structure better suited GWA, which

---

[5] The financing fee, which GWA called the "leverage fee," was not charged to the customer on a periodic basis. Rather, it reduced the cash settlement amount to be paid out to the customer at the end of the contract.

[*21] generally sought to keep 20% of the account's value uninvested, i.e., in the form of cash equivalents.

Deutsche Bank and GWA agreed that Quaker Partners would be appointed as investment advisor for the reference basket of securities. GWA provided a sample securities basket, ostensibly so that Deutsche Bank could evaluate the basket risk and offer appropriate pricing. Deutsche Bank promptly offered to fund the reference basket at ten times the amount of GWA's stated premium. This was the same 10 to 1 leverage that GWA enjoyed through its RBC investment. But in practical effect GWA would have access to double this leverage: For each basket security held in a long position, GWA could hedge the position by selling the same security short. GWA thus regarded the Barrier Contracts as affording it leverage of up to 20 to 1.

On March 6, 2003, Deutsche Bank presented GWA with a "pricing proposal" setting forth its fees for "Equity Prime Services," which included prime brokerage, swaps, and MAPS. The pricing proposal indicated that Deutsche Bank would charge financing fees for the capital it supplied in the Barrier Contracts at one of three interest rates, depending on the value of the basket securities. These financing fees were identical to the fees Deutsche Bank charged customers for leverage in its prime brokerage accounts. The "ticket charge" for each trade executed in the securities basket, $3, was also identical to the commission Deutsche Bank charged for trades in a prime brokerage account.

Mr. Doucette approved the pricing proposal, and in early 2003 GWA's executive committee authorized the firm's participation in the Barrier Contracts. Three of the RBC contracts expired on April 15, 2003. GWA concurrently decided to terminate the other three RBC contracts, whose stated expiration dates fell during 2005 and 2006.

On April 15, 2003, Deutsche Bank acquired via "cross trade" the portfolio securities held in the securities baskets underlying the RBC contracts set to expire on that date.[6] The securities thus transferred to Deutsche Bank were used to populate the reference basket for the first Barrier Contract. GWA then instigated a "cash event" in the other three RBC contracts, causing their expiration dates to be accelerated to April 23, 2003. On its Form 1065, U.S. Return of Partnership Income, for

---

[6] A cross trade is the practice of matching buy and sell orders for the same instrument without engaging in an open-market transaction. Its use permits an investor to avoid certain costs that open-market transactions entail.

**[\*22]** 2003, GWA reported $59,439,344 in long-term capital gain stemming from termination of the six RBC contracts.

On April 1, 2003, GWA and OGI each signed a Margin Lending, Securities Lending, Custody Account, and Sweep Account Agreement with Deutsche Bank. On the same day each signed a Prime Broker Margin Account Agreement with Deutsche Bank Securities Inc., the broker-dealer that cleared and settled transactions on Deutsche Bank's behalf for both MAPS and prime brokerage clients.

GWA entered into its first Barrier Contract with Deutsche Bank on April 15, 2003 (Barrier Contract #1). It was described as a European-style "barrier call option" with a "notional amount" of $500 million and a stated premium of $50 million.[7] The amount to be paid to GWA at the end of the contract (cash settlement amount) was to be calculated by reference to the performance of a basket of U.S. equities. At commencement the securities basket held 919 positions, divided into long and short stock positions, as well as some positions in bonds and derivatives. All of these positions were transferred via cross trade from the RBC contracts that had expired on April 15, 2003.

Deutsche Bank held title to the securities in the reference basket. But GWA or one of its affiliates could (and did on occasion) instruct Deutsche Bank as to how voting rights associated with the shares should be exercised. (Deutsche Bank was not required to follow this advice.) Deutsche Bank was obligated to prepare periodic reports showing the performance of the securities in the reference basket and indicating what the cash settlement amount would be if the Barrier Contract were terminated on that date. These reports resembled the monthly statements that Deutsche Bank delivered to its prime brokerage customers. As was true for the RBC "options," the customer would receive settlement payments from class action and shareholder-derivative lawsuits filed on behalf of companies whose stock was held in the reference baskets. *See supra* p. 18. In fact, on its 2009 return GWA reported $127,925 in class action settlement proceeds—all received in connection with basket securities—as "other long term capital gains."

---

[7] In at least some of its promotional materials, Deutsche Bank advertised the barrier call options as "American-style," suggesting that a MAPS customer could exercise the option at any time before its expiration date.

**[*23] X.**     *The Investment Advisory Agreement*

Although Deutsche Bank was entitled to choose the investment advisor for the reference basket, it agreed that Quaker Partners, a GWA affiliate, would be selected for this role. On April 15, 2003, GWA and Deutsche Bank executed an Investment Advisory Agreement (IAA #1) providing that Quaker Partners would receive, for providing advisory services, a quarterly fee equal to 0.25% of the stated premium. Because the stated premium for Barrier Contract #1 was $50 million, the "advisory fee" was $125,000 per quarter.[8]

GWA and Deutsche Bank negotiated the terms of IAA #1, which supplied guidelines and restrictions governing trading in the reference basket. The guidelines stated that trading was to follow a "long/short statistical arbitrage" strategy and specified general parameters regarding the maximum size of long/short positions and the acceptable classes of investments. The guidelines concerning the size of positions ensured that there was sufficient liquidity to facilitate unwinding the positions if necessary.

Quaker Partners was not required to seek permission from Deutsche Bank before executing any trade, and nothing prevented it from liquidating the basket entirely to cash. However, Quaker Partners was precluded from trading any securities appearing on a "Trade Restricted List," which Deutsche Bank updated daily. The purpose of this restriction was to ensure that Deutsche Bank did not violate any conflict-of-interest rules. IAA #1 also prohibited Quaker Partners from trading securities designated "hot issues."[9]

IAA #1 obligated Quaker Partners, as investment advisor, to take remedial action if a restricted security was inadvertently included in the reference basket. In that event, Quaker Partners could dispose of the problematic security through an ordinary market transaction or transfer it to another account at Deutsche Bank that was customer owned.

---

[8] Barrier Contract #1 stated that GWA "shall not contact directly the investment advisor regarding the terms or subject matter of th[e] transaction." But this prohibition was meaningless because Quaker Partners had no employees and had delegated all of its investment management responsibilities to Weiss Associates. *See supra* p.18.

[9] Under SEC rules, a "hot issue" is a stock issued in an initial public offering (IPO) whose market price rises 5% or more above the IPO price within the first five minutes of trading. "Hot issues" are regarded as risky investments.

**[\*24]** OGI's prime brokerage account at Deutsche Bank was designated the other account.

Under IAA #1, Deutsche Bank could terminate the advisory agreement for any reason, or for no reason, upon written notice to Quaker Partners. If Deutsche Bank terminated the agreement within 12 months of its effective date and the performance of the MAPS account was positive, then Deutsche Bank was required to pay Quaker Partners $200,000.

Shortly after executing IAA #1, Quaker Partners subcontracted to Weiss Associates its role as investment advisor. The parties thereby agreed that Weiss Associates would receive 95% of Quaker Partners' fee for providing investment advisory services in connection with Barrier Contract #1.

XI.    *Term of Barrier Contract #1*

Barrier Contract #1 had a term of 12+ years, running from April 15, 2003, to April 30, 2015. Deutsche Bank could accelerate the expiration date to 3, 6, or 9 years preceding the stated expiration date, provided that it gave GWA 30 days' notice of its decision to do so.

GWA had no explicit right to terminate the contract early. But it had the de facto ability to do so by causing Quaker Partners, the investment advisor, to manufacture a "cash event." Quaker Partners could generate a "cash event" by selling all securities in the reference basket, reducing it to cash. Or Quaker Partners could terminate IAA #1 (after giving Deutsche Bank sufficient notice), which would require the basket securities to be liquidated and converted to cash "in a prompt and orderly manner."

Upon occurrence of a "cash event," Deutsche Bank had the right to immediately accelerate the option termination date. Deutsche Bank would have a strong economic incentive to exercise this right because the cash in the reference basket would begin accruing interest at the Federal Funds Rate *plus 5%*. Marcus Peckman, GWA's chief financial officer (CFO), acknowledged that this rate would be "punitive" for a financial institution like Deutsche Bank. Moreover, because none of Deutsche Bank's capital would be actively invested in the reference basket following a cash event, Deutsche Bank would be entitled to receive no further financing fees. For both reasons, Mr. Peckman viewed GWA's ability to generate a cash event as a de facto "out provision" that it could employ to terminate a Barrier Contract at any time of its choosing.

**[\*25]** Barrier Contract #1 could also terminate early if the basket value reached a knockout barrier, defined as an "early expiration event." Such an event would occur if the Net Asset Value (NAV) Index Level, set at 100 at the outset of the contract, declined to 94 (the "Expiration Price"). A decline of that magnitude would translate to a 6% reduction in the value of the reference basket.

If the NAV Index Level declined to 97, Deutsche Bank was required to provide GWA an "early expiration notice." GWA would then have four hours to notify Deutsche Bank, via a "buyer election notice," that it intended to continue with Barrier Contract #1. If so, GWA was required to pay Deutsche Bank an "additional premium amount" of $15 million, i.e., 3% of the "notional amount." The additional premium was due by 4 p.m. on the next business day following delivery of the "early expiration notice." If GWA declined to pay additional premium, the "option" would terminate and the basket securities would be liquidated. Barrier Contract #1 would terminate automatically in any event if the NAV Index Level reached 94.

XII. *Payout on Barrier Contract #1*

Barrier Contract #1 stated that GWA was to pay a "premium" of $50 million for the "option." The stated premium consisted of two parts: a "fixed premium" of $44 million, and an "amortizable premium" of $6 million. The fixed premium was payable to Deutsche Bank on the third business day following commencement of the contract. The amortizable premium accrued as a daily amount and was spread over the life of the contract.

Upon expiration of the "option" Deutsche Bank was required to pay GWA a cash settlement amount. This was expressed by a complex formula. In essence, GWA was entitled to receive upon expiration an amount equal to the cumulative performance of the basket securities ("Basket Base Performance") plus a "Premium Settlement Amount."

The "Basket Base Performance" was the amount by which "Basket Gains and Income" exceeded "Basket Losses and Expenses." "Basket Gains and Income" included realized and unrealized gains in the underlying securities basket, plus "dividends in respect of the Basket Long Positions." "Basket Losses" included realized and unrealized losses in the underlying securities basket. "Basket Expenses" included "dividends in respect of the Basket Short Positions," investment advisory fees paid to Quaker Partners, "ticket charges" paid to Deutsche Bank, and

**[\*26]** the financing or "leverage" fees paid to Deutsche Bank for use of its capital.

The "Premium Settlement Amount" for Barrier Contract #1 equaled the stated premium ($50 million) minus the "total amortized premium." The latter amount was calculated as the sum of the "amortized daily premium" charged for each calendar day of the contract. Barrier Contract #1 ran from April 15, 2003, through April 30, 2015, i.e., for 4,398 days. Since the "amortizable premium" was $6 million, the "amortized daily premium" was $1,364 ($6 million ÷ 4,398). The "total amortized premium" would thus be exactly $6 million if the contract expired as scheduled, but it would be less than $6 million if the contract terminated early.

The calculation described in the preceding paragraph suggests that GWA would be refunded only a portion of the $50 million stated premium because of the downward effect of the "total amortized premium." But the "total amortized premium" would also be refunded, albeit in a different manner, i.e., via calculation of the Basket Base Performance.

In calculating the cash settlement amount, the leverage fee paid to Deutsche Bank reduced the Basket Base Performance. But the leverage fee itself was reduced by $1,364 for every day that the amount of capital invested in basket securities exceeded the stated premium ($50 million). The amount of Deutsche Bank capital that could be invested in basket securities could be as high as $500 million, and the amount so invested invariably exceeded $50 million by a very healthy margin.[10] For every day that a Barrier Contract was in place, therefore, the leverage fee was reduced by $1,364.

In short, the Basket Base Performance would be adjusted upward via reduction of the leverage fee at a rate of $1,364 per day. This upward adjustment would precisely offset the downward effect of the "total amortized premium," which was also calculated at a rate of $1,364 per day. The record disclosed no reason for reducing the leverage fee by $1,364 per day, other than to create this offset. These neutralizing adjustments ensured that GWA would receive, upon exercise of the

---

[10] As noted *supra* pp. 20–21, GWA typically sought to keep 20% of the reference basket in cash, so it appears that up to $400 million would usually be actively invested.

**[\*27]** "option," 100% of the accumulated net gains in the reference basket plus 100% of the $50 million stated premium.[11]

If Barrier Contract #1 were terminated by an "early expiration event," GWA would be refunded at least some portion of its "premium." If the NAV Index Level hit 97, representing a 3% decline in the value of the reference basket, and if GWA declined to pay additional premium, Deutsche Bank would begin "orderly liquidation" of the basket securities. Unless Deutsche Bank was unable to liquidate the securities before the portfolio had declined by another 7%—an extremely unlikely scenario, given that most positions in the reference basket were hedged long/short positions—GWA would be refunded up to 70% of its "premium," or $35 million. The premium refund would vanish only if the NAV Index Level fell to 90 by the time the portfolio had been fully liquidated. In that event, the Basket Base Performance would be negative $50 million, exactly offsetting the $50 million "premium."

XIII.  *Trading and Management of the Securities Basket*

Weiss Associates, pursuant to delegation from Quaker Partners, directed trading in the reference basket. It pursued trading strategies that precisely mirrored the long/short investment strategies that GWA and its affiliates deployed in their other portfolios.

Each night Weiss Associates would send Deutsche Bank trade files through an electronic file transfer protocol. These trade files would be entered directly into Deutsche Bank's order management system for booking and execution on the following business day. On an average trading day, Weiss Associates initiated trades of 268 unique securities in the reference basket. During 2005 it initiated 89,075 trades involving more than two billion units of stock.

Weiss Associates occasionally requested the trade of a security that appeared on the "Trade Restricted List." When this occurred, Deutsche Bank's order management system automatically redirected that trade to OGI's prime brokerage account. As of April 2006 OGI's trading activity primarily involved securities that could not be traded in the Barrier Contract reference baskets.

---

[11] In the event GWA had paid an "additional premium," *see supra* pp. 25–26, that "additional premium" would also be refunded 100% through the "Premium Settlement Amount."

[*28] Weiss Associates was responsible for identifying violations of the investment guidelines and so informing Deutsche Bank. On several occasions, however, Deutsche Bank was the first to discover the violation and urged Weiss Associates to remediate it. The urgency with which Weiss Associates did so varied.

XIV. *Related Agreements*

An International Swaps and Derivatives Association (ISDA) agreement is typically used by a derivatives dealer and its counterparty before executing a derivatives trade. GWA and RBC had signed an ISDA agreement in 1998 before executing the RBC "options." Deutsche Bank required that all derivatives customers sign ISDA agreements, and that a parent and its subsidiary sign separate ISDA agreements even if both were existing clients. OGI and Deutsche Bank executed an ISDA agreement in 1998 and amended it in 2003. But the record contains no evidence that GWA ever executed an ISDA agreement with Deutsche Bank, notwithstanding their shared view that MAPS was a type of derivative product.

On April 18, 2003, GWA and OGI entered into a Master Netting Agreement (MNA) with Deutsche Bank. An MNA allows a customer to use positive equity in one account as collateral to support borrowing in another account. Such agreements typically cover accounts that have the same beneficial owner. They mitigate risk for the investment firm by bringing multiple entities under a single agreement, so that the firm has recourse against one entity for the liabilities of the other. On June 16, 2003, the MNA was amended so that it also applied to Barrier Contract #2.

As initially drafted, the MNA governed three agreements between GWA and Deutsche Bank (including Barrier Contract #1) and five agreements between OGI and Deutsche Bank (including their prime brokerage contract). The MNA provided that all of these agreements constituted "a single business and contractual relationship among the parties." This agreement permitted (for example) the netting of amounts that OGI owed Deutsche Bank (such as interest that had accrued on the margin loan in OGI's prime brokerage account) against amounts that Deutsche Bank owed GWA (such as a Barrier Contract's cash settlement amount).

The MNA also permitted cross-collateralization between the MAPS account and the accounts that other GWA affiliates held at

[*29] Deutsche Bank. GWA could thus pledge the equity value in a Barrier Contract reference basket as collateral for the margin loan that Deutsche Bank extended to OGI through the latter's prime brokerage account. OGI often drew on this line of credit, then lent the proceeds back to GWA. In this and other ways GWA had de facto access to the cash value of the barrier "option" at any time of its choosing.

As Mr. Doucette acknowledged, "[h]istorically we have been able to fund the operating expenses of our business by borrowing against the excess equity value of the [barrier] option." The operating expenses thus funded included payroll, rent, and employee bonuses. GWA used borrowed funds—all collateralized by the equity value in the Barrier Contracts—to acquire positions in OGI's prime brokerage account that could not be maintained in a Barrier Contract reference basket without violating investment guidelines. GWA also used OGI-borrowed funds to acquire positions at other financial institutions, which had the effect of reducing GWA's counterparty exposure to Deutsche Bank.

GWA provided Deutsche Bank with a guaranty, dated April 15, 2003, by which GWA guaranteed repayment of all of OGI's liabilities and obligations to Deutsche Bank. GWA thus assumed secondary liability for any deficits in the line of credit that Deutsche Bank extended to OGI in the latter's prime brokerage account.

XV.  *Barrier Contract #2*

In May 2003 GWA received the proceeds from its termination of the final three RBC "options." *See supra* p. 21. Mr. Doucette approached Deutsche Bank about investing these assets through MAPS. Deutsche Bank presented Mr. Doucette with several possible scenarios for doing this.

One scenario involved terminating Barrier Contract #1 and striking a new "option" using the combined proceeds from that contract and the final three RBC "options." But GWA was advised that termination of Barrier Contract #1 in May 2003—one month after the "option" was entered into—would trigger recognition of capital gain taxable at the short-term rate (35%) instead of the long-term rate (15%) applicable to assets held longer than one year. That outcome was not appealing to GWA.

Instead, GWA agreed to purchase a second "option" whose performance would be tied to trading activity in the same reference basket that underlay Barrier Contract #1. On May 22, 2003, Deutsche Bank

[*30] and GWA entered into Barrier Contract #2 on substantially the same terms as Barrier Contract #1. The "notional amount" was again $500 million, but the "premium" was revised to $52.8 million. This revised premium roughly equaled the cash that became available to GWA following termination of the final three RBC "options." The parties concurrently amended IAA #1 to provide that Quaker Partners would receive a quarterly investment advisory fee of $257,000. That fee equaled 0.25% of the aggregate "premium" for Barrier Contracts #1 and #2, or $102.8 million.

XVI.  *Weiss Multi-Strategy Advisors*

By the mid-2000s GWA's investment of "inside money" through MAPS had proven lucrative. In 2005 GWA launched Weiss Multi-Strategy Partners, LLC (WMSP), as a hedge fund dedicated to investing outside money. This hedge fund employed the same long/short strategies used in the reference baskets underlying the Barrier Contracts.

GWA decided that there should be a single entity to serve as investment advisor for its "inside money" and "outside money" portfolios. On May 9, 2005, Weiss Multi-Strategy Advisors, LLC (WMSA), was formed for this purpose. WMSA provided advisory services for GWA's MAPS accounts, OGI's prime brokerage account at Deutsche Bank, and the "outside money" accounts held through WMSP. WMSA pooled the capital from these sources, deploying its investment strategies across what was essentially a single aggregated fund.

From time to time WMSA issued "due diligence questionnaires" to provide current and prospective investors with information about its products. In one of these documents WMSA stated that "[GWA's] principals have generally not invested any capital in [WMSP]. For tax purposes, [GWA's] principals . . . invest their capital in a separate legal structure [i.e., the Barrier Contracts] which is managed pari passu to [WMSP]."

GWA held a 99.9% ownership interest in WMSA. The remaining 0.1% was owned by Mr. Weiss directly. From 2006 through 2010 Mr. Weiss served as chairman and chief executive officer (CEO) of WMSA, and Mr. Doucette served as its president, COO, and head of risk management. Weiss Associates gradually transferred its operations, including its investment advisory activities, to WMSA. By late 2006 Weiss Associates had become a shell.

**[\*31]** On January 1, 2006, Quaker Partners redelegated to WMSA the investment advisory services that Weiss Associates had previously performed for the MAPS reference baskets. The agreement contained roughly the same terms as the prior agreement between Quaker Partners and Weiss Associates. WMSA was the investment advisor for all GWA-affiliated accounts, including the Barrier Contracts, from 2006 through 2010.

Upon receipt of its quarterly advisory fee, Quaker Partners would transfer 95% of that sum to WMSA. The remaining 5% was distributed to Quaker Partners' members—Mr. Doucette and two other employees of WMSA. But when these individuals received a distribution from Quaker Partners, their WMSA salaries were reduced by the amount of the distribution. In effect, therefore, GWA and Mr. Weiss—who together owned 100% of WMSA—received (directly or indirectly) all of the investment advisory fees that Deutsche Bank paid in connection with the Barrier Contracts.

Although 100% of the advisory fees eventually flowed up to GWA and Mr. Weiss, GWA returned those sums to Deutsche Bank at the expiration of a Barrier Contract. The advisory fees were included in "Basket Losses and Expenses," which were subtracted from "Basket Gains and Income" to determine the payout on the "option." *See supra* pp. 25–26. Because this reduction to the cash settlement amount offset GWA's advisory fees virtually dollar for dollar, those advisory fees had no economic significance.

Mr. Weiss managed the WMSA investment teams, which typically consisted of a portfolio manager, a trader, and quantitative analysts. Each team was responsible for managing one of the investment strategies that WMSA deployed. The "allocation committee," chaired by Mr. Weiss, decided what proportion of the total funds under management would be allocated to each "strategy."

From 2006 through 2010, each team deployed its particular strategy across all GWA-affiliated accounts, including the Barrier Contracts, "outside money," and OGI prime brokerage. WMSA's traders did not know the account or fund to which their trades would be settled. Rather, once a trade had been executed, a computer-based accounting system allocated the trade pari passu (i.e., proportionally) across all of the funds.

[*32] XVII. *Termination of Barrier Contract #2 and Execution of Barrier Contracts #3 Through #6*

GWA and Deutsche Bank agreed that Barrier Contract #2 would be terminated in December 2005. On December 21, 2005, Deutsche Bank issued GWA a letter asserting that a "cash event" had occurred and that Deutsche Bank was accelerating the expiration date of the "option" to that day. GWA received $130,569,181 in proceeds from the termination of Barrier Contract #2 and reported $76,907,731 in long-term capital gain on its Form 1065 for 2005.

In fact, the securities in the reference basket underlying Barrier Contract #2 had not been liquidated as of December 21, 2005. And no "cash event," as defined in the contract, had occurred as of that date. Having noticed this problem, GWA in February 2006 requested from Deutsche Bank a report showing that a "cash event" had occurred on the desired date. GWA noted that, "in order for us to terminate the option, the account has to be all cash." GWA accordingly requested "[f]or tax purposes . . . a report for Option 2 [that] shows only a cash balance" and "all positions . . . [having been] liquidated prior to the exercise of the option" on December 21, 2005.

On December 21, 2005, the same day Deutsche Bank terminated Barrier Contract #2, GWA and Deutsche Bank entered into four new "options" (Barrier Contracts #3 through #6). Barrier Contracts #3 and #5 had "notional amounts" of $184 million and "premiums" of $18.4 million; Barrier Contracts #4 and #6 had "notional amounts" of $276 million and "premiums" of $27.6 million. Each "option" had a 12-year term, with a stated expiration date of December 21, 2017.

That same day Deutsche Bank and Quaker Partners entered into a new investment advisory agreement (IAA #2) for these four contracts. It resembled IAA #1, except that it did not limit trading to U.S. equities. Rather, the reference baskets were permitted to include foreign equities, bonds, derivatives, futures contracts, and other securities. The quarterly advisory fee was $230,000, i.e., the same 0.25% rate but applied against the $92 million aggregate stated premium for Barrier Contracts #3 through #6 ([$18.4 million × 2] + [$27.6 million × 2] = $92 million).

GWA updated its May 2001 PPM in an addendum dated April 20, 2006. The addendum noted that GWA had total capital of $149,558,658, and "[s]ubstantially all of [these] assets" were "devoted to STFIs, in particular the barrier options." It further stated:

**[*33]** [GWA] expects that it will not report gain or loss from its investment in the barrier options until such options are exercised or terminated and that gain or loss will be treated as gain or loss from the sale or exchange of a capital asset. Nevertheless, the Company is unaware of any case law, regulations or rulings of the [IRS] dealing with financial instruments similar to the barrier options purchased by the Company. There is a risk that the [IRS] or the courts could conclude that some other less favorable tax treatment is appropriate for [GWA's] barrier options.

GWA incorporated this same statement into three more PPM addenda that it issued between June 2007 and July 2008.

XVIII. *Cross Trading and Position Journaling*

GWA and Deutsche Bank regularly used "cross trading" to move securities between the Barrier Contract reference baskets and OGI's prime brokerage account. Because cross trades do not take place on the open market, discrepancies between the "bid" and "ask" prices are eliminated, and ticket charges and commissions do not apply. *See supra* pp. 21–22 & note 6.

Cross trading was beneficial to GWA because it facilitated the speedy extraction of gains from its Barrier Contract investments. Without the use of cross trading, securities in the reference basket would need to be liquidated, and those transactions settled, before GWA could access the cash. By cross trading basket securities to OGI, GWA could realize a return on its investment without relinquishing control of the underlying securities and without causing market disruptions through open-market transactions.

GWA and Deutsche Bank also used a technique called "position journaling," or "position rolling," beginning in 2006 or earlier. Position journaling refers to the movement of a securities position via book entry between two separate accounts that have the same legal owner. Like cross trading, position journaling avoids the need to execute an open-market transaction. Deutsche Bank used position journaling to transfer securities from a MAPS basket to OGI's prime brokerage account, even though the accounts had different legal owners.

[*34] XIX. *Replacement of Barrier Contracts #3 Through #6 by Barrier Contracts #7 Through #10*

In December 2006 GWA wished to extract cash from Barrier Contracts #3 through #6 without causing the securities in the associated reference baskets to be liquidated. GWA hoped to accomplish these objectives by use of "position journaling." If the securities positions associated with those four contracts could be "journaled" into separate accounts tied to four new contracts, no investment positions would need to be changed.

GWA had no unilateral right to "terminate" Barrier Contracts #3 through #6. Nevertheless, on December 11, 2006, GWA notified Deutsche Bank of its intention to "exercise its rights with Deutsche Bank to terminate Options 3, 4, 5 & 6." On the following day, GWA entered into four new "options" with Deutsche Bank (Barrier Contracts #7 through #10).

The terms of the four new contracts were substantially identical to the terms of the contracts they replaced, including the aggregate "premium" ($92 million for all four "options"). The portfolio positions in the securities baskets associated with Barrier Contracts #3 through #6 were replicated in new accounts associated with Barrier Contracts #7 through #10. Deutsche Bank "journaled" the positions in the old accounts to the new accounts on December 12, 2006. Three days later GWA directed Deutsche Bank to wire $92 million from OGI's prime brokerage account "[t]o reflect payment of option premiums." Deutsche Bank agreed to do this even though the debit balance in OGI's account then exceeded $200 million. Quaker Partners and Deutsche Bank executed a new investment advisory agreement (IAA #3) to cover trading in the four new contracts.

On December 22, 2006, Deutsche Bank issued a letter to GWA asserting that a "cash event" had occurred with respect to Barrier Contracts #3 through #6 and that it was terminating them immediately. GWA treated the four "options" as terminating on December 22, 2006—exactly one year and one day after the "options" had been entered into.

On December 28, 2006, Deutsche Bank deposited $124,191,610 into OGI's prime brokerage account. Of this deposit, $92 million was designated as replacing the $92 million that OGI had transferred two weeks earlier "[t]o reflect payment of option premiums." On its Form 1065 for 2006, GWA reported gross proceeds of $124,191,610 from

[*35] disposition of the "options" and an aggregate cost basis of $92,036,098. It thus reported $32,155,512 as long-term capital gain from the termination of Barrier Contracts #3 through #6.

XX.    *Financial Turbulence and "New MAPS"*

In August 2007, in an event known as the "Quant Quake," several hedge funds engaged in a massive selloff that shook financial markets. During the financial crisis of 2008–2009, stock market prices declined by more than 50%. These events caused banks and investment firms to engage in deleveraging and other risk-averse behaviors.

During this period Deutsche Bank took steps to mitigate its risk exposure. In December 2008 Deutsche Bank reduced the "gross leverage" that was available for investment in the MAPS reference basket— i.e., the total "long-side" plus "short-side" leverage—from 20 to 12 times the stated premium. It made this change unilaterally, even though the Barrier Contracts' terms were supposedly "locked in" for the duration of the agreement.[12]

Deutsche Bank also became very concerned about the debt that GWA was running up in OGI's prime brokerage account. In late November 2008 Deutsche Bank officers noted that OGI's margin debt exceeded $400 million and that the "MAPS/OGI cross-collateralization arrangement is very low on equity." Deutsche Bank informed GWA that "the cross-collateralization has to end." Believing that GWA would nevertheless "try to hang on to the options," Deutsche Bank concluded that "we can/should force early exercise of the oldest option [Barrier Contract #1] in Apr 09." (Deutsche Bank in fact terminated Barrier Contract #1 on April 30, 2009, facilitating the transfer of $380 million into OGI's account. *See infra* p. 37.)

During 2007 and 2008 Deutsche Bank's chief risk officer and general counsel became concerned that its arrangements with GWA exposed the bank to excessive financial and legal risks. Deutsche Bank

_____

[12] It appears that GWA generally did not need more than 12 times gross leverage in the reference basket. In mid-March 2009 a GPF employee stated in an email to GPF's head of risk that GWA's investment strategy "ha[d] a normal range of 3×–5.5×" leverage. Later that month the same employee sent an email to Mr. Doucette noting that, since 2005–2006, the account had not required more than 5 times leverage per side (10 times on a gross basis), "even with a buffer." Mr. Doucette likewise testified that the accounts managed by WMSA generally had "four to five times [leverage] per side." Dr. Montgomery determined that the leverage ratio in the reference basket as of May 2003 was approximately 10.7 times on a gross basis.

[*36] accordingly approached GWA about entering into a new version of MAPS, which would retain a similar structure but exhibit features more akin to those of standard call options. Under "New MAPS" Deutsche Bank proposed that:

● The Barrier Contract would have a term of 13 to 18 months, as opposed to 12 years under the existing contracts. "When pushed," Mr. Doucette noted, Deutsche Bank "said they might be able to do [a] 24 months term."

● The "knockout barrier" would occur at an NAV Index Level of 97.7, as opposed to 94 under the existing contracts.

● It would no longer be possible for GWA to avert a knockout by paying an "additional premium."

● If the option did knock out, GWA would no longer be entitled to a refund of the "amortizable premium." The "amortizable premium," moreover, could be as high as 20% of the stated premium (as opposed to 12% under the existing Barrier Contracts).

● The leverage fee would be calculated on the full "notional value" of the Barrier Contract, rather than being imposed only on the amount of capital actively invested in the reference basket.

● GWA would no longer be permitted to engage in cross trading between the MAPS reference basket and OGI's prime brokerage account.

● GWA would no longer be permitted to cause OGI to borrow against the "excess equity" in the MAPS reference basket. In other words, GWA could no longer pledge the equity value in a Barrier Contract reference basket as collateral for the margin loan that Deutsche Bank extended to OGI through the latter's prime brokerage account. Deutsche Bank made clear that this change "is not negotiable."

● GWA would no longer be able to manufacture early termination of a Barrier Contract (e.g., by generating a "cash event" or ending an investment advisory agreement). Rather, as with a true European style option, GWA would be able to exercise the option only on the stated expiration date.

Deutsche Bank later proposed a further modification to address what it called "optionality value." Under this proposal, Deutsche Bank

[*37] would retain a portion of the stated premium—perhaps as much as 20%—if a Barrier Contract "terminated in a situation in which the purchaser of a 'true' option would not expect to receive back its premium." Deutsche Bank's counsel believed that this modification would require the customer to bear a degree of risk that better aligned with the risk incident to "'true' option[s]." In a February 25, 2009, email to Deutsche Bank, Mr. Doucette called several of the proposed changes "potential deal breakers."

Negotiations about the terms of New MAPS continued through the end of 2010. GWA proposed that New MAPS include a "tax out" provision, whereby GWA could terminate a barrier contract if there was a "change in the tax law" that "adversely impacts the . . . tax treatment of [MAPS] to [GWA]." Deutsche Bank did not oppose that idea, but it insisted on a further agreement that, if such a change occurred, GWA would not report a New MAPS barrier contract as "an option, forward contract, or other open transaction." Deutsche Bank also insisted that "change in the tax law" be defined to exclude GWA's "realization that [it] has misconstrued current law." The record of this case contains no evidence that a final agreement regarding "New MAPS" was ever reached.

XXI. *Termination of Barrier Contract #1*

In April 2009 Deutsche Bank accelerated termination of Barrier Contract #1 to April 30, 2009, one of the "early termination dates" permitted in that contract. Deutsche Bank insisted that the cash settlement for Barrier Contract #1 be used to reduce the massive deficit in OGI's prime brokerage account (caused in part by new margin requirements Deutsche Bank had imposed in December 2008). But Deutsche Bank agreed that the payment would first be made to GWA so as "to show the proper transaction trail."

Barrier Contract #1 was terminated effective April 30, 2009, with a cash settlement amount of $387,324,387. On May 5, 2009, that sum was wired to GWA's prime brokerage account at Deutsche Bank, and $380 million was then journaled to OGI's prime brokerage account at Deutsche Bank. On its Form 1065 for 2009, filed August 30, 2010, GWA reported gross proceeds of $387,324,387 from disposition of Barrier Contract #1 and an adjusted basis of $53,182,269. It thus reported $334,142,118 as long-term capital gain from the termination of that "option."

[*38] XXII. *Termination of Barrier Contracts #7 Through #10*

In August 2009 GWA reiterated its interest in terminating the four remaining Barrier Contracts, noting that it "suspect[ed] a change [in] tax laws and want[ed] to crystallize [its] gains." GWA feared that MAPS may "no longer [be] a viable investing instrument due to changes in Washington" that would eliminate the "long term tax advantages" associated with the Barrier Contracts. GWA also noted the parties' continuing impasse over the terms of "New MAPS" and GWA's desire to reduce its counterparty exposure to Deutsche Bank.

In October 2009 Mr. Kleinman emailed Mr. Doucette and Robert Gendreau (GWA's tax director) expressing his concern about proposals, then pending in Congress, regarding "codification of the 'economic substance doctrine.'" Mr. Kleinman stated his view that codification "could have serious implications with respect to the [Deutsche Bank] option transaction." He noted that, "[w]hile this proposal will not completely eliminate the benefit of the option structure, nevertheless, this will be a powerful tool for the IRS." In reply Mr. Gendreau "agreed that the codification of the 'economic substance doctrine' would be a powerful tool for the IRS." Mr. Doucette forwarded these messages to Deutsche Bank with an inquiry about "the risk of passage and its affects [sic] on the MAPS product."

GWA wished to unwind the last four Barrier Contracts by use of cross trading or position journaling, whereby the securities positions would be transferred to OGI's prime brokerage account (or another account under GWA's control). But Deutsche Bank would not agree to use these techniques to transfer the positions unless the positions were transferred to a "New MAPS" account. Unwilling to accept that condition, GWA acquiesced in liquidation of the securities in the reference baskets. But in the hope of ensuring an "orderly liquidation" and minimizing any possible market disruption, GWA requested that the securities baskets underlying Barrier Contracts #7, #8, and #10 be liquidated first.

In letters to GWA dated May 14, 2010, Deutsche Bank stated that "cash events" had occurred in Barrier Contracts #7, #8, and #10 and that it was accelerating the "option termination dates" accordingly. (In fact, no "cash event" had yet occurred because the reference baskets were still fully populated with securities.) On May 17, 2010, WMSA began liquidating the positions in those reference baskets using open-market transactions. Most of the securities (valued at $790 million) were liquidated

**[\*39]** that same day, and all positions (other than de minimis fractional shares) were liquidated by May 19, i.e., within three days.

Upon liquidating positions in the three reference baskets, WMSA replicated the exact same positions—generally within 15 minutes—in OGI's prime brokerage account at Deutsche Bank. WMSA refrained from replicating positions only when it regarded the original position as "fully matured," i.e., where that position had reached a value that aligned with GWA's price target.

Barrier Contract #7 had a cash settlement amount of $57,469,367, and Barrier Contracts #8 and #10 each had a cash settlement amount of $86,204,046. On May 19, 2010, the cumulative cash settlement amounts ($229,877,460) were wired to GWA's prime brokerage account at Deutsche Bank. Later that day, GWA instructed Deutsche Bank to wire this same amount to OGI's prime brokerage account at Deutsche Bank.

In a letter to GWA dated May 21, 2010, Deutsche Bank stated that a "cash event" had occurred in Barrier Contract #9 and that it was accelerating the "option" termination date accordingly. Barrier Contract #9 had a cash settlement amount of $56,210,572. That same day Deutsche Bank wired $43 million to GWA's prime brokerage account, and then to OGI's prime brokerage account at Deutsche Bank. Another $13 million followed the same path on May 24–26, and a final $133,948 on June 1. The remainder of the $56,210,572 cash settlement amount, $76,625, was paid to Quaker Partners as its final advisory fee.

XXIII. *IRS Legal Advice Memorandum*

On November 12, 2010, the IRS released Generic Legal Advice Memorandum No. AM2010-005 on the subject of "Hedge Fund Basket Option Contracts."[13] It posited a scenario in which a hedge fund entered into a contract with a foreign bank. The contract was styled a "call option," with a payout linked to the value of an underlying reference basket of securities. The contract addressed in the IRS memorandum was substantially similar to the Barrier Contracts. The memorandum concluded that the contract in question was not an option and that the hedge fund in substance owned the basket securities.

---

[13] Generic legal advice memoranda are nonprecedential legal opinions written by the National Office of the IRS Office of Chief Counsel. They are intended to assist IRS personnel in administering the tax laws.

**[*40]** On the following business day Deutsche Bank emailed Mr. Doucette a copy of the IRS memorandum. On January 14, 2011, Mr. Doucette met with a Deutsche Bank official and was informed that "New MAPS" was in grave danger. Although the GPF team believed in the product, they were "under a lot of pressure from the tax people" at Deutsche Bank to abandon it.

GWA filed its Form 1065 for 2010 on September 1, 2011. Messrs. Weiss and Gendreau were aware of the IRS Memorandum, and the conclusions it reached, before that return was filed. GWA nevertheless took the same position on that return, with respect to the termination of Barrier Contracts #7 through #10, that it had taken on prior returns with respect to the termination of the other six contracts. On its Form 1065 for 2010, GWA reported $192,679,910 as long-term capital gain stemming from the termination of Barrier Contracts #7 through #10 (aggregate amount realized of $286,011,407 less aggregate adjusted basis of $93,331,497).

XXIV. *Mark-to-Market Election*

On its Federal income tax return for 1997, Weiss & Co. made a "mark-to-market" election under section 475(f). It thus elected to recognize gain or loss on any security held at the close of the taxable year as if that security had been sold for its fair market value on the last business day of that year.

GWA made the same mark-to-market election on its Form 1065 for 1998, which bears the signature of its return preparer dated May 28, 1999. First, GWA included with that return a Form 3115, Application for Change in Accounting Method, to request a change from the cash to the accrual method of accounting. On the Form 3115 GWA stated that its primary business activity was as an investment company and that it "also engage[d] in a trader activity through a wholly owned limited liability company," viz., OGI.

Line 15 of the Form 3115 asked whether the taxpayer had "more than one trade or business" and (if so) directed the taxpayer to attach a description of "each trade or business." In the attached statement GWA identified its two businesses as "investment activity" and "trader activity." In the case of its "trader activity," it stated that it was "[a]dopting the accrual method of accounting in its initial year of operation."

Second, GWA included with its 1998 return a statement captioned "Election Under [Section] 475(f) for OGI, LLC (a Wholly Owned

[*41] Limited Liability Company of GWA, LLC).” As noted earlier, OGI was a “disregarded entity” of GWA. The Election bore the header “GWA, LLC” followed by GWA’s mailing address and EIN. GWA stated that OGI was “engaged in a trade or business as a trader in securities and elects to have [section] 475(f)(1) apply to such trade or business.”

Mr. Kleinman, who replaced Mr. Peckman as CFO of GWA, pointed to the existence of a mark-to-market election during discussions surrounding the execution of Barrier Contract #2. During a May 22, 2003, meeting between GWA and Deutsche Bank, Mr. Doucette recorded in his notes that “we are at 35% vs 15%”—referring to the tax rates on short-term versus long-term capital gains—and “currently have mark to market election.”

During the examination of GWA’s returns in this case, GWA sent the IRS examination team a letter captioned “Change in Method of Accounting Analysis.” This letter, dated September 20, 2013, stated that, “[i]n 1998, GWAL [viz., GWA, LLC] made an election under section 475 to report its trading gains and losses on the mark-to-market method.” The letter reported that “[o]ne of GWAL’s principal activities, which it conducts through OGI, is trading securities for its own account using various proprietary long-short trading strategies.” It then said that, “[f]or 1998, and all subsequent years, GWAL (through OGI) directly traded equity and debt securities using long-short trading strategies.”

In December 2013 GWA provided responses to an IRS Information Document Request (IDR). The IDR responses acknowledged that the “Barrier Options” executed with Deutsche Bank “are securities and are subject to the mark-to-market election that GWAL made, unless the Barrier Options can satisfy the exception set forth in section 475(f)(1)(B).” Section 475(f)(1)(B) provides that a mark-to-market election by a securities trader shall not apply to any security that is “clearly identified in such person’s records” as “having no connection to the activities of such person as a trader.”

In its IDR response GWA stated that it had “made the mark-to-market election on behalf of its wholly owned, disregarded subsidiary, OGI.” It initially believed that “it could make a ‘separate’ mark-to-market election for its trading business conducted through OGI, as distinguished from GWAL as an entity, and therefore was not required to satisfy the exception listed in section 475(f)(1)(B).” However, it later concluded that its initial view was incorrect. It accordingly acknowledged in its IDR response that, “unless the Barrier Options met the exception

[*42] under section 475(f)(1)(B), they were subject to the mark-to-market election made by GWAL on behalf of OGI."

XXV. *Supervisory Approval of Penalties*

Susan Chambers (RA Chambers) was the revenue agent who served as senior team coordinator for the IRS examination of GWA's 2009 and 2010 returns. Her immediate supervisor was Keneth Hetzel. Mr. Hetzel was a supervisor in the IRS Global High Wealth Department during 2014 and 2015.

Philip Yarberough was an attorney in the IRS Office of Chief Counsel during 2014 and 2015. He was assigned to offer advice to RA Chambers in connection with the GWA examination. Mr. Yarberough's immediate supervisor was Associate Area Counsel John Guarnieri.

On December 17, 2014, Mr. Yarberough drafted a memorandum advising RA Chambers about the applicability of penalties in connection with GWA's reporting of the Barrier Contracts. He recommended that penalties be determined for underpayments due (in the alternative) to negligence and substantial understatements of income tax. *See* § 6662(a) and (b)(1) and (2). Mr. Guarnieri approved this recommendation, indicating his approval by initialing the memorandum on December 17, 2014.

On December 19, 2014, Mr. Yarberough sent his memorandum, thus approved, via email to RA Chambers. That same day she emailed Mr. Hetzel, her immediate supervisor, requesting approval to assert the section 6662 penalties. She attached to her email Mr. Yarberough's memorandum recommending that these penalties be asserted. Mr. Hetzel approved assertion of both penalties by return email on December 19, 2014.

On March 3, 2015, RA Chambers sent Mr. Hetzel draft Forms 886–A, Explanation of Items, that included penalties for underpayments due (in the alternative) to negligence and substantial understatements of income tax. Mr. Hetzel approved her penalty recommendations that same day by placing his initials on the "Penalty Lead Sheet." He again approved her penalty recommendations two days later in an email stating that her request to impose the penalties was "approved."

On June 22, 2015, the IRS issued GWA so-called 60-day letters for 2009 and 2010. These letters indicated (among other things) that the IRS intended to assert penalties for each year (in the alternative) for

**[\*43]** negligence and substantial understatement of income tax. These letters constituted the first formal communication to GWA that the IRS intended to assert these penalties.

XXVI. *Issuance of the FPAAs*

On December 3, 2018, the IRS timely mailed FPAAs to petitioner for tax years 2009 and 2010. The FPAAs made three principal determinations that are the focus of the parties' dispute. First, the IRS determined that the Barrier Contracts "are not options for [F]ederal [income] tax purposes, and that the partnership [GWA] is the owner of the security positions in the Reference Baskets for [F]ederal [income] tax purposes."

Second, the IRS determined that the mark-to-market election that GWA made on its 1998 return "applies to both GWA LLC and OGI (as GWA LLC's disregarded entity)." The IRS concluded that GWA had failed to establish, "to the satisfaction of the Secretary," that either the "barrier options" or the securities in the reference baskets had "no connection to the activities of [GWA] as a trader" or that those securities were "clearly identified in [GWA's] records" as having no such connection. *See* § 475(f)(1)(B). Because the "exception" set forth in section 475(f)(1)(B) therefore did not apply, GWA was required to mark the reference basket securities (or the "options") to market on an annual basis, rather than deferring realization of its profits to the year in which the "options" were terminated or exercised.

Third, the IRS determined that "requiring [GWA] to account for gains and losses from the security positions in the Reference Baskets under the . . . mark-to-market method of accounting [or] to recognize gains and losses [on the underlying securities] under I.R.C. § 1001 . . . constitutes a change to [GWA's] method of accounting to clearly reflect income under I.R.C. § 446." The IRS further concluded that "an adjustment under I.R.C. § 481 is necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted." *See* § 481(a)(2). The FPAA for 2009 determined a section 481 adjustment of $337,170,142 on this ground. The FPAAs asserted a variety of alternative positions, depending on how the three questions listed above are decided. Finally, the FPAAs asserted for each year a 20% accuracy-related penalty for an underpayment due to negligence or (in the alternative) a substantial understatement of income tax. *See* § 6662. These were the same penalties that the examination team had communicated to GWA in the 60-day letters. *See supra* pp. 42–43.

**[*44]**                                    OPINION

I.      *Burden of Proof*

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner,* 107 T.C. 94, 104 (1996); *Genecure, LLC v. Commissioner,* T.C. Memo. 2022-52, 123 T.C.M. (CCH) 1271, 1276. Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner does not contend that the burden of proof should shift to respondent on any question of fact.

II.     *Expert Testimony*

To support their positions regarding the proper characterization of the Barrier Contracts, the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner,* 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner,* 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker,* 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.,* 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner,* 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may resolve the disputed factual questions on the basis of our own examination of the record evidence. *See Silverman v. Commissioner,* 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

We have listed the experts who testified in this case, along with brief summaries of their credentials, in the Appendix to this Opinion. In the pages that follow, we discuss their testimony to the extent it is relevant to our analysis.

**[\*45]** III.   *Proper Characterization of the Barrier Contracts*

The first question we must decide is whether the "option" form of the Barrier Contracts should be disregarded for Federal income tax purposes, and whether GWA should be treated, in substance, as owning the securities in the underlying reference baskets.  If GWA is determined to have been the owner of the basket securities for Federal income tax purposes, it would be required to recognize, on an annual basis, the profits it realized from trading those securities each year.  *See* § 1001.  By contrast, the holder of a standard option contract will recognize gain or loss only for the taxable year when the option is exercised, is terminated, or expires worthless.  *See Fed. Home Loan Mortg. Corporation v. Commissioner* (*Freddie Mac*), 125 T.C. 248, 267 (2005); *Westall v. Commissioner*, T.C. Memo. 1988-421, 56 T.C.M. (CCH) 66, 73.[14]

It has long been established that substance, not form, determines the proper characterization of a transaction (or group of transactions) for Federal income tax purposes.  *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Benenson v. Commissioner*, 910 F.3d 690, 699 (2d Cir. 2018), *rev'g and remanding* T.C. Memo. 2015-119; *Altria Grp., Inc. v. United States*, 658 F.3d 276, 284 (2d Cir. 2011).  "[I]n tax law, . . . substance rather than form determines tax consequences."  *Raymond v. United States*, 355 F.3d 107, 108 (2d Cir. 2004) (quoting *Cottage Sav. Assn. v. Commissioner*, 499 U.S. 554, 570 (1991) (Blackmun, J., dissenting)).  In applying the substance-over-form doctrine, courts look to the "the objective economic realities of a transaction rather than to the particular form the parties employed."  *Altria Grp.*, 658 F.3d at 284 (quoting *Frank Lyon*, 435 U.S. at 573).

Labels do not determine tax consequences when they are inconsistent with economic realities.  *Bank of N.Y. Mellon Corp. v. Commissioner*, 140 T.C. 15, 40 (2013), *supplemented by* T.C. Memo. 2013-225, *aff'd*, 801 F.3d 104 (2d Cir. 2015).  But "[i]f substance follows form then this Court will respect the form chosen by the taxpayer."  *Turner Broad. Sys., Inc. & Subs. v. Commissioner*, 111 T.C. 315, 326–27 (1998).  Deciding whether the form of a transaction should be disregarded in favor of its substance requires a factual determination.  *Harris v. Commissioner*,

---

[14] Section 1234A provides that gain or loss attributable to the termination of an option with respect to property which is a capital asset in the hands of the taxpayer is treated as gain or loss from the sale of that capital asset.  Because every Barrier Contract was terminated before its expiration date, section 1234A would presumably govern if we were to decide that the Barrier Contracts were true "options."

[*46] 61 T.C. 770, 783 (1974); *Endeavor Partners Fund, LLC v. Commissioner*, T.C. Memo. 2018-96, 115 T.C.M. (CCH) 1540, 1551, *aff'd*, 943 F.3d 464 (D.C. Cir. 2019).[15]

### A. *Economic Realities of the Barrier Contracts*

As the Supreme Court emphasized in *Frank Lyon*, 435 U.S. at 584, the answer to the substance-over-form inquiry "in any particular case will necessarily depend upon its facts." The Second Circuit has described the analysis mandated by *Frank Lyon* as a "wide-ranging and fact-intensive" inquiry. *Altria Grp.*, 658 F.3d at 286, 288 (ruling that the district court properly "instructed the jury to consider 'all the relevant facts and circumstances'").

"A contract is an option contract when it provides (A) the option to buy or sell, (B) certain property, (C) at a stipulated price, (D) on or before a specific future date or within a specified time period, (E) for consideration." *Freddie Mac*, 125 T.C. at 261 (citing *W. Union Tel. Co. v. Brown*, 253 U.S. 101, 110 (1920)); *see Halle v. Commissioner*, 83 F.3d 649, 654 (4th Cir. 1996), *rev'g and remanding Kingstowne LP v. Commissioner*, T.C. Memo. 1994-630; *Estate of Franklin v. Commissioner*, 64 T.C. 752, 762–63 (1975), *aff'd*, 544 F.2d 1045 (9th Cir. 1976). Characterization of an agreement as an option contract depends not only on the "contractual language" but also on "the economic substance of the agreement." *Freddie Mac*, 125 T.C. at 261; *see Old Harbor Native Corp. v. Commissioner*, 104 T.C. 191, 201 (1995) (citing *Frank Lyon*, 435 U.S. at 573).

We have undertaken the fact-intensive inquiry required to ascertain "the substance and economic realities of the [Barrier Contract] transaction[s]." *See Frank Lyon*, 435 U.S. at 582. We conclude that the Barrier Contracts were not options in substance because they lacked the essential economic and legal characteristics of genuine options. When

---

[15] The substance-over-form doctrine is related to, but distinct from, the "economic substance" doctrine. *See Benenson v. Commissioner*, 910 F.3d at 699 n.8; *Altria Grp.*, 658 F.3d at 291 (recognizing doctrines as distinct); *Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d 221, 230 n.12 (3d Cir. 2002) (same), *aff'g* 115 T.C. 43 (2000). *But see Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779, 785 (6th Cir. 2017) (appearing to conflate the doctrines), *rev'g* T.C. Memo. 2015-119. Under the economic substance doctrine, the court will consider whether the taxpayer (1) had an objectively reasonable expectation of profit from the transaction, apart from tax benefits, and (2) had a subjective nontax business purpose in entering the transaction. *Bank of N.Y. Mellon Corp. v. Commissioner*, 801 F.3d at 115. Given our disposition, we need not address the economic substance doctrine.

**[\*47]** the self-serving labels are stripped away, the true substance of the arrangements is clear. GWA held and traded the basket securities through a prime brokerage account, and Deutsche Bank financed GWA's investment in those securities by extending a margin loan at 10-to-1 leverage, with the putative "premium" serving as collateral for that loan.

### 1. *Consideration*

For a contract to be an option contract, it must provide for "consideration." *Freddie Mac*, 125 T.C. at 261. In a standard equity option contract, the consideration paid to the optionor is the option premium. The premium compensates the optionor for accepting the investment risk that the stock, at a future date, will be called away from him for less than the stock is then worth. Stated differently, the premium compensates the optionor for bearing upside investment risk. The option premium is paid to the optionor at the outset of the contract, and the premium is never refunded or returned to the optionee.

In stark contrast to option contract norms, the Barrier Contracts provided that Deutsche Bank would refund the premium to GWA upon its exercise of the "option." Barrier Contract #1 was typical. It specified a nominal premium of $50 million, divided into a $44 million "fixed premium" and a $6 million "amortizable premium." The $44 million fixed premium (as well as any "additional premium" GWA might have paid) was refunded to GWA as part of the "Premium Settlement Amount." *See supra* pp. 25–27 & note 11. The "amortizable premium," which accrued at a rate of $1,364 per day, was refunded to GWA via upward adjustment to the Basket Base Performance, at the identical rate of $1,364 per day for every day the contract was outstanding. *See supra* p. 26.

These neutralizing adjustments ensured that GWA would be refunded, upon exercise of the "option," 100% of the $50 million stated premium. The other nine Barrier Contracts were structured the same way. All in all, GWA received premium refunds totaling $286.8 million upon termination of the Barrier Contracts, the exact amount of the "premiums" it paid.

Besides departing from recognized option norms, Deutsche Bank's agreement to refund 100% of the premium to GWA sheds light on how the bank actually viewed the arrangement. The owner of stock is entitled to enjoy the stock's full upside potential. By refunding the premium to GWA upon exercise of the "option," Deutsche Bank waived all consideration for surrendering to GWA 100% of the upside potential

**[\*48]** of the basket securities. This suggests that Deutsche Bank regarded the upside potential of those securities as belonging, not to it, but to GWA. But if GWA owned 100% of the upside potential, that is a strong indication that GWA owned the securities in substance.

The "premium refund" feature of the Barrier Contracts, while inconsistent with their characterization as "call options," is perfectly consistent with what we believe to be their substance—namely, prime brokerage accounts funded by margin loans from Deutsche Bank. As Peter Tufano, respondent's expert in financial economics and engineering, cogently explained, the economic role of the "premium" was essentially identical to that of margin (collateral) in a prime brokerage account. Like margin in a prime brokerage account, the premium supplied a cushion that protected Deutsche Bank from downside risk if GWA's trading generated losses. But if GWA's trading generated profits, GWA would get 100% of its collateral back through refund of its "premium." In substance, the "premium" thus functioned as the collateral Deutsche Bank required as a condition of extending a margin loan to GWA at 10-to-1 leverage.

Petitioner contends that the premium refund provision is not fatal to option characterization. Timothy Weithers, petitioner's expert in financial economics, asserts that exotic versions of knockout barrier options occasionally display a similar feature, providing for "an independent cash payment (from the barrier option seller to the barrier option buyer) should the barrier be breached." Dr. Weithers indicates that this type of cash payment "is generally known as a 'rebate.'"

We are not persuaded by this line of argument. First, the exotic products to which Dr. Weithers refers appear to be rare in the option universe. Second, petitioner has not demonstrated that such contracts, any more than the Barrier Contracts, would be characterized as true "options" for Federal income tax purposes. Third, these exotic products appear to provide for a partial cash rebate, rather than the 100% premium refund that occurs upon exercise of a Barrier Contract. As respondent's expert Tanya Beder explained: "Occasionally, the owner of the down-and-out [knockout barrier] option may receive *a portion of* the premium back if the option is cancelled."

Finally, and perhaps most importantly, the cash rebate cited by Dr. Weithers works very differently from the Barrier Contract refund. The cash rebate occurs in a *loss scenario,* i.e., where the option hits a barrier and terminates before its expected expiration date. It is not

**[*49]** wholly illogical to provide for a cash rebate in this scenario. According to a source cited by Dr. Weithers, the rationale for such a rebate is as follows: "When a knock-out option knocks out, all hopes of participating in the upside of the vanilla option payoff are dashed. To soften the blow, contracts are sometimes modified to include a feature whereby a fixed payment is made if the option knocks out." *See* Zareer Dadachanji, *FX Barrier Options* 25 (2015).

The Barrier Contracts themselves provided for a partial premium refund in a loss scenario. *See supra* p. 27. If a contract hit a barrier and "knocked out," GWA would always be refunded a portion of its premium, so long as the NAV Index Level did not decline to 90. We need not decide whether this type of rebate—a partial rebate in a loss scenario—is fatal to option characterization.

The problem with the Barrier Contracts is that they provided for *a full premium refund* in a *gain scenario*, i.e., where the option finishes "in the money" and is exercised. Where the optionee has made a profit, there is no logic behind a cash rebate "to soften the blow." By refunding the premium in this scenario, Deutsche Bank waived all consideration for surrendering to GWA 100% of the upside potential of the basket securities. Petitioner has offered no explanation as to why a rational optionor would do that. And petitioner's experts cited no example of an option—however exotic—that that would offer a 100% premium refund in a gain scenario. Every source cited by Dr. Weithers indicates that cash rebates are paid only when the option hits a barrier and "knocks out."

2.  *Pricing*

The pricing of the Barrier Contracts exhibited none of the risk characteristics that inform the pricing of true options. As respondent's experts cogently explained, the pricing of call options—at least in theory—is a complicated affair. Factors that determine the magnitude of the premium include time until expiration (theta), sensitivity to the volatility of the underlying asset (vega), prevailing interest rates (rho), sensitivity to changes in the price of the underlying asset (delta), and sensitivity to changes in the rate of change in the price of the underlying asset (gamma). Sophisticated option traders call these risk factors "the Greeks."

"The Greeks" were utterly irrelevant to the pricing of the Barrier Contracts. Each "premium" was calculated exactly the same way—as a

**[*50]** flat 10% of the "notional amount." Barrier Contract #2 was a slight exception to the rule, with the "premium" calculated as 10.56% of the "notional amount."[16]

Petitioner did not attempt to show how "the Greeks" would (or could) produce premiums of this sort. Interest rates and asset volatility, which inevitably vary over a multiyear period, are highly influential in how an option is priced. The Barrier Contracts had extremely long terms—12+ years—and the risks attributable to interest rate and asset volatility would thus be at their apogee. Barrier Contracts #1, #3 through #6, and #7 through #10, respectively, were executed on three different trade dates between April 2003 and December 2006. But each was assigned exactly the same premium—10% of the contract's "notional amount." It seems obvious that standard option pricing methods would not yield identical premium calculations at such divergent points in time.[17]

The multiplicand in the Barrier Contract pricing formula—the number that was multiplied by 10% to generate the "premium"—also shows that these arrangements were not true "options. The price of a true option will be heavily influenced by the characteristics of the underlying asset. For example, assume an investor writes a call option on IBM stock, currently trading at 245, with an option strike price of 250. The premium demanded by the optionor will be influenced to a limited degree by factors exogenous to IBM stock, e.g., the option term and general market conditions. But it will be heavily influenced by the salient characteristics of that underlying asset, e.g., the price volatility of IBM stock, the company's expected earnings, its price/earnings ratio, its current dividend, etc.

Because the securities in the Barrier Contract reference baskets changed daily or hourly, Deutsche Bank could not know what the

---

[16] Barrier Contract #2, like Barrier Contract #1, had a "notional amount" of $500 million, but its "premium" was $52.8 million rather than $50 million. That may have been because $52.8 million was the amount of cash that happened to be available for carryover to Deutsche Bank following termination of the final three RBC "options." *See supra* p. 30. Respondent's expert Ms. Beder explained that, "[a]fter adjustment to align Barrier Options #1 and #2 for the difference in start dates, Barrier Option #2 also had a Notional Amount ten times its Total Premium."

[17] As Prof. Tufano showed, a well-known measure of market volatility decreased from 3.44% in April 2003 to 1.86% in December 2006. And the interest rate on one-year Treasury securities (often called the "risk-free rate") increased from 1.32% to 4.91% between those dates. Yet the pricing on the Barrier Contracts remained exactly the same.

[*51] "underlying asset" actually was. (This is a distinct problem we discuss *infra* pp. 52–55.) But even if Deutsche Bank had known what the underlying asset was, the "premium" it charged was not determined with respect to that asset. The "premium" was calculated as 10% of the "notional amount," i.e., the maximum amount of capital Deutsche Bank was prepared to make available to GWA for acquisition of basket securities. Petitioner has cited no example, and we know of none, in which the premium for a genuine call option was dictated, not by the characteristics of the underlying asset, but by the amount of financing a bank was willing to make available to facilitate purchase of that asset.

A third component of the Barrier Contract pricing—Deutsche Bank's ability to demand "additional premium" if the NAV Index Level fell to 97—was likewise inconsistent with true option pricing. For a genuine call option, the price is determined and paid at the outset of the contract. By paying that price, the optionee acquires the right to exercise the option until its expiration date. Requiring the optionee to pay additional premium to preserve that right would constitute a retroactive increase to the agreed-upon price, depriving the optionee of the benefit of his bargain. And it would violate a basic principle underlying all call options: that the optionee bears no downside risk beyond the premium he pays. If the optionee is required to pay additional premium to retain his bargained-for rights, he is forced to bear additional downside risk.[18]

These pricing features, while making no sense for a genuine call option, make perfect sense if the Barrier Contracts are recharacterized to match their substance. Pricing GWA's required payment by reference to the amount of capital Deutsche Bank made available—rather than by reference to the characteristics of the underlying assets—was completely logical, because Deutsche Bank was providing financing. Computing the "premium" as 10% of the "notional amount" was completely logical, because Deutsche Bank agreed to provide financing with 10-to-1 leverage. And requiring GWA to pay "additional premium" if the securities declined in value was completely logical, because that requirement was equivalent to a margin call in a prime brokerage account.

---

[18] If the NAV Index Level fell to 97 and GWA paid a $15 million additional premium, the "knock-out level" would be reset downward from 94 to 91. This was also inconsistent with standard option norms. As Ms. Beder explained, "[i]n a typical [barrier] option, the knock-out level does not change during the option's life."

**[\*52]**        3.        *Option Term*

Each Barrier Contract had a term of 12+ years.  A term of this length is not absolutely inconsistent with "option" characterization.  But setting the expiration date 12 years away is—at the very least—highly unusual for an equity call option.

Publicly traded call options commonly have terms of 3, 6, or 9 months.  So-called long-term options may have terms of 12 to 18 months.  It is thus no accident that Deutsche Bank, when proposing terms for "New MAPS," specified that future barrier contracts would have terms between 13 and 18 months.  "When pushed," Mr. Doucette noted, Deutsche Bank "said they might be able to do [a] 24 months term."  These changes were part of Deutsche Bank's effort to make the arrangements look more like "'true' option[s]."  *See supra* pp. 35–37.

The reason equity call options with 12-year terms are difficult to find is not hard to guess.  Key factors in pricing call options include the price of the underlying security, the volatility of the underlying security, general stock market conditions, and prevailing interest rates.  Needless to say, these factors vary considerably over time.  For example, in the 12-year period beginning January 1, 2010, the S&P 500 Index reached a low of 1,034 and a high of 4,766, and the Dow Jones Industrial Average ranged between 9,774 and 36,338.  Interest rates were likewise variable, with the Federal funds rate touching a low of 0.05% and a high of 2.42%.

The direction of stock prices and interest rates is hard to predict over the short term.  Twelve years is an eternity in the stock market.  Equity call options with 12-year terms are unicorns because no investor could rationally price them using established option pricing methods.

On the other hand, if the Barrier Contracts are recharacterized to match their substance, the 12-year term is not surprising or odd.  In substance, those contracts constituted an agreement by Deutsche Bank to lend money at ten times leverage for securities investment in a prime brokerage account controlled by GWA.  Loan agreements with 12-year terms are hardly uncommon.  Banks routinely offer home mortgages with 15- and 30-year terms, and corporations routinely issue bonds with distant maturity dates.

4.        *Reference Property*

The reference property specified for the Barrier Contracts was fundamentally inconsistent with option norms.  As respondent's expert

[*53] Ms. Beder explained, "[a] barrier option provides a payout dependent on the value of a specific underlying [asset]." Typically, the underlying asset takes the form of a "well-defined equity, fixed income, commodity, currency, credit, or other instrument." A contract is an option contract when it provides the option to buy or sell "*certain property . . . at a stipulated price.*" *Freddie Mac*, 125 T.C. at 261 (emphasis added).

The underlying asset need not be a single, discrete, or fixed investment item. But it must be sufficiently well defined to enable the optionor, using standard option pricing methods, to set a price that reasonably reflects the option's risk. A purported option whose underlying property is ill defined or constantly changing cannot be a true option if it is impossible to assign that option a rational market price.

The reference property for each Barrier Contract was a huge basket of equities, plus some bonds and derivatives. The IAAs gave GWA—acting through its affiliates, Quaker Partners, Weiss Associates, and WMSA—wide discretion to trade those securities as it saw fit, with little or no oversight by Deutsche Bank. GWA traded the securities with such gusto that the contents of the reference baskets changed daily, hourly, or minute by minute. On an average trading day during 2003–2010, GWA initiated trades of 268 unique securities. During 2005 it initiated 89,075 trades involving more than two billion units of stock. Because the ultimate identity of the "underlying asset" was unknowable at the outset of each Barrier Contract, determining a rational premium for an option would be challenging, to say the least.

Petitioner seeks to analogize the Barrier Contracts to options written on an index of securities, such as the S&P 500 Index or the Dow Jones Industrial Average. As petitioner notes, the stocks included in those indices occasionally change. Yet options on those indices are "common in the derivatives market" and "well accepted."

The comparison is unconvincing. As Prof. Tufano explained, familiar market indices are occasionally "rebalanced" by removing the stock of one company and replacing it with another. Such rebalancing occurs very infrequently, and any proposed rebalancing is announced publicly in advance. The rebalancing is conducted mechanically or is based on a specified methodology established by an independent third party (e.g., Standard & Poor's). This episodic form of stock substitution is at the opposite end of the spectrum from the incessant and unpredictable trading in which GWA engaged.

[*54] The rebalancing of equity indices, moreover, is typically done because the index sponsor believes rebalancing necessary to keep the index representative of what it is supposed to represent. The S&P 500 Index, for example, is a market-capitalization-weighted index of 500 major corporations in the United States. Every sophisticated investor knows exactly what the S&P 500 Index stands for. If Standard & Poor's concludes that Company A should be removed from the Index and be replaced by Company B, that does not make the Index less "well defined." Quite the contrary: The substitution is intended to ensure that the stocks in the Index continue to mirror its well-defined objective.

Dr. Weithers opined that a true option need not be tied to the performance of a single asset or even a defined pool of assets. Rather, he suggested that an option could be tied (at least in theory) to a "well-defined activity," such as a specific trading strategy. But petitioner came up with virtually no real-world examples of call options structured in that way.

Assuming arguendo that a genuine call option could be written on a "trading strategy" as opposed to an "underlying asset," the trading strategy would have to be—at the very least—specific and well defined. But not only were the securities in the reference baskets wholly unpredictable, the strategies that GWA pursued in trading them were numerous and varied. According to PPMs issued between 2006 and 2007, GWA was pursuing *31 different trading strategies* as of December 2007, a two-thirds increase over *the 19 different trading strategies* that it was pursuing in 2006. GWA's "allocation committee," chaired by Mr. Weiss, allocated funds among the various trading strategies as it saw fit. *See supra* p. 31. None of petitioner's experts could explain how a rational market participant would go about pricing a 12-year call option, on 31 different trading strategies, which were being implemented on a subjective proprietary basis that was invisible to the market.

In a typical option contract, the underlying asset is a security or group of securities outside the control of the optionor and the optionee, e.g., shares of IBM stock, Treasury bonds, or the S&P 500 Index. Under the Barrier Contracts, the underlying assets were subject to the complete control of GWA, which (through its affiliates) selected and traded the securities in the reference baskets. *See infra* pp. 76–79. As Prof. Glasserman, respondent's expert in derivatives, financial engineering, and risk analysis, noted, "it would be unusual to have an option contract where the underlying asset is under the option buyer's control," because

**[\*55]** the buyer could potentially manipulate the reference property to the seller's disadvantage.

On the other hand, if the Barrier Contracts are recharacterized to match their substance, the ill-defined and indeterminate nature of the reference basket, and GWA's control over the reference assets, are not the least problematic. In substance, the contracts constituted an agreement by Deutsche Bank to lend money to GWA to acquire securities positions in a prime brokerage account. It was immaterial to Deutsche Bank what those positions were, so long as GWA adhered to the investment guidelines and the reference baskets contained no securities on the "restricted list." Deutsche Bank's only concern was the risk—an infinitesimal risk, as we explain *infra* pp. 62–67—that the value of the reference basket would decline so precipitously as to wipe out the margin that GWA supplied.

5.    *Early Termination*

An option contract affords the right to buy or sell specific property "on or before a specific future date or within a specified time period." *Freddie Mac*, 125 T.C. at 261. Unlike standard call options, the Barrier Contracts permitted Deutsche Bank, the putative optionor, to terminate the "options" at virtually any time. And whereas European-style options permit exercise only on the stated expiration date, GWA essentially terminated nine Barrier Contracts early. Significantly in our view, GWA was allowed to do so without being required to pay anything to Deutsche Bank for being granted this early-exercise privilege.

Deutsche Bank could instigate early termination of a Barrier Contract in two ways. First, it could accelerate termination to various dates preceding the stated expiration date, provided it gave GWA 30 days' notice of its decision. *See supra* p. 24. Deutsche Bank availed itself of this right when it accelerated the termination of Barrier Contract #1 to April 30, 2009. *See supra* p. 37. Second, Deutsche Bank could terminate the "option" by causing a "cash event," e.g., by canceling an IAA. Deutsche Bank could cancel an IAA "for any reason or for no reason," and subject only to written notice and payment of a termination fee of at most $200,000. *See supra* p. 24. In effect, Deutsche Bank thus could terminate a Barrier Contract at essentially any time.

Deutsche Bank's unilateral ability to terminate the contract was inconsistent with option norms. The price of a call option is heavily influenced by the length of the option period—the longer the option period,

**[\*56]** the higher the premium.  By paying that price, the optionee acquires the right to exercise the option until it expires.  By accelerating expiration to an earlier date—e.g., a date on which the option is "out of the money"—the optionor would deprive the optionee of his bargained-for rights.  *See Halle v. Commissioner*, 83 F.3d at 654; *Freddie Mac*, 125 T.C. at 259 (noting that an essential feature of an option is an agreement by the optionor "to leave the offer open for a specified or reasonable period of time" (quoting *Old Harbor Native Corp.*, 104 T.C. at 201)); *Saviano v. Commissioner*, 80 T.C. 955, 970 & n.20 (1983) (citing Restatement (Second) of Contracts § 25 and other authorities), *aff'd*, 765 F.2d 643 (7th Cir. 1985).

GWA also had the de facto ability to terminate a Barrier Contract early, enabling it to receive a payout before the stated expiration date.  This would not be problematic for an American-style option, which permits the optionee to exercise at any time during the option term.  But GWA and Deutsche Bank ostensibly entered into European-style options.  A European-style option may be exercised *only* on the stated expiration date.  Because European-style options impose greater risk on the optionee, they are typically priced differently—i.e., less expensively—than American-style options with similar features.

Although the Barrier Contracts did not afford GWA an explicit right to terminate, it could manufacture early termination at essentially any time.  First, it could cause Quaker Partners to liquidate the basket securities to U.S. dollar cash equivalents, creating a "cash event."  Second, it could direct Quaker Partners to cancel the current IAA upon 30 days' notice, triggering the requirement that the basket be liquidated "in a prompt and orderly manner."  That would likewise cause a "cash event." *See supra* p. 24.

Upon occurrence of a cash event, Deutsche Bank had the immediate right to accelerate the option termination date.  It would have a strong economic incentive to exercise this right because the cash in the reference basket would begin accruing interest at the Federal funds rate plus 5%.  Mr. Peckman, GWA's CFO, acknowledged that this rate would be "punitive" for a financial institution like Deutsche Bank.  Moreover, because none of Deutsche Bank's capital would be actively invested in the reference basket following a cash event, Deutsche Bank would be entitled to receive no further financing fees.

For both reasons, Mr. Peckman viewed GWA's ability to generate a cash event as a de facto "out provision" that it could employ to

**[*57]** terminate a Barrier Contract at a time of its choosing. And GWA evidently believed that the Barrier Contracts afforded it a right to terminate. On December 11, 2006, it informed Deutsche Bank of its intention to "exercise its rights . . . to terminate Options 3, 4, 5 & 6 in the MAPS account."[19]

Petitioner contends that GWA had no right to terminate a Barrier Contract early because Deutsche Bank had ultimate "discretion as to whether to terminate." As a supposed example of the exercise of such discretion, petitioner asserts that Deutsche Bank declined GWA's request to terminate a Barrier Contract in October 2008 because the bank was allegedly reluctant to pay out cash during a time of financial stress.

The evidence leads us to a different explanation. Internal Deutsche Bank emails indicate that GWA, as part of its request to terminate, asked that the underlying portfolio positions be "journaled" to other accounts under GWA's control. Deutsche Bank declined to permit this: It acknowledged that GWA could terminate the Barrier Contract but insisted that it would "hav[e] to put the account to cash," i.e., liquidate the underlying positions. In short, Deutsche Bank was not demurring to termination, as petitioner contends, but merely refusing to accede to GWA's extracontractual request that the underlying positions be rolled into other accounts under GWA's control.

In practice, GWA and Deutsche Bank negotiated the early termination of every Barrier Contract, with GWA initiating the negotiations whenever it wished to extract cash from MAPS. On several occasions, Deutsche Bank declared that a "cash event" had occurred, even though the reference basket was still populated with securities. Noting one instance of this problem, GWA in February 2006 requested a report from Deutsche Bank showing that a "cash event" had occurred the previous December. *See supra* p. 32. GWA noted that, "in order for us to terminate the option, the account has to be all cash." It accordingly requested "[f]or tax purposes . . . a report for Option 2 [that] shows only a cash

---

[19] Petitioner appears to contend that GWA could not effect early termination in the manner described above because it was prohibited from "contact[ing] directly the investment advisor [i.e., Quaker Partners] regarding the terms or subject matter of th[e] [MAPS] transaction." *See supra* note 8. But this prohibition was meaningless because Quaker Partners had no employees and delegated all of its investment management responsibilities to Weiss Associates and later to WMSA, both of which were owned and operated by GWA and/or Mr. Weiss.

[*58] balance" and "all positions . . . [having been] liquidated prior to the exercise of the option" on December 21, 2005.

In short, while the Barrier Contracts were European-style options in form, the substance differed significantly from the form. Although GWA supposedly could exercise each "option" only on the stated expiration date, it could terminate the option (and demand payment of the proceeds) at any time of its choosing. All ten Barrier Contracts were in fact terminated long before the option expiration dates, and the terminations were sometimes accomplished in a manner that did not comply with contractual requirements.

Petitioner contends that the deficiencies described above are not fatal to "option" characterization, asserting that standard call options and European-style options may permit early termination in some circumstances. But petitioner's experts cite no examples of genuine call options that can be terminated by the optionor at virtually any time. And while it appears that European-style options occasionally permit early exercise by the optionee, early exercise invariably comes with a financial cost that was not imposed on GWA when it terminated the Barrier Contracts.

European-style options impose greater risk on the optionee. The value of the underlying asset, for example, may rise substantially above the strike price 60 days into the option period, but it may close below the strike price on the expiration date, causing the option to expire worthless. Because of this greater risk to the optionee, the optionor will accept a lower premium for writing a European-style option than for writing a comparable American-style option.

Having agreed to accept a lower premium in consideration of the optionee's being restricted to exercise on a single date, the optionor will naturally demand compensation for releasing the optionee from that restriction. This compensation might take the form of a financial penalty or a "haircut" on the proceeds that would be payable if the option were exercised at maturity in the normal way.[20]

Nine of the Barrier Contracts were terminated early at GWA's request. But on no occasion did Deutsche Bank insist that GWA pay a

---

[20] Respondent's expert Ms. Beder acknowledged that an option seller in some instances "may be willing to negotiate an early termination with the buyer." But she credibly testified that "this is subject to price, including add-on costs for hedges, risk management, lost opportunity and operational costs among others."

**[\*59]** penalty or fee of any kind for the privilege of accelerating the exercise date. Rather, upon termination of each contract, GWA received exactly the same proceeds it would have received if it had exercised the "option" on the expiration date. Because GWA was allowed to exercise the "options" early, and because it was required to pay nothing for securing the ability to do so, the substance of the Barrier Contracts did not match the form of genuine European-style options.

## 6.    *Treatment of Dividends*

When an investor writes a call option on stock he owns, he remains the owner of the stock unless and until the option is exercised. The stock owner is entitled to receive all dividends declared with respect to the stock during the life of the option. As the nominal optionee on a call option, GWA had no right to any dividends paid on shares held in the reference baskets.

But that is not how the Barrier Contracts worked. In calculating the option payout to GWA, the Basket Base Performance was *increased* by the aggregate amount of "dividends in respect of the Basket Long Positions." *See supra* pp. 25–26. This means that GWA, rather than Deutsche Bank, received the economic value of all dividends paid on stock held in the reference baskets. This is an indication that GWA, not Deutsche Bank, in substance owned those shares.

A similar anomaly existed (in reverse) with respect to short positions in the reference baskets. When an investor borrows shares to sell them short, the investor becomes liable for dividends declared on the stock while the securities loan is outstanding. As the nominal holder of the short positions in the reference baskets, Deutsche Bank in theory was the "borrower" of those shares and it should have been liable for the dividends. But in calculating the option payout to GWA, "dividends in respect of Basket Short Positions" were included among "Basket Losses and Expenses." Those dividends thus *decreased* Basket Base Performance and hence reduced the payout GWA received. *See supra* p. 26. The fact that GWA bore economic liability for dividends on the shares sold short is a strong indication that GWA was in substance the borrower, and hence the short-seller, of those shares.[21]

---

[21] As respondent's expert Prof. Tufano explained, one factor that affects the pricing of a call option is the "dividends to be paid out by the reference asset prior to exercise." In theory, the optionor conceivably could agree to assign to the optionee the

**[\*60]**　　　7.　　*Absence of Risk to Deutsche Bank*

An investor who writes a call option on stock bears two kinds of investment risk.  He bears upside risk on the option, and he bears downside risk on the underlying stock position.  The Barrier Contracts were not true options because Deutsche Bank bore neither type of risk.

a.　　*Upside Risk*

In a genuine call option, the premium compensates the optionor for accepting upside investment risk—the risk that the stock, at a future date, will be called away from him for less than it is then worth.  Suppose an investor writes a call on 100 shares of Company A stock, currently trading at $100.  Assume that the strike price is $100 and that the premium is $1,000, or $10 per share.  The optionor bears upside risk because he has surrendered to the optionee, for the life of the option, the stock's upside potential beyond $110 per share, including the possibility that it could rise to $120 or $150 per share.  The $1,000 premium compensates him for accepting that risk.

The economics of the Barrier Contracts show that Deutsche Bank bore no upside risk.  If it had borne upside risk, it would have demanded compensation for doing so.  By agreeing to refund 100% of the premium to GWA upon exercise of the "option," Deutsche Bank in effect waived any such compensation.  *See supra* pp. 47–49.  No rational investor would do that.  By its behavior, Deutsche Bank thus acknowledged that it bore no upside risk.

Petitioner asserts that Deutsche Bank bore upside risk because it could have chosen *not to purchase* the basket securities.  Instead, Deutsche Bank allegedly could have made *notional* trades in a *notional* securities basket, with the cash settlement amount being based on the cumulative performance of the theoretical securities positions.  In effect, petitioner argues that Deutsche Bank could have converted a Barrier Contract into what is commonly called a "naked" call option.

A "naked" call option occurs when an investor sells a call on stock he does not own.  "Naked" call options are extremely risky.  Because the

---

dividends paid on the underlying stock during the option period, and the premium price could be adjusted accordingly.  But petitioner supplied no evidence that this occurred here.  Rather, the Barrier Contracts were priced at a flat 10% of the "notional amount," i.e., the maximum amount of capital Deutsche Bank agreed to make available for investment in the reference baskets.  *See supra* pp. 19, 50–51.

**[\*61]** optionor has no stock to surrender when the optionee exercises the option, the optionor must pay cash out of pocket for every dollar by which the stock's closing price at expiration exceeds the strike price.

We reject this argument out of hand. First, the Barrier Contracts required that the underlying securities be purchased, providing that "[t]he Basket *shall be comprised of Shares* which shall be traded by the [Investment] Advisor." (Emphasis added.) When asked whether the Barrier Contracts permitted a naked call strategy, petitioner's expert Fabio Savoldelli and respondent's expert Prof. Tufano both opined that the Barrier Contracts did not.

Second, there is no evidence that Deutsche Bank ever considered pursuing a naked call strategy, which would have subjected it to unlimited upside risk. The securities basket was under GWA's control, and its composition changed daily according to GWA's investment strategies. *See supra* pp. 23, 27. Whenever GWA wished to extract gains from the basket, it could quickly manufacture the early termination of a Barrier Contract. *See supra* pp. 55–59. Under these circumstances, it is utterly implausible that a publicly traded bank would write naked call options on a $500 million investment portfolio.

Third, in the unlikely event that Deutsche Bank would choose to pursue a "naked" option strategy, the risk it would assume thereby would be of its own making. It would then face the possibility that it would need to come out of pocket for gains realized in the reference basket during a Barrier Contract's lifetime. But the decision to pursue a "naked" call strategy would be a decision Deutsche Bank would make *wholly apart* from its execution of the Barrier Contract. The "naked" call risk, in other words, would be *extrinsic* to the Barrier Contract. It would have nothing to do with the risk (if any) inherent in the "call option" itself.

Alternatively, petitioner contends that Deutsche Bank faced upside risk because it supposedly could "internalize" the basket's long positions and lend those securities to other customers who wished to sell the securities short. Petitioner hypothesizes a scenario in which Deutsche Bank had outstanding loans of basket securities on the "option" expiration date. If Deutsche Bank were unable to replace the lent securities with other securities in its inventory, and instead had to go into the market to repurchase the securities, it could theoretically be at risk from upward market movements in the interim.

**[\*62]** We find this argument wholly unconvincing, for at least four reasons:

• As explained *infra* pp. 81–82, there is no evidence that Deutsche Bank in fact lent to short sellers any shares held in any of the Barrier Contract reference baskets. The contract indicates that Deutsche Bank could not lend basket securities to short sellers unless GWA explicitly consented, and GWA was free to withhold its consent.

• If Deutsche Bank were to lend shares held in basket long positions, the risk that it would be unable to replace those shares in timely fashion would seem extremely small. Most basket securities were highly liquid, and the investment guidelines limited the size of individual stock positions. Prudent risk-management practices would dictate that Deutsche Bank find replacement shares well before the Barrier Contract expiration date. Petitioner's experts made no effort to quantify this alleged risk or ascertain whether it was meaningful.

• To the extent Deutsche Bank incurred any risk from securities lending, that risk was of its own making. The Barrier Contracts did not require Deutsche Bank to lend basket securities. If it did so, that would be a wholly unrelated business decision. Any risk it incurred thereby had nothing to do with the risk (if any) inherent in the "call option."

• The evidence established that Deutsche Bank's London office routinely derived income by lending securities held in its customers' prime brokerage accounts. Most prime brokers engage in this practice. *See supra* p. 10. Like any prime broker, Deutsche Bank thus bore a theoretical risk that, on any given day, the customer would decide to liquidate its long position, requiring Deutsche Bank to replace the securities before the closing date or come out of pocket for their cash value. If Deutsche Bank did lend any basket securities, the risk it incurred thereby was exactly the same risk that all prime brokers face when they lend securities in their customers' accounts. Needless to say, bearing this risk supplies no evidence that the prime broker "owns" the securities in the customer's account.

b.    *Downside Risk*

The owner of stock bears downside risk—the risk that the shares will decline in value. By writing a call option on his stock, the investor secures a degree of protection from downside risk, to the extent of the premium he receives. Returning to our example above, if Company A stock closed at 90 on the option expiration date, the option would expire

**[*63]** worthless. The optionor would realize a $1,000 gain on the option, which would precisely offset his $1,000 investment loss on the stock. The optionor would be protected from net downside risk as long as the stock did not close below 90, but he would remain exposed to the risk of the stock's declining below that price point.

The structure of the Barrier Contracts shows that Deutsche Bank bore no cognizable downside risk with respect to the securities positions in the reference baskets. That is because, in a loss scenario, the "option" would terminate automatically, with the basket securities being converted into cash before the "premium" had been exhausted. The cash plus the remaining "premium" would ensure that Deutsche Bank was repaid in full for the capital it advanced to GWA.

The economics may be illustrated most easily if we simplify the numbers somewhat. Assume that Deutsche Bank supplied capital of $100X in exchange for a "premium" of $10X. If the NAV Index Level declined to 97, Deutsche Bank would demand additional premium of $3X. If GWA paid the additional premium, Deutsche Bank would retain the $10X cushion with which it started (aggregate premium of $13X minus investment loss of $3X). The $10X cushion would continue to protect Deutsche Bank from downside risk.

If the NAV Index Level declined to 97 and GWA refused to pay additional premium, the contract would terminate and liquidation of the basket securities would begin. Assuming that liquidation of the basket securities was completed by the time the NAV Index Level reached 94, Deutsche Bank would get at least $94X in cash and would keep $6X of premium, refunding $4X to GWA. Deutsche Bank would thus be repaid $100X, the full amount of the capital it supplied for investment in the reference basket.

Large securities portfolios, of course, cannot be liquidated instantaneously, and it was possible that the NAV Index Level might decline below 94 before the reference basket was fully converted to cash. Suppose that it took several additional days in a brutal market to close out all the positions, by which time the NAV Index Level had declined to 92. Deutsche Bank would then get at least $92X in cash and would keep $8X of premium, refunding $2X to GWA. Deutsche Bank would again be repaid $100X, the full amount of the capital it supplied for investment in the reference basket.

**[\*64]** In each of these scenarios, Deutsche Bank would be insulated from any downside risk on its $100X capital investment. In asserting that Deutsche Bank nevertheless bore downside risk, petitioner urges the possibility that, under extremely distressed market conditions, the NAV Index Level might decline to (say) 88 before the securities in the reference baskets could be reduced to cash. If that scenario were to occur, the premium would be fully exhausted, and Deutsche Bank would face a loss of $2X (premium of $10X minus investment loss of $12X).

To assess the probability that this "nightmare scenario" might happen in the real world, both parties offered testimony from expert witnesses. We found the testimony of respondent's expert, Prof. Glasserman, most persuasive. Since 2000 he has held an endowed chair at Columbia Business School. He is the author of a treatise titled *Monte Carlo Methods in Financial Engineering*, a widely used reference for valuing derivative securities. He has written more than 100 articles in refereed journals focusing on statistical and probabilistic methodologies for financial applications.

To calculate the possibility that Deutsche Bank would ever suffer a loss on a Barrier Contract, Prof. Glasserman performed a "bootstrap simulation methodology." "Bootstrapping" is a widely used technique for conducting statistical tests and analyzing the distributional properties of data. A "bootstrap simulation methodology" generates a large number of potential paths for a securities portfolio by sampling returns from the portfolio's historical distribution of daily returns.

To implement this methodology Prof. Glasserman used GWA's trading data to compute daily returns on the NAV Index Level. He focused his analysis on Barrier Contract #1, which he determined to be the riskiest of the 10 contracts. Because it was the riskiest, using it for his analysis benefited petitioner.

Before being terminated, Barrier Contract #1 spanned a 6-year period. That period included bouts of extremely volatile market conditions, including the 2007 "Quant Quake" and the 2008–2009 financial crisis. Prof. Glasserman projected sample paths for the NAV Index Level throughout the full 12-year contract term by using a technique called "sampling with replacement."

Prof. Glasserman performed bootstrap simulations under four-day and seven-day liquidation scenarios. He chose a four-day period because the Barrier Contracts specified a four-day averaging period for

**[\*65]** securities settlements in the reference baskets. He chose an alternative seven-day period because, when GWA decided to terminate Barrier Contracts #7, #8, and #10, it told Deutsche Bank that liquidation of the portfolios would likely take five or six days, so as to minimize market disruptions. GWA's prediction proved pessimistic: WMSA began liquidating those positions on May 17, 2010, and most of the securities (valued at $790 million) were successfully liquidated that same day. All positions other than fractional shares were liquidated by May 19 (i.e., within three days). *See supra* pp. 38–39.

In his first set of simulations, Prof. Glasserman assumed that liquidation of the portfolio would begin when the NAV Index Level hit 97, triggering an "early expiration notice" to GWA. *See supra* p. 25. If GWA declined to pay additional premium, liquidation of the portfolio would begin immediately. Thus, liquidation of the securities beginning at NAV Index Level 97 was a very likely scenario.

Prof. Glasserman generated one million sample paths starting at 97, then counted how many paths ever reached 90. Assuming a four-day liquidation period, he found that only 35 of one million paths declined below 94, and that none declined below 90. Assuming a seven-day liquidation period, he found that the lowest NAV Index Level reached by any path was 92.34, and that no path declined below 90.

Prof. Glasserman observed that the most extreme negative one-day return for Barrier Contract #1 over its six-year life was −1.74%. In the highly unlikely event that GWA were to experience that maximum negative return *four days in a row*, the total loss would be less than 7%. Assuming the worst of all possible outcomes, therefore, the NAV Index Level would not decline from 97 to 90 during a four-day period even if *no securities* were liquidated.

As a "sanity check" on these findings, Prof. Glasserman used a "Black-Scholes" model to estimate the likelihood that the NAV Index Level would move from 97 to 90 in a 7-day period. He found the likelihood of this occurring to be essentially zero. As a further sanity check he assumed a 30-day liquidation period, an extremely unlikely scenario. He found that the NAV Index Level declined from 97 to 90 on between

**[\*66]** 0.0001% and 0.0069% of the sample paths (i.e., between 1 and 69 times out of one million paths).[22]

On the basis of these statistical results, Prof. Glasserman concluded that Deutsche Bank's risk of loss on the Barrier Contracts was "de minimis." This conclusion is not surprising given the composition of the reference basket. The investment guidelines reduced risk by requiring diversification of positions across numerous issuers, industries, and economic sectors. The guidelines also limited the size of individual stock positions. As Prof. Glasserman explained, this "helped ensure sufficient liquidity to facilitate unwinding the portfolio, if necessary."

Significantly, the positions in the reference baskets were mostly hedged long/short positions. "For portfolios following a Long/Short strategy," Prof. Glasserman observed, "market-wide movements should result in the long and short positions moving in opposite directions, thereby reducing the risk and volatility associated with general market moves." Prof. Tufano agreed that these investment restrictions, in conjunction with the expiration barriers, "ensured that the likelihood of [Deutsche Bank's] incurring a loss was expected to be remote."

Given the low-risk nature of the portfolio, Prof. Glasserman found it very unlikely that the NAV Index Level would ever decline even as low as 97, the point at which liquidation would begin if GWA did not pay additional premium. Using "single-day" and "block" bootstrapping approaches, he found that the NAV Index Level declined to 97 on only 6.5% to 8.9% of the million sample paths. "These results show that not only was it implausible that Deutsche Bank had any risk of loss associated with the Barrier Contracts, but also that the likelihood of even reaching [NAV Index Level 97] was small."

For these reasons, we conclude that Deutsche Bank bore no upside risk with respect to the Barrier Contracts and bore no cognizable

---

[22] Prof. Glasserman performed another set of simulations in which he made the unlikely assumption that liquidation of the portfolio would not begin until the NAV Index Level had fallen all the way to 94, the point at which the "option" automatically terminated. For this purpose he used two different types of simulation methodologies, "single-day" and "block" bootstrapping. Block bootstrapping caters to the possibility that short-term market trends may persist, and it thus samples "blocks" of consecutive returns rather than individual daily returns (Prof. Glasserman used ten-day blocks). Employing these two approaches, he found that the NAV Index Level declined from 94 to 90 on between 0.0009% and 0.0659% of the sample paths (i.e., between 9 and 659 times out of one million paths). "Even on these extreme conditions," he concluded, "the likelihood of loss for Deutsche Bank is remote."

[*67] downside risk with respect to the underlying securities positions. Because Deutsche Bank did not bear the risks borne by a true optionor, the Barrier Contracts were not genuine "call options."

8.      *Lack of "Optionality" for GWA*

Fundamental to every genuine option is the "truly alternative choice" of whether to exercise the option or allow it to lapse. *Freddie Mac*, 125 T.C. at 259 (quoting *U.S. Freight Co. & Subs. v. United States*, 422 F.2d 887, 895 (Ct. Cl. 1970); *see Halle v. Commissioner*, 83 F.3d at 653–54 (first citing Restatement (Second) of Contracts § 25 cmt. a (1979); and then citing *Estate of Franklin*, 64 T.C. at 762–63). An optionee will choose to exercise a standard European-style call option when the value of the underlying asset exceeds the strike price at expiration. If the asset is worth less than the strike price at that time, a rational optionee will let the option lapse.

GWA had no "truly alternative choice" about whether it would exercise a Barrier Contract or allow it to lapse. Assume that the securities basket appreciated (gain scenario), as it did for every Barrier Contract. GWA would then choose to exercise in order to receive a cash settlement amount roughly equal to its net securities gains plus the premium refund.

But GWA would also choose to exercise if the basket securities had declined in value (loss scenario), because the premium refund would more than offset its investment loss. For example, assume that Barrier Contract #1 (with a $500 million "notional "amount" and a $50 million "premium") finished at NAV Index Level 98 upon expiration, corresponding to an investment loss of $10 million. GWA would choose to exercise because it would receive $40 million (premium refund of $50 million minus investment loss of $10 million). Under every scenario that did not result in a knockout, GWA was incentivized to exercise the "option."

If the securities basket suffered particularly sharp losses, resulting in a knockout, there was no plausible possibility of lapse because the contract would then terminate automatically. GWA would again receive a positive cash payout—a premium refund in excess of its securities loss. For example, assume that the contract "knocked out" and that the NAV Reference Index fell to 92 by the time the portfolio was converted to cash. GWA would then receive $10 million (premium refund of $50 million minus investment loss of $40 million). GWA would fail to receive a

**[\*68]** positive payout only if the Index Level fell below 90 before the portfolio was liquidated. But as explained *supra* pp. 64–66 & note 22, there was essentially zero chance of that happening. Thus, whether a Barrier Contract produced a gain, a modest loss, or a knockout scenario, GWA would always receive a positive payout and would never rationally choose to let the "option" lapse.

Because the possibility of lapse was absent, GWA occupied the same economic position as an investor who is obligated to buy the underlying reference asset. *Cf. Progressive Corp. & Subs. v. United States*, 970 F.2d 188, 194 (6th Cir. 1992) (remanding to the District Court for a "determination of whether [certain] call options . . . were so deep-in-the-money as to be the equivalents of the contractual obligations to sell"). Occupying this position is antithetical to holding a true call option, which gives the optionee exposure to the reference asset without imposing on him any obligation to buy it. As a rational investor, GWA was *bound* to acquire the basket securities (or more precisely their net cash value). The Barrier Contracts thus lacked the optionality that is fundamental to all true options. *See Freddie Mac*, 125 T.C. at 259.

This same bottom line—the absence of "optionality"—can be shown in several other ways. The price of a call option is the sum of its "time value" and its "intrinsic value." *See supra* p. 14. "Time value," measured by delta, is essentially a measure of "optionality." As the delta of an option approaches 1, its value begins to change dollar for dollar with changes in the value of the underlying asset. The pricing relationship between a "delta-1" option and its underlying asset is thus said to be "linear." A delta-1 option has no time value; its value consists entirely of its intrinsic value.

Deutsche Bank marketed the Barrier Contracts to GWA as "provid[ing] delta-1 exposure to [an] underlying reference portfolio." *See supra* p. 19. And that is exactly what the Barrier Contracts did, from Day 1. Barrier Contract #1, for example, carried a "premium" of $50 million. If it expired immediately—i.e., on the Trade Date—GWA would be paid $50 million: the Basket Base Performance ($0) plus the premium refund ($50 million). The intrinsic value of the "option"—its value if it were to expire immediately—was thus $50 million.

Because the intrinsic value of the "option" was $50 million, its time value was necessarily zero. Petitioner's experts could not explain how a genuine call option with a 12-year term could have a time value

**[\*69]** of zero. The fact that the Barrier Contracts had a time value of zero shows that they lacked optionality.

Each Barrier Contract was ostensibly issued "at the money." That is because it had a nominal strike price at NAV Index Level 100, the level at which the reference basket had no net gain or loss. Owing to the premium refund feature, however, the actual strike price in economic terms was at NAV Index Level 90: That was the point at which GWA would always choose to exercise because it would receive a positive payout. And there was essentially no chance the NAV Index Level would ever fall below 90. In economic terms, therefore, the "option"—while ostensibly issued at the money—was actually so deep-in-the money from the outset that GWA was always bound to exercise it.

As Prof. Glasserman convincingly shows, the value of the "option" changed dollar for dollar with the value of the reference basket from NAV Index Level 90 upwards. The relationship between the "option" and the reference assets was thus 100% linear. This is yet another indication that the Barrier Contracts lacked optionality.

The Barrier Contracts lacked optionality, not only because they provided GWA linear exposure to the reference basket's upside potential, but also because they offered GWA no meaningful "downside protection." When an investor buys a call option on stock, he is said to enjoy "downside protection" vis-à-vis an investor who buys the stock outright. *See supra* p. 13. That is because an investor who buys stock is exposed to the stock's full downside risk, whereas the option buyer is at risk only for the premium he pays.

In a standard call option, this downside protection kicks in when the stock declines below a price equal to the strike price minus the premium. For example, assume that an investor buys a call on Company A stock at a strike price of $100, paying a premium of $10. The "downside protection" for the call buyer, relative to the stock owner, kicks in when the stock price declines below $90. That is the point at which the option buyer is better off than the stock owner: The option buyer can never lose more than $10, whereas the stock owner has unlimited downside risk.

For the Barrier Contracts, the "downside protection" for GWA—as a putative optionee, as opposed to a securities owner—would kick in when the NAV Index level declined below 90, the point at which the "premium" would be exhausted. But the two barrier features—the early expiration notice at 97 and the automatic termination at 94—ensured

**[*70]** that the contract would terminate, with the reference baskets being liquidated to cash, before the 90 level would ever be reached. *See supra* pp. 25, 64–66. The downside protection ostensibly provided to GWA was thus illusory: The early expiration process built into each Barrier Contract forced the contract to terminate before the investment loss could exceed the "premium," ensuring that the contract always finished in the money. We thus agree with Prof. Glasserman's conclusion that the early expiration barriers "eliminated the economic structure of a call option" because they "eliminate[d] the optionality and the downside protection" that call options ordinarily provide.[23]

B. *Ownership of the Underlying Securities*

Having considered "the substance and economic realities of the transaction[s]," *see Frank Lyon*, 435 U.S. at 582, we find that the Barrier Contracts in substance were not call options because they lacked the essential economic and legal characteristics of genuine options. Eight different factors point to that conclusion, including the premium refund feature, the irregular pricing, the unusually long term, the constantly changing reference property, the de jure or de facto early termination rights, the treatment of dividends, the lack of risk to Deutsche Bank, and the lack of optionality to GWA.

Besides negating "option" characterization, these factors simultaneously point to the true nature of the arrangement—a prime brokerage account in which GWA held and traded the basket securities, financed by a margin loan from Deutsche Bank at 10-to-1 leverage, with the "premium" serving as collateral for that loan. Respondent contends that GWA in substance owned the basket securities during the life of each Barrier Contract, and that GWA was thus required to realize and recognize its trading profits on an annual basis under section 1001. Whether

---

[23] Petitioner contends that, even if the Barrier Contracts are not "options" within the meaning of section 1234, they are nevertheless "derivatives," with the supposed result that gain on their termination must be treated under section 1234A as "gain . . . from the sale of a capital asset." The term "derivative" does not appear in section 1234A, and it is nowhere defined in the Code. It is a term of extremely broad scope, literally including anything that derives its value from something else. If the Barrier Contracts are not call options, petitioner has failed to identify what other type of financial instrument they could be that would justify the tax treatment claimed on GWA's returns. But it ultimately does not matter what label—"option" or "derivative"—is attached to the Barrier Contracts, because in neither case does the substance match the form. As we show below, GWA did not own a distinct asset that *derived its value from* the basket securities. Rather, GWA owned the *basket securities themselves* in substance.

**[\*71]** GWA was in substance the owner of the basket securities for Federal income tax purposes is a question of fact. *See Calloway v. Commissioner*, 135 T.C. 26, 33 (2010), *aff'd*, 691 F.3d 1315 (11th Cir. 2012).

This Court and other courts have developed and applied various multifactor tests to determine whether a party has acquired the "benefits and burdens of ownership." *Anschutz Co. v. Commissioner*, 135 T.C. 78, 105 (2010), *aff'd*, 664 F.3d 313 (10th Cir. 2011); *Calloway*, 135 T.C. at 39–43; *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–38 (1981); *see Altria Grp.*, 658 F.3d at 289–90 (affirming district court's instruction that jury consider "whether Altria acquired and retained the benefits and burdens of ownership"); *Bailey v. Commissioner*, 912 F.2d 44, 47–48 (2d Cir. 1990) (affirming this Court's "benefits and burdens of ownership" analysis), *aff'g in relevant part* 90 T.C. 558 (1988). The courts have accorded varying weight to different factors, depending on the type of property involved and the type of transaction at issue. *See, e.g.*, *Calloway v. Commissioner*, 691 F.3d at 1327–28; *cf. Ragghianti v. Commissioner*, 71 T.C. 346, 349–50 (1978) (adopting multifactor test to determine ownership of stock), *aff'd*, 652 F.2d 65 (9th Cir. 1981) (unpublished table decision). Factors that the courts have deemed salient in determining the ownership of securities include (1) risk of investment loss, (2) opportunity for investment gain, (3) the ability to select and control the securities for investment, and (4) the right to exercise other prerogatives of ownership.

This Court has also employed the "investor control" doctrine to determine the true ownership of investment assets. *See Webber v. Commissioner*, 144 T.C. 324 (2015); *Pascucci v. Commissioner*, T.C. Memo. 2024-43, at \*10. This doctrine posits that, while ownership of securities is presumed to rest with the titleholder of the account in which the securities reside, the investor who benefits from that account will be considered its owner if his "incidents of ownership over those assets become sufficiently capacious and comprehensive." *Webber*, 144 T.C. at 350; *see Pascucci*, T.C. Memo. 2024-43, at \*10. We have said that "[t]he core 'incident of ownership' is the power to select investment assets by directing the purchase, sale, and exchange of particular securities." *Webber*, 144 T.C. at 361. Other "incidents of ownership" include the powers to

**[*72]** extract cash from the account and to deploy the securities synergistically to bolster the investor's other investment positions. *Ibid.*[24]

### 1. *Risk of Investment Loss*

A hallmark of ownership in property is bearing the economic risk of loss while enjoying the opportunity for gain. *See Frank Lyon*, 435 U.S. at 582–83 (discussing taxpayer's potential risk of loss if its lessee declined to exercise the purchase option); *Webber*, 144 T.C. at 370–71; *Anschutz*, 135 T.C. at 105–06 (finding that ownership in stock had transferred where transferee had "all risk of loss and most of the opportunity for gain"); *Calloway*, 135 T.C. at 43–44. Respondent contends that Deutsche Bank, while holding title to the basket securities in form, did not own those securities in substance because it bore essentially no risk of loss. For the reasons stated *supra* pp. 62–67, we agree.

The Barrier Contracts had stop-loss features that kicked in when the NAV Index Level hit 97 and/or 94. These early expiration barriers ensured that the contracts would terminate automatically, with the basket securities being liquidated to cash, before the premium (margin) furnished by GWA was exhausted. GWA's collateral provided a cushion that insulated Deutsche Bank from any loss, so long as the NAV Index Level remained above 90.

Deutsche Bank's downside investment risk was thus limited to the possibility that NAV Index Level might decline below 90 before the basket securities were fully liquidated. But if GWA declined to pay additional premium, liquidation of those assets would begin when the NAV Index Level hit 97. As Prof. Glasserman demonstrated using various alternative bootstrap simulations, the possibility that the NAV Index Level would decline to 90 during the liquidation process was essentially zero. *See supra* pp. 64–66 & note 22. The fact that Deutsche Bank bore no cognizable downside investment risk with respect to the basket

---

[24] Petitioner contends that the "investor control" doctrine applies only in situations involving annuities or insurance. We disagree. The doctrine is derived from Supreme Court case law addressing the question of asset ownership in a variety of investment contexts. *See Webber*, 144 T.C. at 351–53. In *Webber* the taxpayer urged that the doctrine applied only to annuities and should not be extended to life insurance contracts. *See id.* at 369. We rejected that argument: "To the extent the 'investor control' doctrine seeks to limit misuse of tax-favored investment assets, there is no good reason to limit its application to annuities." *Id.* at 371. The logic underpinning the "investor control" doctrine applies regardless of the particular financial arrangements under which the investment securities are held.

**[\*73]** securities is strong evidence that it did not own those securities in substance.

To support its position that Deutsche Bank bore a risk of loss that was not de minimis, petitioner offered testimony from John Montgomery, an expert in financial economics. Dr. Montgomery based his analysis on a predictive statistical method called the Generalized Autoregressive Conditional Heteroskedastic (GARCH) model. Although we appreciate Dr. Montgomery's credentials, we did not find his methodology as reliable as Prof. Glasserman's as applied to the facts here.

As Prof. Glasserman explained, Dr. Montgomery's GARCH simulations produced hypothetical sample paths for the portfolio returns that were not anchored in the actual performance of the Barrier Contracts. His model forecasted extremely high levels of volatility, which failed to account for the fact that most reference basket positions were hedged long/short positions, which tend to reduce volatility. *See supra* pp. 27, 66. Even so, under most of his simulations Dr. Montgomery found that the probability of Deutsche Bank's bearing a loss was less than 1%, and in one instance as low as 0.34%.[25]

Petitioner errs in citing *Freddie Mac*, 125 T.C. 248, to support his view that Deutsche Bank faced a meaningful risk of loss. In that case Freddie Mac, the optionor, offered to buy mortgages from mortgage originators, the optionees. In exchange for paying a nonrefundable 50-basis-point "commitment fee," the originator acquired the right, but not the obligation, to sell a particular mortgage to Freddie Mac. By paying this fee, the originator protected himself from the risk that the deal would not close, in which case he could be in default because he would have no mortgage to deliver. *Id.* at 264. We held that the nonrefundable commitment fee was a genuine put option premium, even though about 99% of the optionees ultimately exercised their options. *Id.* at 266.

From these facts petitioner seeks to extrapolate that Freddie Mac, the optionor, faced a 1% risk of loss and that a 1% risk of loss is sufficient to characterize a transaction as an "option." This extrapolation is ill

---

[25] Dr. Montgomery concluded that Deutsche Bank could conceivably bear a 1% risk of loss, basing his analysis on the entire portfolio of Basket Securities underlying all of the Barrier Contracts. Considering only Barrier Contract #1, the riskiest contract, he concluded that Deutsche Bank faced at most a 2% likelihood of realizing a loss. If we were to accept these worst-case possibilities, we would still conclude that GWA owned the securities in substance when all elements of the "benefits and burdens" analysis are considered.

[*74] founded. In *Freddie Mac* we considered the 99% exercise rate in determining whether the contract had *optionality* from the standpoint of *the optionee*. *Ibid.* We concluded that it did, reasoning that the "originators were apparently willing to pay a premium for the option because they were uncertain about when or whether they would in fact have a mortgage" to deliver. *Ibid.* Our opinion did not seek to quantify—indeed, it did not address—the investment risk faced by Freddie Mac as optionor. But assuming arguendo that a 1% risk of loss constitutes a significant threshold, Prof. Glasserman's analysis shows that Deutsche Bank's risk of loss in the Barrier Contracts was substantially below 1%.

The fact that Deutsche Bank bore essentially no risk of loss on the Barrier Contracts necessitates the conclusion that virtually all downside risk was borne by GWA. Normally, the owner of securities bears unlimited downside risk. But as Dr. Tufano explained, the knockout barriers built into the arrangement ensured that the contract would terminate automatically, with the basket securities being liquidated to cash before the "premium" was exhausted.

In short, while GWA in substance owned the securities for the life of the Barrier Contract, the knockout features ensured that GWA would *cease to own* those securities before it could incur a loss in excess of the margin it supplied. GWA, in other words, bore with respect to the basket securities the maximum amount of downside risk that was possible under the Barrier Contracts—the risk that the NAV Index Level would fall to 97, 94 or (in the worst case scenario) 90 before the portfolio was liquidated to cash. The fact that GWA bore all possible downside risk is consistent with the conclusion that it owned the securities in substance.

### 2. *Opportunity for Investment Gain*

The owner of securities is entitled to enjoy their full upside potential. But while the securities positions in the reference baskets were titled in Deutsche Bank's name, Deutsche Bank had zero opportunity for investment gain. Each Barrier Contract had a nominal strike price corresponding to NAV Index Level 100, at which point the basket had no gain or loss. If the securities appreciated, the NAV Index Level would close above 100, GWA would invariably exercise the "option," and GWA would capture 100% of the investment gain through the Basket Base Performance. *See supra* pp. 25–27.

Deutsche Bank's only possibility for investment gain would be through the "option premium." By receiving a "premium" of $10X,

**[\*75]** Deutsche Bank would participate in investment gains, at least indirectly, up to the point where the NAV Index Level hit 110. But by refunding 100% of the "premium" to GWA upon exercise of the "option," Deutsche Bank forfeited any opportunity to profit from appreciation in the value of the basket securities.

The premium for a call option compensates the optionor for bearing upside risk, i.e., for surrendering to the optionee all or part of the underlying asset's upside potential. By refunding the "premium" to GWA upon exercise of the "option," Deutsche Bank waived all consideration for surrendering to GWA 100% of the upside potential of the basket securities. *See supra* pp. 47–49. This indicates that Deutsche Bank regarded the upside potential of those securities as belonging, not to it, but to GWA.

Because Deutsche Bank could not profit from appreciation in the value of the basket securities—by retention of the "premium" or otherwise—the Barrier Contracts offered it no opportunity for investment gain. Instead, its compensation consisted solely of the leverage fees it received for supplying financing to GWA, the ticket charges it received for trades executed in the securities basket, and the opportunity to earn interest on the $10X of collateral GWA supplied. These forms of profit do not constitute "investment gain" realized by the owner of securities. Rather, they constitute ordinary business income of a prime broker that lends money to a customer who holds and trades securities in a margin account.

Conversely, the Barrier Contracts ensured that 100% of the investment gain would accrue to GWA. As Deutsche Bank's own promotional materials made clear, the arrangement provided the customer with "delta-1 exposure to [an] underlying reference portfolio" of securities. "Delta-1 exposure" meant that changes in the value of the basket securities would be reflected dollar for dollar in the value of the "option." Prof. Glasserman's analysis confirmed that GWA's exposure was indeed "delta-1," because the relationship between the basket securities and the option was 100% linear from NAV Index Level 90 upwards. *See supra* p. 69. Because that relationship was linear, every dollar of investment gain attributable to the securities portfolio would be paid to GWA upon exercise or termination of the "option." This constitutes powerful evidence that GWA in substance owned the basket securities for the life of each Barrier Contract.

**[\*76]**      3.      *Control over Investment Assets*

"The core 'incident of ownership' is the power to select investment assets by directing the purchase, sale, and exchange of particular securities." *Webber*, 144 T.C. at 361; *see Calloway*, 135 T.C. at 36 (finding that the transferee owned stock over which he exerted "complete control"). When an investor exercises unfettered control over the trading of securities in an investment account, he may be deemed the true owner of those securities even though he lacks formal title to them. *See Christoffersen v. United States*, 749 F.2d 513, 515–16 (8th Cir. 1984) (finding that taxpayers owned securities titled to an insurance company where the "premium" they paid was used to acquire investment assets that they selected and controlled).

The *Webber* case illustrates this principle well. *See Webber*, 144 T.C. at 361–65. The taxpayer there created a grantor trust that purchased "private placement" life insurance policies from an insurer. *Id.* at 328–29. The taxpayer and his relatives were the beneficiaries of the policies. *Id.* at 325, 329–31. The premiums paid by the trust were placed in segregated accounts linked to the policies. *Id.* at 325, 349. The payout on the policies was determined by the performance of the assets in the segregated accounts, which were nominally titled to the insurance company. *Id.* at 325, 331–32.

The money in the segregated accounts was used to purchase investments in startup companies with which the taxpayer was intimately familiar and in which he otherwise invested personally and through funds he managed. *Id.* at 325, 337. Through an intermediary, the taxpayer dictated both the companies in which the segregated accounts would invest and all actions taken with respect to those investments. *Id.* at 325, 364–65. We found that the taxpayer "enjoyed the unfettered ability to select investments for the separate accounts by directing the Investment Manager to buy, sell, and exchange securities and other assets in which [the taxpayer] wished to invest." *Id.* at 361.

In determining whether the taxpayer owned the underlying securities, we considered whether "he retained significant incidents of ownership" over them. *Id.* at 360. In making that assessment, we noted that "[t]echnical considerations, niceties of the law * * *, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes should not obscure the basic issue." *Ibid.* (quoting *Helvering v. Clifford*, 309 U.S. 331, 334 (1940)). Rather, we focused on the actual level of "control over investment" that the taxpayer exercised. *Ibid.*

[*77] (quoting *Helvering v. Clifford*, 309 U.S. at 335). Taking into account the taxpayer's unfettered control over the investment portfolio and other incidents of ownership he possessed, we held that he "owned the separate account assets for Federal income tax purposes." *Id.* at 368. He was therefore taxable annually on "all dividends, interest, capital gains, and other income" generated by the assets underlying the insurance policies. *Ibid.*

The reference baskets underlying the Barrier Contracts in this case are precisely analogous to the segregated accounts underlying the insurance policies in *Webber*. And the control GWA exerted over the securities in the reference baskets was—if anything—more capacious than the control that the taxpayer in *Webber* enjoyed.

Through Quaker Partners, Weiss Associates, and WMSA—all of which it controlled—GWA had complete power to direct trades in the securities baskets without Deutsche Bank's prior approval. GWA traded the securities actively: On average, it effected trades of 268 unique securities every trading day from April 2003 to May 2010. And it selected the securities to hold and trade using the same long/short strategies that its affiliates used in their other portfolios.

From 2006 through 2010, each trading team deployed its particular trading strategy across all Weiss-affiliated accounts, including the Barrier Contracts, "outside money," and OGI prime brokerage. WMSA's traders did not even know the account or fund to which their trades would be settled. Rather, once a trade had been executed, a computer-based accounting system allocated the trade pari passu (i.e., proportionally) across all of the funds. GWA's trading of the basket securities was quite literally *a subset* of the trading in which the Weiss-affiliated companies generally engaged. It is difficult to imagine more comprehensive control than this.

Petitioner insists that GWA lacked control over trading activity in the securities baskets because the advisory agreements included "strict guidelines and restrictions" that supposedly "removed discretion from [Quaker Partners]" in terms of what could be traded. We reject petitioner's characterization of the IAA guidelines and restrictions as "strict," either on their face or as applied. The guidelines directed Quaker Partners to pursue a "long/short statistical arbitrage" strategy. But that was the strategy GWA was already pursuing in all of its portfolios and that it wished to pursue—pari passu—in the Barrier Contract reference baskets. That is hardly a "restriction."

**[*78]** The investment guidelines required diversification of positions across numerous issuers, industries, and economic sectors. But these specifications were prudent risk-reduction measures to which GWA and Deutsche Bank mutually agreed; by reducing risk they benefited both parties. The investment guidelines also limited the size of individual stock positions. But as Prof. Glasserman explained, this specification "helped ensure sufficient liquidity to facilitate unwinding the portfolio, if necessary." By reducing risk, this specification likewise benefited both parties.

By operation of the "Trade Restricted List," the investment guidelines prevented the reference baskets from including securities positions that could generate a conflict of interest for Deutsche Bank. *See supra* p. 23. But if GWA requested the trade of a security on that list, Deutsche Bank's order management system automatically redirected the trade to OGI's prime brokerage account. Because GWA was permitted to shift any "restricted trades" to another Deutsche Bank account under its control, this aspect of the investment guidelines imposed no meaningful restriction.

Besides being far from strict on their face, the investment guidelines were not rigorously enforced in practice. The securities baskets were ultimately allowed to hold shares in "special purpose acquisition companies," which are regarded as risky assets, as well as other assets nominally forbidden by the IAAs. When a guideline violation was flagged for correction, Deutsche Bank sometimes allowed Quaker Partners to cure it on a nonurgent basis (if at all) without imposing penalties for breaches. In the view of Ms. Beder, a hedge-fund expert, this behavior was contrary to standard industry practice. She opined (and we agree) that Deutsche Bank's failures to assiduously enforce the guidelines show that it did not view itself as bearing meaningful risk under the Barrier Contracts, so long as the "Trade Restricted List" was honored. From Deutsche Bank's standpoint, any negative consequences caused by nonenforcement would redound to the detriment of GWA, which had all the upside potential and bore all the downside risk.

The exceedingly low "advisory fee" that Deutsche Bank paid to Quaker Partners indicates that the latter discharged no independent function but was simply a conduit or "rubber stamp" for GWA's investment decisions. The amount of that fee—a flat 1% of the "premium," or 0.1% of the "notional amount"—was far lower than the "two-and-twenty" fee structure commonly charged by hedge fund advisors. As Ms. Beder credibly testified, no independent investment advisor would agree to

**[\*79]** perform its services for such a pittance. *Cf. Webber*, 144 T.C. at 332, 361–64 (finding the $1,000 annual advisory fee indicative of the investment manager's acting as a "rubber stamp" for the taxpayer's investment decisions). And besides being modest on paper, the advisory fees were illusory in practice: At the termination of each Barrier Contract, Deutsche Bank recouped 100% of the advisory fees via reduction to the cash settlement amount paid to GWA. *See supra* pp. 25–26, 31.[26]

In sum, despite the web of entities and advisory agreements, we conclude that GWA possessed "[t]he core 'incident of ownership'" over the reference baskets, namely, the power to select and trade the securities in them. *See Webber*, 144 T.C. at 361. The restrictions imposed by the IAAs and investment guidelines were minimal, and they did not prevent GWA from managing the portfolio using the same strategies deployed in all other Weiss-affiliated portfolios. Most investment managers operate within certain guidelines, self-imposed or otherwise. Managers of mutual funds commonly have sector-specific and diversification guidelines, and trustees are commonly precluded from investing in risky assets that could endanger the trust corpus. At the end of the day, the fact that GWA operated within investment guidelines sheds little light on whether it had "the power to select investment assets by directing the purchase, sale, and exchange of particular securities." *Ibid.* It is clear that GWA possessed that power at all times, and this constitutes strong evidence that it owned the basket securities in substance.

### 4.    *Other Benefits and Burdens of Ownership*

The optionee on a true call option has no ownership rights over the underlying security unless and until it exercises the option. By contrast, GWA enjoyed significant benefits of ownership over the basket

---

[26] If the "option" form of the transaction were taken seriously, the investment advisory arrangement would seem to involve a conflict of interest. Ostensibly, Deutsche Bank owned the basket securities and chose Quaker Partners as the investment advisor to manage the portfolio. As investment advisor, Quaker Partners owed a fiduciary duty to Deutsche Bank, the putative optionor. But Quaker partners was controlled by GWA, the putative optionee. Normally, the interests of optionor and optionee are adverse—the optionor hopes the option will expire worthless, whereas the optionee hopes it will increase substantially in value. If the Barrier Contracts were true "options," it is hard to see how Quaker Partners could serve two masters with divergent interests. But if the transaction is recharacterized to match its substance, the conflict disappears. Deutsche Bank had no horse in the race because it had no upside potential or downside risk; GWA in substance owned the securities; and GWA (through Quaker Partners and WMSA) was managing its own securities portfolio consistently with its own best interests.

**[\*80]** securities—and it bore significant burdens of ownership—during the life of each Barrier Contract.

GWA received—with a time lag—all dividends and other distributions paid on stock held in "long" positions within the reference baskets. All such distributions increased the "Basket Base Performance" and thus the cash settlement amount paid to GWA upon exercise or termination of the "options." As the nominal owner of the shares held in long positions, Deutsche Bank as optionor should have enjoyed those dividends. The fact that GWA received them is consistent with the conclusion that it was the owner of the basket securities in substance. *See Pac. Coast Music Jobbers, Inc. v. Commissioner*, 55 T.C. 866, 876–78 (1971) (finding receipt of dividends to be a factor indicating ownership of stock), *aff'd*, 457 F.2d 1165 (5th Cir. 1972).

Conversely, GWA bore economic liability for dividends declared on stock held in "short" positions within the reference baskets. That is because these dividends were included in "Basket Losses and Expenses," which decreased the "Basket Base Performance" and thus reduced the cash settlement amount paid to GWA upon exercise or termination of the "options." *See supra* pp. 25–26. As the supposed "borrower" of the shares sold short, Deutsche Bank should have borne that liability.

The other "Basket Expenses" borne by GWA are likewise consistent with the conclusion that it owned the basket securities in substance. The costs that GWA incurred for participation in the Barrier Contracts were substantially identical to the costs of holding and trading securities on margin in a prime brokerage account. Deutsche Bank's March 2003 pricing proposal indicated that it would charge financing fees for the capital it supplied in the Barrier Contracts at one of three interest rates, depending on the value of the basket securities. These financing fees were identical to the fees Deutsche Bank charged customers for leverage in its prime brokerage accounts. The "ticket charge" for each trade executed in the securities basket ($3) was also identical to the commission Deutsche Bank charged for trades in a prime brokerage account. If Deutsch Bank owned the basket securities, why did GWA defray the costs of trading them?

GWA received settlement payments from class action and shareholder derivative lawsuits filed on behalf of companies whose stock was held in the reference baskets. On its 2009 return GWA reported $127,925 in class action settlement proceeds—all received in connection with basket securities—as "other long term capital gains."

**[\*81]** Mr. Kleinman, the CFO of GWA, signed class action claim forms on its behalf. His name appears on checks made out to GWA reflecting payment of such proceeds. In 2010 GWA directed Deutsche Bank to deposit class action settlement checks into its MAPS account. It then directed that the settlement proceeds be transferred to its account at Deutsche Bank, followed by onward transfer of those funds to OGI's prime brokerage account. If Deutsche Bank was the owner of the basket securities, it is hard to understand why GWA received these payments.

There was some dispute at trial as to whether Deutsche Bank possessed, as an incident of ownership over the basket securities, the right to lend those securities to other Deutsche Bank customers who wished to sell the securities short. We found the evidence inconclusive as to whether Deutsche Bank possessed this right. Even if it were thought to have had this right, that would not constitute evidence that it owned the basket securities.

The letter agreement covering the first Barrier Contract provided: "Neither the Transaction nor any Option nor any interest or obligation in or under the Transaction or any Option may be transferred, pledged, or hypothecated (whether by way of security or otherwise) by either party without the prior written consent of the other party." We interpret this prohibition to mean (among other things) that Deutsche Bank could not lend basket securities to short sellers unless GWA explicitly consented. GWA was free to withhold such consent. No evidence was submitted at trial to establish that Deutsche Bank in fact lent or "hypothecated" to short sellers any shares held in any of the Barrier Contract reference baskets.

Several employees of Deutsche Bank's London office testified that the bank routinely derived income by lending, to short sellers, securities held in customer accounts. As best we could tell, this testimony chiefly related to the bank's practices with respect to prime brokerage accounts generally, as opposed to shares held in Barrier Contract reference baskets specifically.

Assuming arguendo that Deutsche Bank had the theoretical right to lend shares held in the Barrier Contract reference baskets, that would not constitute evidence that the bank owned those shares. As the testimony recited above indicated, Deutsche Bank routinely lent shares held in the prime brokerage account of Customer A to other Deutsche Bank customers who wished to sell those shares short. Needless to say, this

[*82] does not mean that Deutsche Bank owned the shares in Customer A's account.

One incident of ownership over common stock is the right to vote the shares. *See Anschutz*, 135 T.C. at 99–100, 105–07. Voting rights are typically most consequential when the company is privately held. *Cf. Webber*, 144 T.C. at 364–65 (determining ownership where taxpayer directed voting with respect to closely held stock in nonpublic startup companies). Virtually all the long equity positions in the reference baskets consisted of stock in publicly traded companies. As the holder of record title to these shares, Deutsche Bank automatically had the right to vote the shares. But GWA, on at least some occasions, instructed the bank on how it wished the shares to be voted—a prerogative not normally enjoyed by the optionee on a call option. The record includes very little evidence concerning the frequency with which GWA issued such instructions or the regularity with which Deutsche Bank followed them. All in all, we give little weight to the exercise of voting rights in determining whether GWA was the owner of the basket securities in substance.

5.    *Ability to Extract Cash*

A taxpayer's ability to extract cash at will from investment assets may support a determination that he is the true owner of the securities, even if he does not hold literal title to them. In *Webber*, for example, the securities were titled to an insurance company and were held in separate accounts underlying a life insurance policy, of which the taxpayer and his family members were beneficiaries. *See Webber*, 144 T.C. at 325, 329–31. We held that the taxpayer in substance owned the underlying securities, relying in part on the fact that he extracted more than $1 million cash without resort to policy loans. *See id.* at 357, 365–67; *see also Christoffersen*, 749 F.2d at 515 (finding that taxpayers could generate cash payouts from a separately held account keyed to the account's accumulated value).

In form, the Barrier Contracts were European-style options that could be exercised only on the expiration date. As the value of the basket securities increased, the "equity value" of the contract would increase pro tanto. But GWA was ostensibly prohibited from accessing that equity value—i.e., from wringing cash out of the "option"—until the expiration date of the contract, which was 12 years away.

In substance, GWA was able to access the cash value of the basket securities at any time of its choosing. It could do this in two ways: (1) it

[*83] could take advantage of its MNA with Deutsche Bank and (2) it could terminate a Barrier Contract early and receive the cash value of the portfolio whenever it desired. These facts are consistent with the conclusion that the Barrier Contracts were not options and that GWA in substance owned the underlying securities.

### a. *Master Netting Agreement*

The MNA permitted cross-collateralization between GWA's MAPS account and the accounts that other GWA affiliates held at Deutsche Bank. GWA could thus pledge the equity value in a Barrier Contract reference basket as collateral for the margin loan that Deutsche Bank extended to OGI through the latter's prime brokerage account. OGI often drew on this line of credit, then lent the proceeds back to GWA through an interest-free loan. In this and other ways GWA had the de facto ability to access the cash value of the barrier "option" at any time of its choosing.

As Mr. Doucette acknowledged, "[h]istorically we have been able to fund the operating expenses of our business by borrowing against the excess equity value of the [barrier] option." The operating expenses thus funded included payroll, rent, and employee bonuses. GWA used borrowed funds—all collateralized by the equity value in the Barrier Contracts—to acquire positions in OGI's prime brokerage account that could not be maintained in a Barrier Contract reference basket without violating investment guidelines. GWA also used OGI-borrowed funds to acquire positions at other financial institutions, which had the effect of reducing GWA's counterparty exposure to Deutsche Bank.

Petitioner insists that GWA *itself* could not extract cash from the Barrier Contracts, noting that OGI was the borrower on these loans. But OGI was a disregarded entity wholly owned by GWA. Because OGI was a disregarded entity, all activities in which it engaged are deemed for tax purposes to have been engaged in by GWA. OGI was able to secure these loans only because GWA pledged the equity value of the Barrier Contract to collateralize the loan. In economic reality, therefore, GWA was the borrower: It enabled the loans by posting the collateral, and it enjoyed the benefit of the loans by receiving the cash proceeds.

Petitioner asserts that OGI must be regarded as the borrower because OGI's margin loans were "recourse" to OGI. This is a meaningless assertion: OGI was a disregarded entity of GWA, and OGI's obligations were GWA's obligations. GWA provided Deutsche Bank with a

[*84] guaranty, dated April 15, 2003, by which GWA guaranteed repayment of all of OGI's liabilities and obligations to Deutsche Bank. Asserting that OGI's margin borrowings were "recourse" to OGI is just another way of saying that these borrowings were "recourse" to GWA.[27]

### b. *Early Termination*

Whenever GWA desired to receive the full equity value of the basket securities, it would approach Deutsche Bank, and the two entities would employ procedures to facilitate a cash payout of the "option." GWA approached Deutsche Bank about terminating a Barrier Contract in 2005. Later that year, Deutsche Bank declared that a "cash event" had occurred with respect to Barrier Contract #2. It promptly issued a payment for $130,569,181, reflecting the cash settlement amount from the termination of Barrier Contract #2.

On December 11, 2006, GWA informed Deutsche Bank of its intention to "exercise its rights . . . to terminate Options 3, 4, 5 & 6 in the MAPS account." The next day, Deutsche Bank rolled the basket securities associated with those four Barrier Contracts into newly struck Barrier Contracts #7 through #10, which had substantially identical terms. Eleven days later Deutsche Bank declared that a "cash event" had occurred with respect to Barrier Contracts #3 through #6. But the record contains no evidence of anything economically significant occurring on December 22, 2006. That date was obviously chosen because it was exactly one year and one day after Barrier Contracts #3 through #6 were executed. Deutsche Bank thus cooperated with GWA in facilitating an extraction of cash in a manner designed to permit GWA to claim long-term capital gain treatment on termination of the putative "option." *See* §§ 1(h), 1222(3). Deutsche Bank promptly issued a payment for $124,191,610, reflecting the cash settlement amount from the termination of Barrier Contracts #3 through #6.

In May 2010 GWA informed Deutsche Bank that it wished to terminate the last four Barrier Contracts. On May 14, 2010, Deutsche Bank declared that "cash events" had occurred in Barrier Contracts #7, #8, and #10 and that it was accelerating the "option termination dates"

---

[27] Petitioner contends that GWA's ability to extract cash as outlined above could be limited if Deutsche Bank cut back on OGI's borrowing power, as it did during the 2008–2009 financial crisis. But it is always possible that an investor's ability to extract cash by borrowing against investment assets may be temporarily restricted by macroeconomic events outside his control. Indeed, many prime brokers pulled back on margin lending during this financially turbulent period.

[*85] accordingly. Three days later, WMSA began liquidating the positions in those reference baskets. It replicated the exact same positions—generally within 15 minutes—in OGI's prime brokerage account at Deutsche Bank. On May 19, 2010, the cash settlement amounts for these three Barrier Contracts, totaling $229,877,460, were wired to GWA's prime brokerage account at Deutsche Bank.

On May 21, 2010, Deutsche Bank declared that a "cash event" had occurred in Barrier Contract #9 and that it was accelerating the "option" termination date accordingly. Barrier Contract #9 had a cash settlement amount of $56,210,572. That sum was paid to GWA within the next ten days, thus closing out the last of the ten Barrier Contracts.

Petitioner contends that GWA's ability to extract cash via early termination is irrelevant because, "while termination . . . might result in a cash payment, it also would terminate the investment." It is true that GWA needed to terminate the *Barrier Contracts* to extract cash. But that does not mean that it needed to terminate *the investment*—i.e., its investment in the underlying securities—and it typically did not do so.

Barrier Contract #2 was terminated on December 21, 2005, even though the securities in the reference baskets had not been liquidated. *See supra* p. 32. It appears that these securities positions were rolled into the reference baskets for Barrier Contracts #3 through #6, which were executed the same day. Thus, while GWA extracted cash from the contract, it kept its investment in the underlying securities intact.

Barrier Contracts #3 through #6 were terminated on December 22, 2006, even though the securities in the reference baskets had not been liquidated. Via position journaling, the portfolio positions in the securities baskets associated with those four contracts were replicated in new accounts associated with Barrier Contracts #7 through #10. *See supra* p. 34. Thus, while GWA extracted cash from the contracts, it kept its investment in the underlying securities intact.

Barrier Contracts #7, #8, and #10, which were terminated on May 14, 2010, followed the same pattern with a twist. GWA again requested that the securities positions underlying these contracts be transferred, by cross trading or position journaling, to another account under GWA's control. As previously, Deutsche Bank agreed to do so, but only if the securities were transferred to a "New MAPS" account. Unwilling to accept that condition, GWA agreed to liquidate the securities positions via

[*86] open-market transactions. It then replicated the exact same positions—generally within 15 minutes—in OGI's prime brokerage account at Deutsche Bank. *See supra* pp. 38–39.

The manner in which the Barrier Contracts were terminated, far from supporting petitioner's position, supports the conclusion that GWA owned the basket securities in substance. Notwithstanding the termination of Barrier Contracts #2 through #6, GWA maintained the portfolio positions in place in new accounts under its control. That is a clear incident of ownership over those securities. GWA could have done the same thing upon termination of Barrier Contracts #7, #8, and #10 if it had been willing to roll the positions to an investment account governed by "New MAPS." Unwilling to accept that condition, it replicated those positions in OGI's prime brokerage account through open-market transactions.

In sum, while the Barrier Contracts were European-style options in form, GWA's ability to extract cash whenever it wished supports the conclusion that it owned the basket securities in substance. By virtue of the cross-collateralization agreement, GWA could extract cash weekly or monthly by causing OGI to borrow against the equity value of the "option" and lend the money to GWA interest free. If GWA needed larger amounts of cash, it could engineer a termination of the Barrier Contract, receive the full cash proceeds, and perpetuate its control over the existing securities portfolio in a new account under its control. These facts provide a strong indication that GWA owned the basket securities in substance.

### 6. *Other Benefits*

Another indication of investor control, apart from the ability to extract cash, is the ability to integrate investments into the taxpayer's overall financial strategy. In *Webber*, 144 T.C. at 367, the securities held in the insurance company separate accounts "mirrored or complemented the investments in [the taxpayer's] own personal portfolio and the portfolios of the private-equity funds he managed." The taxpayer "regularly used the separate accounts synergistically to bolster his other positions." *Ibid.* We held that these facts (among others) supported the conclusion that the taxpayer owned the underlying securities in substance. *Id.* at 367–68.

GWA derived benefits from the MAPS account by deploying it synergistically with OGI's prime brokerage account. After pledging the

[*87] equity value of the MAPS account as collateral, GWA caused OGI to borrow substantial sums that GWA used to pay the costs of its operations. GWA also used these borrowed funds to acquire positions in OGI's account that could not be maintained in the reference baskets owing to the "Trade Restricted List." Restricted securities were transferred to OGI by cross trading, enabling GWA to avoid transaction costs. GWA transferred basket positions to OGI's prime brokerage account using position journaling, again enabling it to avoid transaction costs. The ability to transfer cash and securities seamlessly between the MAPS account and OGI's account benefited the Weiss group as a whole.

The portfolio positions in the Barrier Contracts "mirrored or complemented the investments" in the accounts managed by GWA's affiliates. *Cf. id.* at 367. Portfolio managers did not distinguish between trades intended for the MAPS account and those intended for Weiss-affiliated proprietary accounts, so that GWA's trading of the basket securities was a subset of the trading in which the Weiss-affiliated companies generally engaged. *See supra* p. 77. These synergies simplified operations, reduced costs, and meaningfully benefited the affiliated group's bottom line.

7. *Conclusion*

Each of the foregoing factors points in the same direction: Although Deutsche Bank held nominal title to the basket securities, GWA owned those securities in substance for the life of each Barrier Contract. GWA enjoyed 100% of the upside potential if the securities appreciated and bore virtually 100% of the downside risk. It had complete control over the selection and trading of the basket securities, subject to modest, mutually agreed guidelines that reduced risk in a manner consistent with GWA's overall portfolio strategy. Quaker Partners—the allegedly independent investment advisor—was controlled by GWA and dutifully implemented the same long/short investment strategies that GWA's affiliates were pursuing in their own trading accounts.

GWA received the economic benefit of all dividends paid on basket long positions and the proceeds of litigation settlements involving those shares. The investment costs it incurred—margin interest, trading ticket charges, and dividends due on short positions—were exactly the same costs that would be incurred by the owner (or borrower) of securities in a prime brokerage account. Despite the transaction's form as a European-style option, GWA was able to extract cash—and repeatedly did extract cash—from the Barrier Contracts at will, while maintaining

**[\*88]** its control over the underlying securities. Finally, GWA demonstrated ownership of the basket securities by using its MAPS account synergistically with OGI's prime brokerage account to enhance its overall investment performance. For all these reasons, we conclude that GWA owned the basket securities in substance and was required to recognize its net trading gains and related investment income annually.

### C.   *Petitioner's Leverage Theory*

Petitioner contends that the "option" form of the transactions must be respected because GWA's purpose in entering into the Barrier Contracts was not only to minimize Federal income tax, but also to secure greater leverage than the securities laws then allowed. In support of that contention it cites *Frank Lyon*, 435 U.S. at 583–84, where the Supreme Court upheld the substance of a leasing transaction that was "compelled or encouraged by business or regulatory realities." Petitioner asserts that the arrangement with Deutsche Bank was "compelled or encouraged by business or regulatory realities" because GWA allegedly needed 10-to-1 leverage to achieve the level of profitability it desired.

In *Frank Lyon*, 435 U.S. at 563–64, a poorly capitalized bank wished to construct a building, but banking regulators would not permit it to incur the debt needed to finance the construction. An alternative plan was then devised whereby Frank Lyon Co. (Lyon), an independent third party, would secure a loan needed to finance construction of the building, which occurred in phases. *Id.* at 564–65. Once construction was completed Lyon leased the building back to the bank, with the bank being given an option to purchase the building at the end of the 15-year lease term. *Ibid.* Banking regulators approved this sale-and-leaseback arrangement. *Ibid.* The IRS sought to deny the interest and depreciation deductions claimed by Lyon on the theory that the bank was in substance the owner of the building, with Lyon merely supplying financing. *Id.* at 568–69.

The Court rejected the Government's argument that the form of the transaction should not be respected. Speaking through Justice Blackmun, it held that where

> there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-

**[\*89]** avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.

*Id.* at 583–84.

In deciding the substance-over-form question, the Court considered more than 20 factors bearing on the "the substance and economic realities of the transaction." *Id.* at 582–83. It did not treat any particular factor as dispositive or entitled to special weight. Rather, it emphasized that "any particular case will necessarily depend on its facts." *Id.* at 584. The Second Circuit has called *Frank Lyon* the "touchstone in determining whether the form of an agreement should govern" for tax purposes. *Newman v. Commissioner*, 902 F.2d 159, 163 (2d Cir. 1990), *vacating and remanding* T.C. Memo. 1988-547.

Scrutinized under *Frank Lyon,* the Barrier Contracts do not fare well. The Court found the transaction in that case to be "a genuine multiple-party transaction with economic substance," i.e., a sale of the building to Lyon, followed by Lyon's lease of the building back to the bank. *See Frank Lyon*, 435 U.S. at 583. The Court concluded that the substance of the transaction plausibly matched its form. But the Barrier Contracts were not "call options" in any sense of the word because they manifested none of the legal or economic characteristics of genuine call options. *See supra* pp. 45–70. The form of the Barrier Contracts *cannot possibly be respected* because their substance cannot conceivably match their form. Whether or not they are properly viewed as "a multiple-party transaction"—in *Frank Lyon*, an insurance company was also involved—the Barrier Contracts were not "a genuine [option] transaction with economic substance." *Frank Lyon*, 435 U.S. at 583.

Expressing the same thought "another way," the Court ruled that the transactional form adopted by the parties must be respected "so long as the lessor retains significant and genuine attributes of the traditional lessor status." *Id.* at 584. Applying that test here, the question would be whether Deutsche Bank, the optionor, "retain[ed] significant and genuine attributes of the traditional [optionor] status." As we have shown, the answer to that question is a resounding "no."

**[\*90]** In *Frank Lyon*, 435 U.S. at 564, banking regulators had opposed the initial version of the transaction because they did not want the undercapitalized bank to incur more debt. But banking regulators approved the ultimate version of the transaction because the debt would be incurred by Lyon, with the bank's liability being limited to periodic lease payments. *Ibid.* In concluding that the sale-and-leaseback transaction was "compelled or encouraged by . . . regulatory realities," the Court surely found it significant that the transaction, having been approved by banking regulators, was *consistent with* regulatory requirements. *Id.* at 583.

Petitioner has not attempted to show that GWA's plan to secure 10-to-1 leverage through the Barrier Contracts was consistent with securities or banking regulatory requirements. As noted earlier, the leverage GWA sought to obtain was well in excess of the leverage permitted during 2003–2007 under Regulations T, U, and X. *See supra* pp. 10–11. Petitioner suggests that obtaining leverage beyond what Federal margin rules allowed was a "legitimate non-tax business reason" for entering into the Barrier Contracts. But as the Senate PSI concluded in its 2014 report, "[c]ircumventing margin rules by relabeling a prime brokerage account as an 'option' account is not . . . a legitimate business purpose." *See* Staff of S. Perm. Subcomm. on Investigations, 113th Cong., at 81.

Regulatory requirements apart, petitioner contends that GWA's entry into each Barrier Contract was "compelled or encouraged by *business . . .* realities." *Frank Lyon*, 435 U.S. at 583 (emphasis added). "Investing through the form of the Barrier Contract," petitioner urges, "was necessary to maintain GWA's profitability and stay in business." But GWA was a hedge fund whose beneficiaries were fewer than 50 insiders employed by the Weiss group of entities. It had no serious competitors for these individuals' investment dollars. GWA naturally wanted to reward its inside investors with the greatest possible profits. But it cannot plausibly contend that its desire to do so was "compelled by business realities."

In 2005 Mr. Weiss formed WMSP as a hedge fund for outside investors. In a "due diligence" document WMSA stated that "[GWA's] principals have generally not invested any capital in [WMSP]. For tax purposes, [GWA's] principals . . . invest their capital in a separate legal structure [i.e., the Barrier Contracts] which is managed pari passu to [WMSP]." WMSP deployed precisely the same portfolio strategies that GWA deployed, and WMSP was able to offer a successful hedge fund to

**[\*91]** outside investors without needing 10-to-1 leverage. This makes it clear that GWA's entry into the Barrier Contracts was not "compelled by business realities," but was done (as it admitted) "[f]or tax purposes."

The evidence established that GWA had many legitimate ways to secure elevated leverage, e.g., by executing swap transactions, repurchase agreements, and futures contracts. It could enjoy up to 20-to-1 leverage as an alternate specialist on the Philadelphia Stock Exchange. Beginning in February 2007, new rules permitted investors such as GWA to receive leverage of up to 6.5 to 1 on equities in ordinary prime brokerage accounts. By using these tools, GWA could have secured at least as much leverage—and at least as much profitability—as WMSP enjoyed. Contrary to petitioner's assertion, therefore, the excessive leverage facilitated by the Barrier Contracts was not "necessary to maintain GWA's profitability and stay in business."[28]

At the end of the day, petitioner's argument is that the "option" form of the Barrier Contracts should be respected under *Frank Lyon* because the arrangement with Deutsche Bank was "encouraged by business . . . realities." *See Frank Lyon*, 435 U.S. at 583. But all sorts of questionable behavior—violations of the antitrust laws, for example—could conceivably be rationalized on the ground that they were "encouraged by business realities." Needless to say, this is not enough—standing alone—to require that the form of a transaction be respected for Federal income tax purposes when its substance has nothing in common with its form.

In any event, assuming arguendo that GWA's desire for the maximum possible leverage was a legitimate concern that should count on its side of the ledger, it is but one of many factors that must be considered in answering the substance-over-form question. As the Second Circuit noted in *Altria Grp.*, "the Supreme Court [in *Frank Lyon*] expressly declined to identify particular factors that would determine 'the substance and economic realities of the transaction.'" *Altria Grp.*, 658 F.3d at 285 (quoting *Frank Lyon*, 435 U.S. at 582). Limiting the analysis to five exclusive criteria, as urged by the taxpayer in that case, would have contravened "*Frank Lyon*'s command that this question 'in any particular case will necessarily depend on its facts.'" *Id.* (quoting *Frank Lyon*, 435 U.S. at 584); *cf. Benenson v. Commissioner*, 910 F.3d at 702 (considering the "totality of circumstances"); *Long Term Cap. Holdings v.*

---

[28] The record indicates that GWA rarely (if ever) used more than 6.5-to-1 leverage anyway. *See supra* note 12.

[\*92] *United States*, 330 F. Supp. 2d 122, 186 (D. Conn. 2004) (citing *Frank Lyon* for the proposition that a case-by-case, fact-based inquiry is also the proper mode of analysis in determining economic substance), *aff'd*, 150 F. App'x 40 (2d Cir. 2005).

We have undertaken the multifactor, fact-intensive inquiry mandated by *Frank Lyon* and the Second Circuit precedents applying *Frank Lyon*. As explained *supra* pp. 45–88, every relevant factor points inescapably to the conclusion that the Barrier Contracts were not call options and that GWA in substance owned the basket securities. The possibility that GWA might have been slightly less profitable if it had not resorted to the Barrier Contracts is not enough to mandate a different conclusion.[29]

## IV. *Mark-to-Market Election*

The second question we must decide concerns the scope and effect of a mark-to-market election statement that GWA included with its 1998 return. Section 475(f)(1) permits "a person who is engaged in a trade or business as a trader in securities" to elect to recognize gain or loss on securities held at the close of the taxable year as if those securities had been sold for their fair market value at the end of that year.

Respondent contends that GWA was "a person . . . engaged in a trade or business as a trader in securities" during 1998 because it is treated for Federal income tax purposes as having conducted the securities trading business conducted by OGI, its wholly owned "disregarded entity." According to respondent, GWA was thus entitled to make under section 475(f)(1) a mark-to-market election that applied to all securities trading in which it engaged, both directly and through OGI. Respondent contends that GWA made a valid mark-to-market election in 1998, that this election applied to all securities it held during 2003–2010, and that GWA was thus required to recognize at the close of each year—and treat as ordinary income—the annual realized and unrealized appreciation in

---

[29] Petitioner contends that, under *Frank Lyon* as applied in the Second Circuit, the presence of *some* business purpose underlying a transaction precludes application of the substance-over-form doctrine. In advancing this contention, petitioner seems to confuse the substance-over-form inquiry with the "economic substance" doctrine, which the Second Circuit and this Court recognize as distinct. *See supra* p. 46 & note 15. In any event, we reject petitioner's view. What the Supreme Court and the Second Circuit require is a fact-intensive analysis into "the objective economic realities of [the] transaction." *Altria Grp.*, 658 F.3d at 284 (quoting *Frank Lyon*, 435 U.S. at 573). Our multifactor analysis shows that the Barrier Contracts lacked the essential legal and economic characteristics of true options.

**[\*93]** the value of the basket securities (or of the "options" if the Barrier Contracts were properly characterized as such).

Petitioner contends that the mark-to-market election was not made by GWA, the partnership that filed the 1998 return, but by OGI. According to petitioner, GWA was not entitled to make the election because, as an investment company, it was not itself a "trader in securities." And although OGI was a "disregarded entity," petitioner insists that OGI was entitled to make the election because it was "a person" within the meaning of section 475(f)(1). If we reject these contentions, petitioner urges that the mark-to-market election was invalid and that the tax liabilities properly reportable by GWA should be calculated as if that election had never been made.

A.    *Statutory and Regulatory Background*

Section 475(a), enacted in 1993, requires dealers in securities to use the mark-to-market method of accounting for all securities not identified as held for investment. This method of accounting requires that unrealized gains and losses in such securities be recognized on the last business day of the taxable year. The resulting gain or loss "shall be treated as ordinary income or loss." § 475(d)(3)(A)(i).

In 1997 Congress allowed dealers in commodities, as well as traders in securities and commodities, to elect to use the mark-to-market method of accounting. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1001(b), 111 Stat. 788, 906–07 (adding Code section 475(e) and (f)). Section 475(e) allows "a dealer in commodities" to elect use of this method. Section 475(f)(1)(A) allows "a person who is engaged in a trade or business as a trader in securities" to elect use of this method. And section 475(f)(2) allows "a person who is engaged in a trade or business as a trader in commodities" to do the same.

A taxpayer that trades both securities and commodities may make distinct elections "for each trade or business." § 475(f)(3). But a taxpayer that trades only securities cannot elect mark-to-market treatment for less than all of its securities trading. Rather, the election must be made "with respect to the taxpayer's entire business as . . . a securities trader." H.R. Rep. No. 105-148, at 445 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 678, 839.

When a securities trader makes an election under section 475(f)(1), all securities it holds are subject to mark-to-market treatment unless two conditions are met. First, it must be "established to the

**[\*94]** satisfaction of the Secretary" that particular securities have "no connection to the activities of [the electing] person as a trader." § 475(f)(1)(B)(i). Second, the security must be "clearly identified in [the electing] person's records as being described in [section 475(f)(1)(B)(i)] before the close of the day on which it was acquired, originated, or entered into." § 475(f)(1)(B)(ii).

Congress expressed its understanding that "[t]he [mark-to-market] election will be made in the time and manner prescribed by the Secretary." H.R. Rep. No. 105-148, at 446, 1997 U.S.C.C.A.N. at 840. The Treasury Department duly issued Revenue Procedure 99-17, § 1, 1999-1 C.B. 503, 504, which "provides the exclusive procedure for dealers in commodities and traders in securities or commodities to make an election to use the mark-to-market method of accounting under § 475(e) or (f)." This Court has consistently ruled that making a valid section 475(f) election requires compliance with the procedures specified in this Revenue Procedure. *See, e.g.*, *Poppe v. Commissioner*, T.C. Memo. 2015-205, 110 T.C.M. (CCH) 401, 405; *Kantor v. Commissioner*, T.C. Memo. 2008-297, 96 T.C.M. (CCH) 500, 502.

GWA filed its 1998 partnership tax return on or after May 28, 1999. For such returns the procedure for making a section 475(f) election was spelled out in sections 5.02 and 5.04 of Revenue Procedure 99-17. Section 5.02 stated:

> For a taxpayer to make a [section 475(f)] election that is effective for a taxable year which begins before January 1, 1999, and for which the original [F]ederal income tax return is filed on or after March 18, 1999, the taxpayer must make the election by attaching a statement that satisfies the requirements in section 5.04 . . . to an original [F]ederal income tax return for the election year that is timely filed (including extensions).

Rev. Proc. 99-17, § 5.02, 1999-1 C.B. at 504.

Section 5.04 required that the statement attached to the return "describe the election being made, the first taxable year for which the election is effective, and, in the case of an election under § 475(f), the trade or business for which the election is made." *Id.* § 5.04, 1999-1 C.B. at 505.

"Use of mark-to-market accounting under § 475(e) or (f) is a method of accounting." *Id.* § 2.03, 1999-1 C.B. at 504. As a general rule,

[*95] "a taxpayer must obtain the consent of the Commissioner to change a method of accounting for [F]ederal income tax purposes." *Ibid.*; *see* § 446(e). But in Revenue Procedure 99-17 the Commissioner granted what is commonly called "blanket consent" to taxpayers wishing to adopt mark-to-market accounting for securities or commodities trading. *See* Rev. Proc. 99-17, § 6.01, 1999-1 C.B. at 505 ("The Commissioner hereby grants consent for a taxpayer to change its method of accounting for securities or commodities, as appropriate, if [specified] conditions are satisfied . . . .").

## B. *GWA's Mark-to-Market Election*

GWA included with its 1998 partnership return a statement captioned "GWA, LLC," followed by its address and taxpayer identification number. GWA labeled this statement an "Election under Internal Revenue Code section 475(f)." We find that this statement constituted an election by GWA to use mark-to-market accounting.

GWA was entitled to make a mark-to-market election because it was "a person . . . engaged in a trade or business as a trader in securities." *See* § 475(f)(1)(A). GWA's wholly owned subsidiary, OGI, was indisputably engaged in securities trading. But OGI was a single-member LLC and a "disregarded entity" of GWA. Under the "check-the-box" regulations, therefore, all of OGI's activities are "treated in the same manner as a sole proprietorship, branch, or division" of GWA, its owner. Treas. Reg. § 301.7701-2(a); *see Whirlpool Fin. Corp. & Consol. Subs. v. Commissioner*, 154 T.C. 142, 146 (2020) (finding that a disregarded entity had "no existence separate and distinct" from its parent company), *aff'd*, 19 F.4th 944 (6th Cir. 2021); *Dover Corp. & Subs. v. Commissioner*, 122 T.C. 324, 351 (2004) (ruling that activities of a disregarded subsidiary "become the activities of a functional or operating business unit directly owned and conducted by the parent"). Because GWA is regarded as conducting all securities trading in which OGI engaged, GWA during 1998 was "a person . . . engaged in a trade or business as a trader in securities."[30]

---

[30] Petitioner errs in relying on *Chen v. Commissioner*, T.C. Memo. 2004-132, 87 T.C.M. (CCH) 1388. We held there that an individual investor was not a "trader in securities" within the meaning of section 475(f)(1) because his trading activities were "sporadic" rather than "frequent, regular, and continuous." *Chen*, 87 T.C.M. at 1391. That case is irrelevant here because it did not involve a disregarded entity whose trading activities were attributed to its owner. Petitioner does not dispute that OGI's trading activities were "frequent, regular, and continuous."

**[\*96]** Citing the definition of "person" in section 7701(a), petitioner argues that attributing OGI's securities trading to GWA would be "manifestly incompatible with the intent" of section 475(f). But in advancing this argument petitioner makes no reference to Congress's intent in enacting the mark-to-market regime or the concerns Congress expressed regarding it. Rather, petitioner simply quotes the statute, asserting (as if it were self-evident) that the "person who is engaged in a trade or business as a securities trader" is indisputably OGI.

In so contending petitioner assumes his own conclusion. If OGI's securities trading activities are regarded as being conducted by GWA—as the check-the-box regulations require—then the "person who is engaged in a trade or business as a securities trader" is *indisputably GWA.* In other words, the statutory text, in and of itself, supplies no support for petitioner's contention that OGI's trading activities should not be attributed to GWA, because the text makes perfect sense if OGI's trading activities—consistently with the check-the-box regulations—are attributed to GWA.

GWA has previously acknowledged that it engaged in the business of securities trading during 1998. In the Form 3115 included with its 1998 return, GWA stated that it "engage[d] in trader activity through [OGI], a wholly owned limited liability company." And it listed its "trader activity" as a distinct "trade or business."

GWA reiterated this representation during the examination of its 2009–2010 returns, when it sent the IRS examination team a letter captioned "Change in Method of Accounting Analysis." Referring to itself as "GWAL," it stated that "[o]ne of GWAL's principal activities, which it conducts through OGI, is trading securities for its own account using various proprietary long-short trading strategies." GWA acknowledged that "[f]or 1998, and all subsequent years, GWAL (through OGI) directly traded equity and debt securities." And it acknowledged that, "[i]n 1998, GWAL made an election under section 475 to report its trading gains and losses on the mark-to-market method."

The election statement that GWA included with its 1998 return complied with the technical requirements of Revenue Procedure 99-17. The Revenue Procedure specified that "the taxpayer must make the election by attaching a statement that satisfies the requirements in section 5.04 of this revenue procedure to an original federal income tax return for the election year that is timely filed." Rev. Proc. 99-17, § 5.02.

**[\*97]** GWA complied with these procedural requirements. GWA was "the taxpayer" that filed the 1998 partnership return on which the election was made.[31] That return was its "original" return for 1998, and the return was "timely filed." The statement GWA attached to its return, moreover, "satisfie[d] the requirements in section 5.04." The attachment specified the election being made, i.e., the election under section 475(f). It specified the "first taxable year for which the election is effective," i.e., GWA's "tax year ended December 31, 1998." And it specified "the trade or business for which the election is made," i.e., the securities trading activity conducted by "OGI, LLC (a wholly owned limited liability company of GWA, LLC)."

Section 475(f)(1)(B) sets forth an "Exception" to the general rule regarding the scope of the mark-to-market election. It provides that the election shall not apply to any security that meets two conditions. First, it must be "established to the satisfaction of the Secretary [that the security has] no connection to the activities of such person as a trader." § 475(f)(1)(B)(i). Second, the security must be "clearly identified in such person's records as being described in clause (i) before the close of the day on which it was acquired." § 475(f)(1)(B)(ii).

Petitioner cannot plausibly contend that the basket securities underlying the Barrier Contracts qualified for this "Exception." Portfolio managers for Weiss-affiliated accounts did not distinguish between trades intended for the MAPS account and those intended for other proprietary accounts, including OGI's prime brokerage account. GWA's trading of the basket securities was basically a subset of the trading in which the Weiss-affiliated companies generally engaged. *See supra* p. 77. GWA regularly used cross trading or position journaling to transfer securities from the MAPS account to OGI's prime brokerage account.

---

[31] In section 7701(a)(14) the word "taxpayer" is generally defined to mean "any person subject to any internal revenue tax." Under this definition, a partnership might not be regarded as a "taxpayer"—even though it is required to file partnership tax returns—because it is a passthrough entity. The definitional provisions of the Code, however, do not apply where "otherwise distinctly expressed or manifestly incompatible with the intent thereof." § 7701(a). Unless a partnership is treated as a "taxpayer" for purposes of Revenue Procedure 99-17, no partnership could ever be capable of making a mark-to-market election. Because GWA was the party required to file all relevant tax returns, petitioner does not dispute that it is a "taxpayer" for purposes of section 475 and other Code provisions discussed in this Opinion. Our conclusion is reinforced by the principles contained in section 703(b), which provides that "[a]ny election affecting the computation of taxable income derived from a partnership" shall generally be made by the partnership. *Cf. Demirjian v. Commissioner*, 457 F.2d 1, 5–6 (3d Cir. 1972), *aff'g* 54 T.C. 1691 (1970).

**[\*98]** And if Weiss Associates or WMSA requested the trade of a security that appeared on the "Trade Restricted List," Deutsche Bank's order management system automatically redirected that trade to OGI's prime brokerage account. Given these facts, GWA cannot establish that the basket securities (or the Barrier Contracts) "ha[d] no connection" to the securities trading activity that GWA conducted through OGI. § 475(f)(1)(B)(i).[32]

In sum, we conclude that the mark-to-market election included in GWA's 1998 return was made by GWA. If that election was valid, it applied to GWA's entire business as a securities trader. Because GWA did not satisfy the conditions necessary to qualify for the "Exception" set forth in section 475(f)(1)(B), mark-to-market treatment would then apply to all securities GWA held directly or indirectly, including the basket securities (or the Barrier Contracts if characterized as true "options").

### C.  *OGI's Alleged Mark-to-Market Election*

The principal argument petitioner advances in his posttrial briefs is that the section 475(f)(1) election was made by OGI, that this election was valid, and that mark-to-market treatment thus applies only to securities nominally owned and traded by OGI, to the exclusion of any securities separately owned and traded by GWA. Petitioner agrees that OGI, as a "disregarded entity" of GWA, is not "a taxpayer." But it insists that OGI is nevertheless "a person." As a "person who [was] engaged in a trade or business as a securities trader" during 1998, OGI was assertedly entitled to elect mark-to-market treatment limited to its own securities trading business. *See* § 475(f)(1).

In advancing this argument, petitioner relies heavily on the definition of "person" in section 7701(a)(1). It provides that "[t]he term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." The regulations

---

[32] Petitioner contends in a footnote that GWA became entitled to the section 475(f)(1)(B) exception by separately recording the basket securities in its books and records. But identifying the basket securities (or the Barrier Contracts) in this manner is not enough to meet the section 475(f)(1)(B) exception. For that exception to apply, GWA must establish that the basket securities (1) were not held *in connection with* its securities trading and (2) were clearly identified, on the date it acquired them, *as having no connection* to its securities trading. *See* § 475(f)(1)(B). As explained in the text, the basket securities were connected to the trading activities GWA conducted through OGI, and GWA did not identify the basket securities, on the date it acquired them, as having no connection to those trading activities. Notably, petitioner did not allege in its Petition that GWA had satisfied the section 475(f)(1)(B) requirements.

[*99] expand the list of entities defined as "person" to include "a syndicate, group, pool, joint venture, or other unincorporated organization or group." Treas. Reg. § 301.7701-6(a). Petitioner urges that a "disregarded entity" is "a person" because it is a "company" or an "unincorporated organization."

We think petitioner has misapprehended the relevant question. As we see it, the relevant question is not whether a disregarded entity, as an abstract matter, can be a "person" as defined in the Code. The question is whether Congress, by using the word "person" in section 475(f)(1), intended that a disregarded entity, as a nontaxpayer, could make a mark-to-market election that would bind itself but not the taxpayer by which it is wholly owned.

The Second Circuit confronted a somewhat similar threshold issue in *McNamee v. Department of the Treasury*, 488 F.3d 100 (2d Cir. 2007). That case involved section 3306(a), which defines an "employer" for employment tax purposes as "any person" who pays a specified amount of wages during a specified period. The entity that hired the workers and paid their wages was a single-member LLC disregarded as a separate entity for Federal tax purposes. The question presented in *McNamee* was whether the LLC or its single member was the "employer" within the meaning of section 3306(a) and hence the party liable for unpaid payroll taxes.[33]

The Second Circuit initially considered the various definitions in section 7701 and the accompanying regulations. It found those definitions overlapping and ambiguous as to whether an LLC that elects to be disregarded is a "person" as there defined. *See McNamee*, 488 F.3d at 106–07. But the court found it unnecessary to decide that question, concluding that the case could be decided on the basis of the check-the-

---

[33] After *McNamee* was decided, the Treasury Department issued final regulations, effective January 1, 2009, providing that a disregarded entity will usually be treated as a corporation with respect to employment taxes. *See* Treas. Reg. § 301.7701-2(c)(2)(iv). As the IRS explained in the notice of proposed rulemaking, the interaction of the disregarded entity rules and Federal employment tax statutes had created administrative difficulties for taxpayers and the IRS. *See* Disregarded Entities; Employment and Excise Taxes, 70 Fed. Reg. 60475-76 (Oct. 18, 2005). Although petitioner asserts that the court in *McNamee* "overlooked [relevant] Code provisions," the Second Circuit's disposition of the case was correct under law as it then stood, and the court's mode of analysis is fully applicable in deciding the question presented here.

**[\*100]** box ("entity classification") regulations, which it held to be valid. *See* Treas. Reg. §§ 301.7701-2(a), 301.7701-3(b).

Under the check-the-box regulations, the LLC had elected to be disregarded as an entity separate from its owner. As a result of that election, all of the LLC's activities—including its hiring of workers and payment of their wages—were deemed to be conducted by the LLC's single member. "Under the pertinent Treasury Regulations," the court concluded, "the single-member LLC is the employer if it elects to be treated as a corporation; but if it does not elect that treatment, it is '*[d]isregarded*' as a 'separate' entity . . . and hence cannot be regarded as the employer." *See McNamee*, 488 F.3d at 111.[34]

We think a similar conclusion follows here, for similar reasons. If OGI had elected to be classified as a corporation, it would be a distinct taxpayer engaged in the business of securities trading, and it would be entitled to use the mark-to-market method of accounting under section 475(f)(1). But because OGI did not choose corporate treatment, it is disregarded as an entity separate from its owner, and its securities trading activities are regarded as being conducted by GWA.

Because OGI's securities trading activities are regarded as being conducted by GWA, OGI cannot be regarded as the "trader in securities" for purposes of section 475(f)(1), just as the LLC in *McNamee* could not be regarded as the "employer" for purposes of section 3306(a). By virtue of OGI's choice to be a disregarded entity, GWA was the "person . . . engaged in a trade or business as a trader in securities." GWA was thus the only party capable of making a mark-to-market election. Like the Second Circuit in *McNamee*, we need not decide whether a disregarded

---

[34] This and other Courts reached the same result as the Second Circuit in *McNamee*, although the fact patterns of the cases varied somewhat. *See, e.g.*, *Med. Prac. Sols., LLC v. Commissioner*, 132 T.C. 125, 127, 129–30 (2009) (following *McNamee* and concluding that, under the check-the-box regulations, "the LLC and its sole member are a single taxpayer or person"), *aff'd without published opinion sub nom. Britton v. Shulman*, No. 09-1994, 2010 U.S. App. LEXIS 19925 (1st Cir. Aug. 24, 2010); *Costello v. Commissioner*, T.C. Memo. 2016-184, 112 T.C.M. (CCH) 396, 399 (ruling that "the sole member of [an LLC] and the [LLC] itself are a single taxpayer or person" for employment tax purposes before January 1, 2009); *Scott Labor, LLC v. Commissioner*, T.C. Memo. 2015-194, 110 T.C.M. (CCH) 334, 338–39 (same); *Bergdale v. Commissioner*, T.C. Memo. 2014-152, 108 T.C.M. (CCH) 95, 96 (same).

**[\*101]** entity may sometimes be a "person" for Federal tax purposes. Whether or not OGI was a person, it was not *the relevant person*.[35]

Even if OGI could be viewed—notwithstanding its choice to be a disregarded entity—as a "person . . . engaged in a trade or business as a trader in securities," we would not find petitioner's position persuasive. The gist of his argument is that Congress purposefully used the term "person" rather than "taxpayer" in section 475(f)(1) because it wished to allow disregarded entities like OGI to make mark-to-market elections that bound themselves but not their owners. We find little textual or other support for that argument.

As a textual matter, petitioner urges that the term "person" as used in section 475(f) should be construed to include a person who is not a taxpayer. In deciding whether that construction is correct, "we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (original quotation marks and citations omitted); *see Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute . . . .").

Considering the text of section 475 as a whole, it appears to us that Congress used the words "taxpayer" and "person" interchangeably when referring to dealers and traders in securities and commodities. We do not find this terribly surprising: Every "taxpayer" is necessarily a "person" for Federal tax purposes, and in most contexts the scope of the two terms is identical.

Section 475(a) requires securities dealers to use the mark-to-market method. Section 475(c)(1) defines a securities dealer to mean "a

---

[35] Citing the statement in section 7701(a) that its definitions apply "where not otherwise distinctly expressed or manifestly incompatible with the intent thereof," petitioner urges that OGI must be treated as a "person" entitled to make a mark-to-market election. But as explained in the text, we need not decide whether OGI is a "person" as defined in section 7701(a)(1) because, even if it were a person, it would not—by virtue of its election to be disregarded—be the person "engaged in a trade or business as a trader in securities." *See* § 475(f)(1). In any event, petitioner would need to establish that the term "person" as used in section 475(f)(1) includes a person who is not a taxpayer. As we show *infra* pp. 103–09 & note 37, petitioner's arguments on that point are not persuasive. Finally, allowing a disregarded entity to make a mark-to-market election that binds only itself and not its parent would be "manifestly incompatible with the intent" of section 475(f). *See infra* p. 108.

[*102] taxpayer" who performs certain functions. But section 475(b), which provides exceptions to mark-to-market treatment, refers alternatively to any security "acquired . . . by *the taxpayer*," any hedge with respect to a position "which is not a security in the hands of *the taxpayer*," and "any security held by *a person* in its capacity as a dealer in securities." *See* § 475(b)(1)(B)(i), (C)(ii), (b)(1) (flush language) (emphasis added). And section 475(d), which provides "special rules" for purposes of section 475, refers alternatively to misidentification of a security by "a taxpayer" and the tax treatment of a security "held by *a person* other than in connection with its activities as a dealer in securities." *See* § 475(d)(2), (3)(B)(ii) (emphasis added).

Section 475(e) allows a dealer in commodities to elect the mark-to-market method of accounting. If that election is made, mark-to-market treatment "shall apply to commodities held by such dealer in the same manner as [it] applies to securities held by a dealer in securities." § 475(e)(1). The term "commodity" is defined to include "any position which . . . is clearly identified *in the taxpayer's records* as being described in this subparagraph." *Id.* subpara. (2)(D)(iii) (emphasis added). The word "person" does not appear in section 475(e).

Section 475(f), which allows securities and commodities traders to elect mark-to-market treatment, generally refers to the trader as a "person." But section 475(f)(1)(C), which addresses coordination with other Code provisions, refers to securities "acquired in the normal course of *the taxpayer's* activities as a trader in securities." (Emphasis added.) Section 475(f)(1)(D) provides that rules similar to those of subsection (d), relating to misidentification of securities, "shall apply to securities held by a person" who elects mark-to-market treatment. But subsection (d)(2) addresses misidentification of securities, not by "a person," but by "a taxpayer."[36]

Section 475(g) authorizes the Commissioner to issue regulations as necessary or appropriate to carry out the purposes of section 475. These regulations could include (among other things) rules "to prevent the use *by taxpayers* of subsection (c)(4) to avoid the application of this section to a receivable that is inventory *in the hands of the taxpayer*." § 475(g)(3) (emphasis added). But section 475(c)(4) refers to those same

---

[36] Petitioner appears to agree that section 475(a), requiring use of mark-to-market accounting by securities *dealers*, applies only to taxpayers. But he insists that section 475(f)(1), providing a mark-to-market election for securities *traders*, applies to disregarded entities who are not taxpayers. Petitioner offers no explanation as to why Congress would have chosen to enact such an asymmetrical regime.

**[\*103]** receivables as arising from the sale of certain items "by a person" or "held by such person." *See* § 475(c)(4)(B)(ii) and (iii).

The transitional rule that Congress prescribed for elections under section 475(e) and (f) supports the conclusion that the electing entity must be a "taxpayer." That is so for two reasons. First, Congress provided that the transitional rule was to apply "[i]n the case of *a taxpayer* who elects under subsection (e) or (f) of section 475 . . . to change its method of accounting." Taxpayer Relief Act of 1997, § 1001(d)(4)(B), 111 Stat. at 908 (emphasis added). Second, Congress provided that any adjustments "required to be taken into account by the taxpayer under section 481" shall be implemented over a four-year period. *Id.* cl. (ii). Section 481(a) specifies, in the case of a change in method of accounting, adjustments that may be required "[i]n computing the taxpayer's taxable income" for the year of the change. Because a disregarded entity is not a taxpayer, it does not have "taxable income" and it cannot have a section 481 adjustment.[37]

The procedures the Commissioner promulgated for making the mark-to-market election supply additional support for the conclusion that this election can be made only by taxpayers. Section 7805(d) provides: "Except to the extent otherwise provided by this title, any election under this title shall be made at such time and in such manner as the Secretary shall prescribe." Congress expressed its understanding that "[t]he [mark-to-market] election will be made in the time and manner prescribed by the Secretary." H.R. Rep. No. 105-148, at 446, 1997 U.S.C.C.A.N. at 840. The Treasury Department duly issued Revenue Procedure 99-17, which "provides the exclusive procedure for dealers in

---

[37] Petitioner cites no legislative history to support his view that Congress intended that entities who are not taxpayers can elect mark-to-market treatment under section 475(f). As respondent shows, the legislative history is decidedly to the contrary. *See., e.g.*, H.R. Rep. No. 105-220, at 515–16 (1997) (Conf. Rep.), *reprinted in* 1997-4 C.B. (Vol. 2) 1457, 1985–86 (stating that "the section 481 adjustment applies only to taxpayers making the election" and that "an electing taxpayer must be able to demonstrate" certain facts); H.R. Rep. No. 105-148, at 445, 1997 U.S.C.C.A.N. at 839 ("All securities held by an electing taxpayer in connection with a trade or business as a securities trader . . . are subject to mark-to-market treatment."); *id.* (stating that "an electing taxpayer" recognizes ordinary gain or loss, but that the "taxpayer is allowed to identify [certain] property" as not subject to mark-to-market treatment). The House report does use the term "person" when describing how mark-to-market treatment affects a securities *dealer*. *See* H.R. Rep. No. 105-148, at 444, 1997 U.S.C.C.A.N. at 838. But section 475(c)(1) defines a securities dealer to mean "a taxpayer" who performs specified functions. This supplies further evidence that Congress used the terms "person" and "taxpayer" interchangeably in connection with mark-to-market treatment.

[*104] commodities and traders in securities or commodities to make an election to use the mark-to-market method of accounting under § 475(e) or (f)." Rev. Proc. 99-17, § 1.

For a 1998 tax return filed on or after March 18, 1999—as GWA's return was—the procedure for making a section 475(f) election was spelled out in sections 5.02 and 5.04 of Revenue Procedure 99-17. Section 5.02 provided: "For a taxpayer to make a [section 475(f)] election . . . the taxpayer must make the election by attaching a statement that satisfies the requirements in section 5.04 . . . to an original federal income tax return for the election year that is timely filed."

This provision of Revenue Procedure 99-17 states that the election must be made *by a taxpayer*. And it requires the taxpayer to make this election by attaching a statement "to an original [F]ederal income tax return for the election year." *Id.* § 5.02, 1999-1 C.B. at 504. This surely implies that the statement must be attached to *the taxpayer's* return; it would be odd if the taxpayer's election statement could be attached to somebody else's return. As a disregarded entity, OGI was not a taxpayer, and it was ineligible to file a Federal income tax return. It was therefore incapable of making a section 475(f) election "in such manner as the Secretary shall prescribe." § 7805(d).

"Use of mark-to-market accounting under § 475(e) or (f) is a method of accounting." Rev. Proc. 99-17, § 2.03. As a general rule, "a taxpayer must obtain the consent of the Commissioner to change a method of accounting for [F]ederal income tax purposes." *Ibid.*; *see* § 446(e). In Revenue Procedure 99-17, § 6.01, the Commissioner granted blanket consent to specified taxpayers wishing to adopt the mark-to-market method. If a taxpayer was required to seek the Commissioner's consent to a change in method, it was instructed to file Form 3115. *See id.* § 6.02(2), 1999-1 C.B. at 505.

A disregarded entity does not have "a method of accounting for [F]ederal income tax purposes" that is distinct from the method employed by its single member. A disregarded entity, therefore, is ineligible to file Form 3115 to request permission to change its method of accounting, and it is incapable of benefiting from the Commissioner's blanket consent to a change in method of accounting. These facts show that, if a disregarded entity engages in securities trading, any mark-to-market election must be filed by its parent—which has the relevant method of accounting—and not by it.

**[*105]** In its opening Posttrial Brief, petitioner appears to agree that Revenue Procedure 99-17 did not provide "a specific procedure for how persons who did not file tax returns could make [a mark-to-market] election." But it asserts that the unavailability of "a procedure for persons who are not taxpayers, e.g., disregarded entities, is beside the point."

With that assertion we cannot agree. Section 7805(d) provides that "any election under this title shall be made at such time and in such manner as the Secretary shall prescribe." Revenue Procedure 99-17, § 1 "provides *the exclusive procedure* for . . . traders in securities or commodities" to make a mark-to-market election. (Emphasis added.) Petitioner appears to concede that disregarded entities are not able to comply with the requirements of Revenue Procedure 99-17. Since that pronouncement provides "the exclusive procedure" for a securities trader to elect mark-to-market treatment, we think OGI's inability to comply is not "beside the point," but is very much the point.[38]

As petitioner points out, the regulations provide that a disregarded entity will be recognized as separate from its owner in very limited circumstances, e.g., for certain excise tax and employment tax purposes. *See* Treas. Reg. § 301.7701-2(c)(2)(ii) through (vi). And the courts have held that a disregarded entity's formal existence under state law is recognized in two other situations. In determining the scope of the "small partnership exception" under TEFRA, the courts have ruled that a disregarded entity can be a "pass-thru partner" within the meaning of section 6231(a)(9), i.e., a "person through whom other persons hold an interest in the partnership."[39] And this Court has held, for Federal gift tax purposes, that the gift of an interest in a single-member LLC should

---

[38] As petitioner notes, section 7805(d) provides that any election under Title 26 shall be made at the time and in the manner prescribed by the Secretary, "[e]xcept to the extent otherwise provided by this title." Petitioner has identified no provision in Title 26 that provides a different time or manner for making elections under section 475. The procedures prescribed in Revenue Procedure 99-17 are thus "exclusive," as section 1 of that document states.

[39] *See Seaview Trading, LLC v. Commissioner*, 858 F.3d 1281, 1287 (9th Cir. 2017) (ruling that "the corporate form persists" even though the LLC's separate existence is disregarded); *see also, e.g., Mellow Partners v. Commissioner*, 890 F.3d 1070, 1072–73 (D.C. Cir. 2018); *Bedrosian v. Commissioner*, 143 T.C. 83, 104 (2014), *aff'd*, 940 F.3d 467 (9th Cir. 2019).

**[\*106]** be valued as a gift of an LLC interest, rather than as a gift of a proportionate share of the assets held by LLC.[40]

The courts in these two circumstances held that a single-member LLC should be recognized as an entity insofar as it holds title to certain property. The fact that the LLC was validly organized under state law was important to this conclusion.[41] In none of the cases petitioner cites did the courts dispute the proposition that the activities of a disregarded entity are "treated in the same manner as a sole proprietorship, branch, or division" of its owner. Treas. Reg. § 301.7701-2(a). Nor did they disturb the well-established proposition that the business operations of a disregarded entity are regarded as being conducted by its owner. Rather, the courts simply held (in the words of the U.S. Court of Appeals for the Ninth Circuit) that the LLC's disregarded status did not "negate[] the factual circumstance in which the owner of a partnership [interest] holds title through a separate entity." *Seaview Trading, LLC v. Commissioner*, 858 F.3d at 1286. In effect, the courts held that the single-member LLC, despite its "disregarded" status, should be treated as a valid state law entity that occupies a box on an organizational chart.

None of these cases is relevant in deciding whether a disregarded entity should be treated as a person entitled to make a mark-to-market election under section 475(f)(1). Indeed, petitioner has cited no judicial opinion or other authority holding that a disregarded entity can make any sort of election for Federal tax purposes, other than an election about its classification status. A single-member LLC is entitled to make *the initial* check-the-box election as to whether it will be treated as a corporation or be disregarded. *See* Treas. Reg. § 301.7701-3(c)(1)(i) (providing that "an eligible entity" makes this election by filing Form

---

[40] *See Pierre v. Commissioner*, 133 T.C. 24, 32, 35 (2009) (noting that the question presented was not how the disregarded entity and its owner would be taxed for Federal income tax purposes, but how the "*donor* must be taxed under the [F]ederal gift tax provisions"), *supplemented by* T.C. Memo. 2010-106; *cf. RERI Holdings I, LLC v. Commissioner*, 143 T.C. 41 (2014) (ruling similarly when valuing a gift for charitable contribution deduction purposes).

[41] *See Seaview Trading, LLC v. Commissioner*, 858 F.3d at 1285–86 (quoting Rev. Rul. 2004-88, 2004-2 C.B 165, 166) (reasoning that a disregarded entity is a "pass-thru partner" because it "is a partner of [the underlying partnership] under the law of the state in which [the partnership] is organized," whereas the disregarded entity's single member "is not a partner . . . under state law"); *Pierre*, 133 T.C. at 29 ("A fundamental premise of [gift] taxation is that State law creates property rights and interests . . . ."). Revenue Ruling 2004-88 does not mention the definition of "person" in section 7701(a)(1), but rests on the premise that the LLC's status as a "pass-thru partner" is determined by reference to state law.

**[\*107]** 8832, Entity Classification Election). And a single-member LLC may elect to change its classification status, by filing a new Form 8832, five years after making its initial election. *See id.* subdiv. (iv). Having elected and retained "disregarded" status, however, a single-member LLC is entitled to make no further elections. From that point on, all elections must be made by its single member, on whose tax return the disregarded entity's items of income and expense will be reported.[42]

This conclusion is fully consistent with Congress's intent in enacting section 475(f). Congress was "concerned about issues of taxpayer selectivity" with respect to the mark-to-market method. H.R. Rep. No. 105-220, at 515, 1997-4 C.B. (Vol. 2) at 1985. By cherry-picking which securities would be marked to market—e.g., by making year-end transfers of securities that had appreciated, or by retroactively designating appreciated securities as "held for investment"—taxpayers could manipulate the mark-to-market method in an effort to recognize losses currently while indefinitely deferring recognition of gains.

The text of the statute reflects these concerns. Section 475(g)(1) authorizes the Treasury Department to promulgate regulations "to prevent the use of year-end transfers, related parties, or other arrangements to avoid the provisions of this section." If a taxpayer contends that a particular security is exempt from mark-to-market treatment—e.g., because it is allegedly "held for investment"—that security must be "clearly identified" as such in the taxpayer's records "before the close of the day on which it was acquired." *See* § 475(b)(2) (dealers in securities), (e)(2)(D)(iii) (dealers in commodities), (f)(1)(B)(ii) (traders in securities and commodities). As stated in the Conference Report: "[T]he conferees intend that an electing taxpayer must be able to demonstrate by clear and convincing evidence that a security bears no relation to activities as a trader in order to be identified as not subject to the mark-to-market regime." H.R. Rep. 105-220, at 515, 1997-4 C.B. (Vol. 2) at 1985.

By allowing a disregarded entity to make a mark-to-market election that would bind itself but not its single member, petitioner's

---

[42] Section 446(d) provides that "[a] taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business." For two reasons this provision does not help petitioner. First, it provides that the election as to accounting method must be made by "a taxpayer." Second, as explained *supra* p. 93, a taxpayer electing mark-to-market treatment must elect to have this method apply "to the taxpayer's entire business as . . . a securities trader." H.R. Rep. No. 105-148, at 445, 1997 U.S.C.C.A N. at 839. During 2003–2010, GWA and OGI conducted a single, integrated securities trading business.

[*108] position would enable the very conduct about which Congress was concerned. If the disregarded entity and its owner both own securities, securities can be transferred at will between them without tax consequences. The disregarded entity could mark to market securities on which it has unrealized losses, while transferring to its parent securities on which it has unrealized gains. Conversely, the parent could transfer to its disregarded entity, for mark-to-market treatment, securities on which it has unrealized losses, while retaining securities on which it has unrealized gains.

The facts of this case show that Congress's concerns were not theoretical. GWA and OGI in effect conducted a single, integrated securities trading business. If GWA wished to trade securities on Deutsche Bank's "Trade Restricted List," those trades were simply shifted to OGI's account. And GWA routinely transferred securities positions from the MAPS account to OGI's account by cross-trading or position journaling, free of transaction costs and without tax consequences. These facts show how easy it would be for a disregarded entity and its owner to engage in the manipulative behavior about which Congress expressed concern. Treating OGI as a person entitled to make a separate mark-to-market election that bound it but not GWA would thus be "manifestly incompatible with the intent" of section 475(f)(1). *See* § 7701(a).[43]

In sum, we conclude that OGI, for at least two reasons, was not entitled to make a mark-to-market election under section 475(f)(1). First, it was not "a person . . . engaged in a trade or business as a trader in securities" because, by virtue of its election to be a disregarded entity, all of its securities trading activities are regarded as being conducted by GWA rather than by it. Second, whether or not a disregarded entity is thought to be a "person," a mark-to-market election under section 475(f)(1) can be made only by a person who is also a taxpayer. We accordingly hold that GWA, the relevant taxpayer, made the section 475(f) election embodied in the statement attached to its 1998 return.[44]

---

[43] Petitioner tries to minimize Congress's concern about "taxpayer selectivity" by noting that similar transfers of securities could occur between any pair of related parties, one of which had made the mark-to-market election and the other of which had not. Transfers of that sort, however, would usually have tax consequences. The problem of taxpayer selectivity is at its apogee where (as here) the transfers could be made without tax consequences and without transaction costs.

[44] Citing an Example added to the regulations in 2013, petitioner notes that one member of a consolidated group of corporations can elect mark-to-market

**[\*109]** D.    *Validity of the Election*

If we hold that GWA, rather than OGI, made the mark-to-market election in 1998, petitioner contends that the election was void ab initio and thus should be given no effect in determining the tax liabilities properly reportable on GWA's returns for 2003–2010 (and presumably for subsequent years as well).  First, petitioner contends that the election was invalid because GWA was not "a person . . . engaged in a trade or business as a trader in securities" within the meaning of section 475(f)(1).  We have already rejected that contention: Because GWA is regarded as conducting all securities trading activities in which OGI engaged, GWA was the relevant "person" to make the mark-to-market election.  *See supra* pp. 95–98.

Second, if GWA was entitled to make the election, petitioner urges that the election was invalid because it was improperly selective. In petitioner's view, the statement attached to GWA's return "expressly limits the scope of the election to securities that were held by OGI, whereas a valid section 475(f)(1) election for GWA must apply to all securities that it holds in its securities trading business."  On this point we agree with petitioner:  As we held in *Plumb v. Commissioner*, 97 T.C. 632, 640 (1991), "a taxpayer who attempts to make an election that is not legally available to him will be treated as having made no election."

As explained *supra* p. 93, a taxpayer that trades both securities and commodities may make separate elections under section 475(f)(1) (for its securities trading) and under section 475(f)(2) (for its commodities trading).  *See* § 475(f)(3).  But a taxpayer that trades only securities cannot elect mark-to-market treatment for less than all of its securities trading.  As section 475(f)(1)(A) provides, a securities trader electing mark-to-market treatment must elect to have this method apply "to such trade or business."  The election must therefore be made "with respect to the taxpayer's entire business as . . . a securities trader."  H.R. Rep. No. 105-148, at 445, 1997 U.S.C.C.A.N. at 839.

---

accounting even though other members do not.  *See* Treas. Reg. § 1.1502-13(c)(7)(ii)(K) (example 11).  However, the Commissioner has provided that, "in the case of a consolidated group, the term 'taxpayer' is the consolidated group member to which the request for a change in method of accounting relates."  Rev. Proc. 2015-13, § 3.17(2), 2015-5 I.R.B. 419, 428.  Thus, the ability of one member of a consolidated group to make a separate election under section 475(f) is consistent with the requirement of Revenue Procedure 99-17 that such elections be made by a taxpayer.

**[\*110]** The election statement attached to GWA's 1998 return, while captioned in GWA's name, purports to identify OGI as the electing party. It states: "OGI, LLC is engaged in a trade or business as a trader in securities and elects to have Internal Revenue Code Section 475(f)(1) apply to such trade or business." The election likewise purports to limit the scope of the election to securities held by OGI:

> OGI, LLC shall recognize gain or loss on any security held in connection with [its] trade or business at the close of any taxable year as if such security were sold for its fair market value on the last business day of such taxable year, and . . . any gain or loss shall be taken into account for such taxable year.

This election statement, examined within its four corners, shows that GWA was attempting to make an election that was legally unavailable. GWA purported to limit its election to a subset of the trading in which it then engaged or might in future engage—namely, trading of securities held in accounts denominated in OGI's name. Earlier in this litigation GWA acknowledged that it had made the mark-to-market election, but it urged that it had done so *on behalf of* OGI. *See supra* p. 41. GWA accordingly contended that the scope of its election should be limited to the portion of its securities trading business that was conducted by OGI directly. This election was legally unavailable to GWA because it was not made "with respect to the taxpayer's entire business as . . . a securities trader." H.R. Rep. No. 105-148, at 445, 1997 U.S.C.C.A.N. at 839. And if the election were thought to have been made by OGI rather than by GWA, the election was invalid because OGI, as a disregarded entity, was not entitled to make it.

Another feature of GWA's 1998 return shows that it was attempting to make a mark-to-market election that impermissibly covered only a portion of the securities it held. In 1998, Schedule M–1 of the partnership tax return was captioned "Reconciliation of Income (Loss) per Books With Income (Loss) per Return." The Schedule M–1 included in GWA's 1998 return identified $319,821 of "Unrealized Gains on Investments" that appeared on GWA's books, but were not included in the income reported on Schedule K, Partners' Shares of Income, Credits, Deductions, etc. If GWA had $319,821 of *unrealized* gains on investments at year-

**[*111]** end 1998, the securities generating those gains were obviously not "marked to market."[45]

Apart from the evidence appearing in the return itself, common sense supports the conclusion that GWA was attempting to make a mark-to-market election that excluded securities it held directly. In April and May 1998, GWA entered into the first two of six transactions involving an RBC derivative product styled an "index call option." These putative "options," like the Barrier Contracts, sought to achieve tax deferral by postponing the recognition of securities trading gains until an "option expiration date" in the distant future.

GWA filed its 1998 return roughly a year after executing the initial RBC "options." Electing mark-to-market treatment *for all* its securities positions would have required that it mark the RBC options to market at year-end 1998. There is no indication that GWA did this on its 1998 return; to the contrary, GWA on that return reported $319,821 of "unrealized gains on investments." And electing mark-to-market treatment for the RBC "options" would have been suicidal in tax-planning terms, because it would have undermined GWA's entire tax-deferral objective.

Considering all this evidence, we are convinced that GWA must be treated as having made no valid mark-to-market election because it attempted to make an impermissibly selective election "that [was] not legally available to [it]." *Plumb*, 97 T.C. at 640. The *Plumb* case dealt with an election under 26 U.S.C. § 172(b)(3)(C) (1986) regarding the carryback period for a net operating loss (NOL). *Plumb*, 97 T.C. at 633. In an election statement included with their return, the taxpayers stated that they "elect[ed] to forego [sic] the carryback period for the *regular* NOL in accordance with section 172(b)(3)(C) and will carry forward this NOL." *Plumb*, 97 T.C. at 641. But they sought to *carry back* the NOL for alternative minimum tax (AMT) purposes, attempting to offset AMT income for prior tax years. *Id.* at 633–34.

We held that the election authorized by former section 172(b)(3)(C) related to a single carryback period for all tax purposes. *Plumb*, 97 T.C. at 636–40. Thus, "an effective election . . . must apply to both types of net operating losses," i.e., "for both regular and alternative minimum tax[es]." *Id.* at 638, 640. The taxpayers' election statement

---

[45] Although the record is not entirely clear on this point, it would appear that the $319,821 of "unrealized gains" was attributable to the RBC "options" that GWA acquired during 1998. *See supra* pp. 16–17 and *infra* p. 113.

**[\*112]** in *Plumb*, however, purported to "forego [*sic*] the carryback period for the *regular* NOL" only. *See id.* at 633.

We found that the taxpayers' "use and underlining of the word 'regular' [was] significant in establishing that [they] intended to make an election that was unavailable." *Id.* at 641. We held that the taxpayers failed to make any effective election to relinquish the carryback period and were required to carry the NOLs back for both regular tax and AMT purposes, reasoning that "a taxpayer who attempts to make an election that is not legally available to him will be treated as having made no election." *Id.* at 640.

Respondent errs in relying on *Branum v. Commissioner*, 17 F.3d 805 (5th Cir. 1994), *aff'g* T.C. Memo. 1993-8, 65 T.C.M. (CCH) 1715. That case likewise involved an attempted "split election" concerning the NOL carryback period. *Id.* at 807. But in *Branum* the election statement included with the return was valid on its face. The taxpayer explicitly elected to "carry foreward [*sic*] all losses sustained in the calendar year 1985 and forego [*sic*] carry back of such losses to prior years." *Id.* at 809.

The taxpayer in *Branum* then filed a tentative claim for refund premised on carrying the NOL back for AMT purposes, asserting that the election he had made on his return applied for regular tax purposes only. *Id.* at 807. In our Court the taxpayer argued that his intent in making the election should be judged by looking at his return and refund claim together. *Branum*, 65 T.C.M. (CCH) at 1718. We rejected that argument, ruling that the election on his return was unambiguous and that he had validly elected to forgo the NOL carryback period for all tax purposes. *Id.* at 1719.

The Court of Appeals for the Fifth Circuit affirmed. *Branum v. Commissioner*, 17 F.3d at 806. The taxpayer urged that his true intention was manifested by his refund claim, which sought to carry the NOLs back rather than forward. But the Fifth Circuit ruled that his "subjective intent ultimately [was] irrelevant." *Id.* at 811. What mattered was "the objective manifestation of his intent," as indicated by "the unambiguous statement on his return." *Ibid.* That statement was "sufficiently indicative of the [taxpayer's] unequivocal intent to make an election." *Ibid.*

We conclude that *Plumb*, rather than *Branum*, supplies the relevant precedent for deciding the question before us. In *Branum v.*

**[\*113]** *Commissioner*, 17 F.3d at 811, the election statement included in the taxpayer's return was valid in its face, and the taxpayer separately took action inconsistent with it. In the instant case, as in *Plumb*, the election statement on its face purported to make an election that was legally unavailable.

Other evidence contained in GWA's 1998 return—specifically the Schedule M–1—confirms that GWA was attempting to exclude from its mark-to-market election securities (including the RBC "options") that it held directly rather than through OGI. And here the evidence that appeared in GWA's tax return was consistent with its intent. GWA could not possibly have intended to elect mark-to-market treatment for securities it held directly because that would have eviscerated the tax-deferral objective of the RBC "options."

In sum, we hold that GWA, while the proper party to make a section 475(f) election, attempted on its 1998 return to make an election that was legally unavailable to it. Because its intent to make an impermissibly selective election was manifest on the return to which the election statement was attached—and specifically on the statement itself—that election was invalid. Neither GWA nor OGI thus made a valid election under section 475(f)(1) to use the mark-to-market method to account for its securities trading activities.[46]

---

[46] In urging the opposite conclusion, respondent relies on cases holding that taxpayers cannot revoke an election valid on its face by asserting that the election was premised on a mistake of law. *Accord, e.g.*, *Bankers & Farmers Life Ins. Co. v. United States*, 643 F.2d 234, 238 (5th Cir. 1981); *Shull v. Commissioner*, 271 F.2d 447, 449 (4th Cir. 1959), *rev'g and remanding* 30 T.C. 821 (1958); *Raymond v. United States*, 269 F.2d 181, 183 (6th Cir. 1959); *Grynberg v. Commissioner*, 83 T.C. 255, 261–63 (1984); *Cohen v. Commissioner*, 63 T.C. 527, 533 (1975), *aff'd*, 532 F.2d 745 (3d Cir. 1976) (unpublished table decision); *see Estate of Stamos v. Commissioner*, 55 T.C. 468, 474 (1970) ("Oversight, poor judgment, ignorance of the law, misunderstanding of the law, unawareness of the tax consequences of making an election, miscalculation, and unexpected subsequent events have all been held insufficient to mitigate the binding effect of elections . . . ."). These cases are inapposite: They involved taxpayer attempts to revoke prior elections that were valid on their face; the question here is whether GWA's election was valid to begin with. Whenever a taxpayer "attempts to make an election that is not legally available to him," *Plumb*, 97 T.C. at 640, the taxpayer typically will be operating under a mistake of law. But as the holding in *Plumb* makes clear, this circumstance does not serve to validate an election that is invalid, judged by what appears on the face of the return.

[*114] V.    *Change in Accounting Method*

We have concluded that the Barrier Contracts were not options and that GWA during 2003–2010 in substance owned the basket securities for Federal income tax purposes.  From these conclusions it follows that GWA was required to recognize annually under section 1001 its realized trading gains and losses in the basket securities, and also to recognize annually the other income (such as dividends) and expenses (such as leverage fees) associated with the Barrier Contracts.  This means that most or all of the income that GWA reported upon the termination of Barrier Contracts #1 (in 2009) and #7 through #10 (in 2010) should have been reported for years before 2009.

Those prior years are not before the Court.[47]  But respondent urges that his adjustments effect changes in the method of accounting that GWA employed in connection with its investments in the Barrier Contracts.  Respondent accordingly contends that GWA must recognize for 2009, under section 481, the taxable income it should have recognized for prior years.

Section 481 is captioned "Adjustments required by changes in method of accounting."  Petitioner does not dispute that section 481 applies regardless of whether an accounting method change is initiated by the taxpayer or by the Commissioner; nor does he dispute that section 481 can be invoked regardless of whether the limitations period for the relevant prior years has expired.  Rather, petitioner urges that section 481 is inapplicable because respondent's adjustments to GWA's income allegedly do not constitute a "change in method of accounting" within

_____

[47] Although 2009 is the earliest year before us, we do not agree with petitioner that "[t]he applicable statute of limitations for each of GWA's pre-2009 tax years is closed."  The Code does not provide a specific partnership-level period of limitations; whether respondent could assess tax attributable to partnership items of GWA's partners for years before 2009 would depend on the period of limitations applicable to each partner. *See, e.g.*, *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 555 (2000) (ruling that section 6229, which can extend the period of limitations on the assessment of tax owed by a partner, does not impose a distinct partnership-level period of limitations).  That said, it seems unlikely that the period of limitations for a pre-2009 year of any partner remained open in December 2018, when respondent issued FPAAs to GWA for 2009 and 2010.  As a matter of practice, this Court "will not consider adjustments made in an FPAA if the FPAA has been issued after the time for assessing tax against all of the partners has expired." *Highwood Partners v. Commissioner*, 133 T.C. 1, 11 (2009).  Therefore, while respondent might have issued FPAAs for GWA's 2003–2008 taxable years, adjusting GWA's income for those years would likely have been for naught.

**[\*115]** the meaning of sections 446 and 481. We conclude that respondent has the better side of this argument.

A.    *Governing Legal Principles*

1.    *Purpose and Operation of Section 481*

Section 446(a) provides that taxable income shall generally be computed "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(b) grants the Commissioner discretion to change a taxpayer's accounting method in certain circumstances. It provides that, if the method of accounting used by the taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." § 446(b). The Commissioner has broad discretion in determining whether a taxpayer's accounting method clearly reflects income, and the Commissioner's determination must be upheld unless clearly unlawful. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979); *RCA Corp. v. United States*, 664 F.2d 881, 886 (2d Cir. 1981).

Section 446 by itself does not authorize retroactive adjustments to a taxpayer's liability for a year preceding the year in which the method of accounting is changed. And the period of limitations may prevent the Commissioner from examining prior years to make adjustments that are an essential corollary of a change in method for the current year. *See* § 6501. "The purpose of § 481 is to prevent either a distortion of taxable income or a windfall to the taxpayer arising from a change in accounting method when the statute of limitations bars reopening of the taxpayer's earlier returns." *Suzy's Zoo v. Commissioner*, 273 F.3d 875, 883 (9th Cir. 2001), *aff'g* 114 T.C. 1 (2000).

Section 481 was enacted as part of the 1954 Code. It applies in situations where a taxpayer's income for a particular year (the "year of the change") is computed "under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed." § 481(a)(1). In that event section 481(a)(2) provides that "there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted."

Section 481 leaves many questions unanswered, and it has been described as an example of "codified confusion." *Grogan v. United States*, 475 F.2d 15, 16 (5th Cir. 1973) (quoting William H. Fletcher,

**[\*116]** *Section 481: Changes in Accounting Methods*, N.Y.U. 18th Inst. on Fed. Tax 161 (1960)). "Yet the courts have interpreted [section 481] fairly consistently during the [70] years since its enactment." *Pinkston v. Commissioner*, T.C. Memo. 2020-44, 119 T.C.M. (CCH) 1288, 1291. They have uniformly agreed that section 481 "authorizes the [Commissioner] to adjust the amount of tax due in the year a taxpayer changes its method of accounting, whether [the change is] initiated by the taxpayer or the [Commissioner]." *Suzy's Zoo v. Commissioner*, 273 F.3d at 883. And because this statute "would be virtually useless if it did not affect closed years," courts have consistently interpreted it to allow adjustments, implemented in the year of the change, to reflect adjustments to tax liabilities for years closed by the limitations period. *Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 572 (5th Cir. 1965) (finding "no necessary conflict between section 481 and the statute of limitations"); *see Huffman v. Commissioner*, 518 F.3d 357, 364 n.8 (6th Cir. 2008), *aff'g* 126 T.C. 322 (2006); *Suzy's Zoo v. Commissioner*, 273 F.3d at 884; *Rankin v. Commissioner*, 138 F.3d 1286, 1288 (9th Cir. 1998), *aff'g* T.C. Memo. 1996-350.[48]

Section 481 "is not meant to provide a means to correct errors of past years." *German v. Commissioner*, T.C. Memo. 1993-59, 65 T.C.M. (CCH) 1931, 1937, *aff'd*, 46 F.3d 1141 (9th Cir. 1995) (unpublished table decision). Rather, it is intended to take into account for the year of the change—here, 2009—those adjustments that are necessary, solely by reason of the change in accounting method, to prevent amounts from being duplicated or omitted. *See ibid.* Because section 481 might be said to deny taxpayers the repose otherwise granted by the period of limitations, we carefully examine each instance in which the Commissioner invokes section 481. If a change in accounting method has occurred, we must also ensure that any section 481 adjustment is made to compensate only for that change. *See Rankin v. Commissioner*, 138 F.3d at 1288.

### 2. *Changes in Accounting Method*

"A change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item." Treas.

---

[48] The Commissioner's authority to make section 481 adjustments is not limited by any "duty of consistency." *See Wasco Real Props. I, LLC v. Commissioner*, T.C. Memo. 2016-224, 112 T.C.M. (CCH) 640, 651 (declining "to let the judicially established doctrine of a duty of consistency defeat th[e] legislative act" embodied in section 481), *aff'd*, 744 F. App'x 534 (9th Cir. 2018).

**[\*117]** Reg. § 1.481-1(a)(1). Section 481 was designed "to complement section 446." *German*, 65 T.C.M. (CCH) at 1937. The regulations accordingly cross-refer to section 446(e) and the regulations under it "[f]or rules relating to changes in methods of accounting." Treas. Reg. § 1.481-1(a)(1) (cross-referring to Treas. Reg. § 1.446-1(e)).

A change in method of accounting includes a change in the treatment of any material item used in the taxpayer's accounting plan. Treas. Reg. § 1.446-1(e)(2)(ii)(*a*). A material item is "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." *Ibid.* An item is "material," in other words, if it concerns when (as opposed to whether) taxable income is affected. *See Rankin v. Commissioner*, 138 F.3d at 1288 (noting that an item is "material" when it affects the timing of reporting income as opposed to "*how much* income is reported").

"[A] method of accounting may exist under this definition without the necessity of a pattern of consistent treatment . . . ." Treas. Reg. § 1.446-1(e)(2)(ii)(*a*). But "in most instances a method of accounting is not established for an item without such consistent treatment." *Ibid.* "This Court and other courts have generally agreed that an erroneous treatment rises to the level of a 'method of accounting' only if it is employed consistently for two or more years." *Thrasys, Inc. v. Commissioner*, T.C. Memo. 2018-199, 116 T.C.M. (CCH) 531, 534.

In cases involving section 481 adjustments, courts often invoke the concept of "lifetime income." *See Hyatt Hotels Corp. & Subs. v. Commissioner*, T.C. Memo. 2023-122, at \*33. When a taxpayer's accounting practice "postpones the reporting of income, rather than permanently avoiding the reporting of income over the taxpayer's lifetime, it involves the proper time for reporting income." *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 510 (1989); *see Primo Pants Co. v. Commissioner*, 78 T.C. 705, 723 (1982) (citing *Graff Chevrolet Co.*, 343 F.2d at 572). Thus, if the adjustments initiated by the Commissioner simply accelerate the reporting of income, they involve "the proper time for reporting income" and constitute a change in method of accounting.

B.    *Analysis*

During 2003–2010 GWA accounted for its investments in the Barrier Contracts under what might be called the "open transaction" method. It deferred recognition of all items of gain, loss, income, and expense associated with the basket securities, and it reported the net

**[*118]** amounts of such items only for the future tax year when the putative "options" terminated. Although we have determined that this accounting practice was erroneous, GWA employed it consistently from the inception of the Barrier Contracts through 2010. This eight-year pattern of consistent treatment is sufficient to establish a "method of accounting." *See Thrasys, Inc.*, 116 T.C.M. (CCH) at 534; Treas. Reg. § 1.446-1(e)(2)(ii)(*a*).

In the FPAAs the IRS determined that GWA was the owner of the basket securities. It accordingly made two changes to the manner in which GWA must account for the associated income and expenses. First, for long and short positions closed during a taxable year, GWA must recognize gain or loss under section 1001 and take such gain or loss into account for that taxable year. Second, because GWA is an accrual method taxpayer, it must account for all other items of income and expense associated with the basket securities (such as dividend income, management fees, leverage fees, and trading costs) on an annual basis, subject to the normal rules of sections 451 and 461. We have sustained these determinations.[49]

Each of these adjustments concerns the proper time for reporting the relevant item of gain, loss, income, and expense. GWA reported these items on an amalgamated net basis as long-term capital gain for the year the putative "option" was terminated. The IRS determined that GWA must report these items on a disaggregated basis for the year in which they were realized, received, paid, or accrued. All these items are "material items" because they "involve[] the proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(*a*); *see Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 798 (11th Cir. 1984) ("The essential characteristic of a 'material item' is that it determines the timing of income or deductions."); *Primo Pants Co.*, 78 T.C. at 722 (noting that materiality "turns on whether the items affect timing").

These IRS adjustments do not change in any relevant way the "lifetime income" that GWA derived from the Barrier Contracts. Every item of gain, loss, income, and expense that GWA received, paid, or accrued in connection with the basket securities remains exactly the same.

---

[49] The FPAAs made a third change to the manner in which GWA accounted for the Barrier Contracts by determining that it must use the mark-to-market method of accounting for the basket securities. Because we have found GWA's election of the mark-to-market method to have been ineffective, we need not consider any section 481 adjustments in that connection.

**[\*119]** Respondent has simply determined that these items of income and expense must be recognized and netted on an annual basis, rather than being recognized and netted on an aggregate basis in a future tax year.[50]

The "open transaction" method of accounting GWA employed for the basket securities "postpone[d] the reporting of income, rather than permanently avoiding the reporting of income over [GWA's] lifetime." *Cf. Wayne Bolt & Nut Co.*, 93 T.C. at 510. The "open transaction" method and the section 1001/accrual methods prescribe *alternative times* for taking into account the items arising from GWA's investment in the Barrier Contracts. GWA's erroneous accounting practice thus "involve[d] the proper time for reporting income." *See Wayne Bolt & Nut Co.*, 93 T.C. at 510. The change from the open transaction method to the section 1001/accrual methods is accordingly a change in method of accounting.[51]

As petitioner notes, respondent's adjustments in this case do *recharacterize* the transactions at issue—from "options" to ownership of the basket securities. The IRS adjustments also recharacterize the income that GWA derives from the Barrier Contracts—e.g., from long-term capital gain under its "open transaction" method to short-term capital gains and losses from securities trading under section 1001. Neither of these circumstances, however, affects the conclusion that respondent's adjustments constitute a change in GWA's method of accounting.

The Treasury regulations provide, for example, that "a change in the treatment of an asset from nondepreciable or nonamortizable to

---

[50] We agree with respondent that, in determining whether a partnership has changed its accounting method, the principal focus should be on the *partnership's* lifetime income with respect to the adjusted items. A partnership's change in its overall method of accounting from cash to accrual (for example) would be a paradigmatic change in accounting method. *See* Treas. Reg. § 1.446-1(e)(2)(ii)(*a*). But such a change could affect the lifetime taxable income of individual partners (e.g., by altering the threshold for claiming miscellaneous itemized deductions under section 67(a)). This example shows that the possibility of tangential changes to an individual partner's lifetime income is irrelevant in addressing the question before us. *See also* Treas. Reg. § 1.481-2(c)(5)(i) ("In the case of a change in method of accounting by a partnership, the adjustments required by section 481 shall be made with respect to the taxable income of the partnership . . . .").

[51] Petitioner does not dispute that the total income reflected in the FPAAs is equal to the total income that GWA reported on its tax returns from the Barrier Contracts, except for an adjustment attributable to GWA's section 754 election. We discuss that point *infra* pp. 121–25 & note 57.

**[\*120]** depreciable or amortizable . . . is a change in method of accounting" that "results in a section 481 adjustment." Treas. Reg. § 1.446-1(e)(2)(ii)(*d*)(*2*), (*5*)(*iii*). They likewise provide that recharacterization of an asset from inventory to depreciable property is a change in method of accounting. *See* Treas. Reg. § 1.446-1(e)(2)(iii) (example 11). When the IRS makes an adjustment of this sort, it is recharacterizing both the asset and the mode of cost recovery associated with the asset. But this adjustment is nevertheless a "change in method of accounting" because it affects only *the timing* of the taxpayer's cost recovery, without changing the taxpayer's lifetime income associated with the asset.[52]

Section 481 applies where "the taxpayer's taxable income for any taxable year"—referred to as the "year of the change"—is computed "under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed." § 481(a)(1). "The year of the change" in this case is 2009. Beginning in 2009, GWA's taxable income associated with the basket securities must be computed on an annual basis under the section 1001 method (for securities trading gains and losses) and the accrual method (for other items of securities-related income and expense). These methods of accounting are different from the method—the "open transaction" method—that GWA used in computing its taxable income for 2008, the preceding taxable year. Section 481 is thus applicable here.

Section 481 requires that, in computing GWA's taxable income for 2009, "there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to

---

[52] Caselaw confirms that a change in method of accounting, whether initiated by the taxpayer or the Commissioner, can be generated by the recharacterization of an asset, a transaction, or the income and deductions related thereto, provided that the change affects only timing. *See, e.g.*, *Diebold, Inc. v. United States*, 891 F.2d 1579, 1583 (Fed. Cir. 1989) (finding a change in accounting method where nondepreciable inventory was recharacterized as a depreciable capital asset); *Pac. Enters. & Subs. v. Commissioner*, 101 T.C. 1, 17 (1993) (same, where inventory was recharacterized as a capital asset); *Mingo v. Commis*sioner, T.C. Memo. 2013-149, 105 T.C.M. (CCH) 1857, 1860 (same, where there was a change from the installment method entailing capital gain to the cash method yielding ordinary income), *aff'd*, 773 F.3d 629 (5th Cir. 2014); *Humphrey, Farrington & McClain, P.C. v. Commissioner*, T.C. Memo. 2013-23, 105 T.C.M. (CCH) 1150, 1157–58 (same, where deductible litigation expenses were recharacterized as nondeductible loans); *Sunoco, Inc. & Subs. v. Commissioner*, T.C. Memo. 2004-29, 87 T.C.M. (CCH) 937, 949 (same, where development costs were recharacterized as production expenses includible in cost of goods sold); *Cargill Inc. v. United* States, 91 F. Supp. 2d 1293, 1298 (D. Minn. 2000) (citing *Witte v. Commissioner*, 513 F.2d 391 (D.C. Cir. 1975)) (same, where transaction was recharacterized from a lease to a sale), *rev'g and remanding* T.C. Memo. 1972-232.

[*121] prevent amounts from being duplicated or omitted." § 481(a)(2). By virtue of the change in accounting method, the taxable income properly reportable by GWA for 2009 and 2010 in connection with the basket securities is limited to the income (net of expenses) actually realized in each year. The vast bulk of the income GWA reported on its 2009 and 2010 returns, however, was realized during 2003–2008, years presumably now closed by the period of limitations. Unless that prior-year income is taken into account as an adjustment to GWA's taxable income for 2009, it would be permanently "omitted." Section 481 was designed to prevent this from happening.

For example, as of December 31, 2008, Barrier Contract #1 had $297 million of realized gains on the associated basket securities. Employing its "open transaction" method of accounting, GWA did not include those realized gains in income until Barrier Contract #1 terminated in 2009. As the owner of the basket securities, however, GWA should have included those realized gains in income on an annual basis during 2003–2008, years now presumably closed by the period of limitations. Because of the change in accounting method, those gains would be permanently omitted from GWA's income absent application of section 481. A section 481(a) adjustment in 2009 is necessary to prevent this omission.[53]

### C. *Petitioner's Arguments*

Petitioner does not dispute that "[a] change in method of accounting to which section 481 applies includes . . . a change in the treatment of a material item." Treas. Reg. § 1.481-1(a)(1). Nor does he seriously dispute that the items of gain, loss, income, and expense associated with the basket securities are "material items" because they "involve[] the

---

[53] Parallel reasoning applies to other items of income derived from the basket securities, such as dividends. For Barrier Contract #1, for example, GWA did not report any dividends received on the basket securities during 2003–2008; it reported those amounts only for 2009 (as a component of long-term capital gain on the "option"). By virtue of the change in accounting method, however, GWA would be taxable in 2009 only on dividends actually received in that year; all dividend income received during 2003–2008 would be permanently omitted from taxable income absent a section 481 adjustment. The same principle applies to expenses associated with the basket securities, such as trading and leverage fees. Under the accrual method of accounting to which GWA has been shifted for these items, the only securities-related expenses deductible for 2009 would be expenses that actually accrued during 2009. Absent a section 481 adjustment, therefore, GWA would be denied a deduction for all securities-related expenses that accrued during 2003–2008, causing those items to be permanently omitted in computing its taxable income.

**[*122]** proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(*a*). Petitioner nevertheless contends that the Commissioner's adjustments, which change the treatment of these "material items," do not constitute a "change in method of accounting."[54]

In advancing this contention petitioner does not rely on any Code or regulatory provision dealing with methods of accounting or changes in method of accounting. Rather, he chiefly relies on a provision of subchapter K, which governs the tax treatment of partnerships and their partners. Specifically, he cites section 754, which is captioned "Manner of electing optional adjustment to basis of partnership property."

Section 754 provides in pertinent part that, "[i]f a partnership files an election, . . . the basis of partnership property shall be adjusted, in the case of a distribution of property, in the manner provided in section 734." Distributions by a partnership to a partner are generally nonrecognition events. *See* § 731(a) and (b). However, a distributee partner is required to recognize gain to the extent he receives cash from the partnership that exceeds his basis in his partnership interest. *See* § 731(a)(1). In that event, if the partnership has a section 754 election in place, it will increase the basis of its assets by the amount of gain recognized by the partner. *See* § 734(b)(1)(A). This basis adjustment prevents the gain recognized by the distributee partner from being recognized a second time within the partnership. GWA made a section 754 election on its 1999 partnership return.

During 2009 GWA distributed cash to four of its partners in redemption of their partnership interests. Those partners recognized gain under section 731(a)(1) in the aggregate amount of $902,161. Consistently with its section 754 election, and as required by section 734(b)(1), GWA increased its bases in Barrier Contracts #1 and #7 through #10 by the amounts of gain recognized by the four partners.

The increase in GWA's income for 2009 from treating it as the owner of the basket securities requires corresponding increases to the partners' "outside bases" in their partnership interests under section 705(a)(1)(A). As a result, the gain recognized by the four partners who were redeemed in 2009 will be smaller than the amounts they originally

---

[54] Although the definition of "material item" is the linchpin in the change-in-method-of-accounting analysis, the term "material item" does not appear in petitioner's 534-page Answering Brief and makes only three cameo appearances in its 285-page Opening Brief.

**[\*123]** reported. Because the gain recognized by the distributee partners will be smaller, the increases to GWA's bases in the basket securities under section 734(b), as required by its section 754 election, will be reduced pro tanto. And because GWA's bases in the basket securities will be reduced slightly, it will recognize slightly more gain upon disposition of those assets in 2009 and 2010.[55]

In short, given the section 754 election that GWA made in 1999, coupled with the happenstance that four partners were redeemed in 2009, petitioner contends that the Commissioner's adjustments will cause GWA to recognize for 2009 and 2010 slightly more gain than it otherwise would have, with the difference corresponding precisely to the reduced gain recognized by the distributee partners. This increase to GWA's "lifetime income," petitioner asserts, means that the Commissioner's adjustments do not constitute a change in method of accounting, even though those adjustments indisputably change the treatment of GWA's "material items."

We think petitioner misapprehends the "lifetime income" concept. This judicially crafted formula paraphrases the regulatory definition of a "material item," i.e., "any item that involves *the proper time* for the inclusion of the item in income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(*a*) (emphasis added). Under this definition, an item is "material" if it concerns when taxable income is affected, as opposed to how much income is reported. *See Rankin v. Commissioner*, 138 F.3d at 1288. The "lifetime income" concept, in short, is a tool that courts use to help assess the *materiality* of the items the Commissioner has adjusted, i.e., to ascertain whether the adjustments merely affect timing. "Lifetime income" is not an inflexible, extra-statutory test divorced from the investigation into the items' materiality.

For this reason, the "lifetime income" concept is logically limited to ascertaining whether the Commissioner's adjustments affect the taxpayer's lifetime income *with respect to the item(s) thus adjusted*. For example, if the IRS recharacterizes an inventory item as a depreciable asset, the question is whether the adjustment will affect the taxpayer's lifetime income *with respect to that asset*. Since the adjustment will not affect the taxpayer's lifetime income with respect to that asset, but only

---

[55] Specifically, the parties have stipulated that the adjustments set forth in the FPAAs cause GWA's section 734(b) adjustment for 2009 to be reduced from $902,161 to $364,306, thus increasing GWA's recognized gain by $537,855. The gain recognized by the four distributee partners is concomitantly decreased by $537,855.

**[\*124]** the timing of his cost recovery, the asset is a "material item," and the change in its treatment is change in method of accounting.[56]

The provisions of subchapter K on which petitioner relies have nothing to do with the intrinsic "materiality" of the income and expense items associated with the basket securities. The sole purpose of GWA's section 754 election was to ensure consistency between the partners' "outside basis" in their partnership interests and GWA's "inside basis" in its assets. The departure of four partners in 2009 was a wholly adventitious event that is logically irrelevant in deciding whether the IRS adjustments change GWA's method of accounting. And although the section 734(b) adjustment might be said to have a tangential effect on GWA's "lifetime income," it is precisely offset by an equal reduction to the redeemed partners' lifetime income, so the net change to the participants' lifetime income is zero.

Whether a change in method of accounting has occurred must be determined under the rules set forth in sections 446 and 481 and the Treasury regulations that interpret these provisions. And the regulations show that petitioner's argument cannot possibly be right. For example, as noted *supra* pp. 119–20, the regulations provide categorically that "a change in the treatment of an asset from nondepreciable or nonamortizable to depreciable or amortizable . . . is a change in method of accounting" that "results in a section 481 adjustment." Treas. Reg. § 1.446-1(e)(2)(ii)(*d*)(*2*), (*5*)(*iii*). The regulations include a dozen or more other provisions stating categorically that a particular change in treatment is (or is not) a change in method of accounting.

The categorical nature of these provisions shows that whether items are "material" for change-in-accounting-method purposes is determined by the intrinsic character of the items and of the change in treatment that has occurred, assessed in the light of the principles set forth in sections 446 and 481. In making that assessment, it is irrelevant whether a partnership has made a wholly unrelated election under subchapter K, whether partners have withdrawn from the partnership,

---

[56] The adjustment described in the text, of course, could have a tangential effect on the taxpayer's lifetime taxable income. By permitting future depreciation deductions, for example, the adjustment could conceivably change the threshold for claiming itemized deductions (such as medical expense or miscellaneous deductions) for some future year. But any effect on future itemized deductions would have nothing to do with whether inventory is a "material item" as defined in Treasury Regulation § 1.446-1(e)(2)(ii)(*a*), such that the Commissioner's recharacterization of the item from inventory to a depreciable asset constitutes a change in accounting method.

**[\*125]** whether the partnership has distributed cash to the departing partners, and whether the cash so distributed exceeds the partners' bases in their partnership interests. If that were not so, a partnership with a section 754 election in place could avoid a change in method of accounting even though the Regulations explicitly provide that a change has occurred.[57]

Under petitioner's theory, the existence of a change in accounting method would be determined, not by the Treasury regulations governing the subject, but by unrelated events largely subject to the taxpayer's control. We find that argument wholly unpersuasive. The fact that GWA has a section 754 election in place has no bearing on whether the Commissioner's adjustments involve timing. And it would be irrational if a partnership could nullify the statutory consequences of a change in accounting method simply by distributing cash to one of its partners.[58]

Petitioner next contends that the Commissioner's adjustments do not involve timing because respondent "is positing a different transaction from the transactions that GWA and Deutsche Bank entered into." Respondent's "imputed ownership argument," petitioner insists, "is about *what* items GWA is required to account for, not *when* it should account for those items." But the questions of *what* and *when* are

---

[57] For example, if a partnership with a section 754 election in place changed its treatment of an asset from nondepreciable to depreciable, the depreciation deductions for the asset in the year of the change (along with any necessary section 481(a) adjustment) would decrease the partners' outside bases in their partnership interests under section 705(a). Since the partners' outside bases would be different, any section 734(b) basis adjustment attributable to liquidating partners would be different and would ultimately change the partnership's lifetime income. In short, if a section 734(b) adjustment were included in the "lifetime income" determination, the existence of a section 754 election would prevent the partnership's change in treatment from being a change in accounting method, even though the regulations expressly denominate it as such.

[58] In a similar vein, petitioner cites the dividends received deduction allowed to corporations by section 243, urging that respondent's adjustments could change the lifetime income of GWA, Inc. (GWAI), one of GWA's indirect partners. On the premise that GWAI would be entitled to a dividends received deduction in respect to dividends respondent treats GWA as having received on the basket securities, petitioner concludes that treating GWA as the owner of those securities would reduce GWAI's lifetime income. But the "lifetime income" concept is properly applied at the partnership, not the partner, level. *See supra* note 50. In any event, whether a partner might be entitled to a dividends received deduction has no bearing on whether the Commissioner's adjustments to the partnership's income involve timing.

**[*126]** inextricably interrelated, and these questions must be answered sequentially.

We first determined that the Barrier Contracts were not "options" and that GWA in substance owned the basket securities. That answered the *what* question. We then turn to the *when* question: Does the substance of the transactions require that the gains, losses, income, and expense associated with the basket securities be accounted for differently from the way GWA accounted for them? We answer that question in the affirmative; we find that the Commissioner's adjustments to these items solely involve timing; and we determine that these items are therefore "material items" within the meaning of Treasury Regulation § 1.446-1(e)(2)(ii)(*a*). The Commissioner has thus effected a change in GWA's method of accounting for "material items," and we hold that this change necessitates a section 481 adjustment. As explained above, a change in method of accounting can be generated by the recharacterization of an asset, a transaction, or the income and expenses related thereto, so long as the adjustment affects only timing. *See supra* pp. 116–20 & note 52.[59]

Finally, we are unpersuaded by petitioner's argument that "[t]he policy justification for section 481" supports his position. Because treating GWA as the owner of the basket securities affects not only the timing of income recognition, but also the character of that income, petitioner insists that implementing a section 481(a) adjustment would unfairly upset the repose to which GWA and its partners are entitled under the period of limitations. But requiring a taxpayer to recognize under section 481 income that should have been recognized in a closed year will *always* upset the repose the taxpayer would otherwise have enjoyed. The courts have uniformly held that Congress's interest in avoiding omissions or duplications of income, as expressed in section 481, overrides the taxpayer's interest in repose. *See supra* pp. 115–16. GWA is not entitled to avoid recognizing hundreds of millions of dollars of

_____

[59] Petitioner errs in relying on *Federated Department Stores, Inc. v. Commissioner*, 51 T.C. 500, 514 (1968), *aff'd*, 426 F.2d 417 (6th Cir. 1970). In that case the taxpayer for many years had "sold" accounts receivable to banks as a financing mechanism; in 1964 it sold all of its accounts receivable to another bank in a true sale. *Id.* at 503. We held that "the bank transactions prior to 1964 differ[ed] so materially from the sale of accounts [in 1964] that no 'change of accounting' under section 481 was involved." *Id.* at 514. The accounting treatment the taxpayer applied in 1964, we reasoned, was not a "'change' of accounting but only a 'new' accounting method for a different transaction." *Ibid.* That case has no relevance here: Neither GWA's Barrier Contracts nor its "open transaction" method of accounting for them changed in any relevant way between 2003 and 2009.

[*127] taxable income simply because it hoped to report long-term capital gain, rather than short-term gain or ordinary income, upon termination of the Barrier Contracts.

In sum, we conclude that the adjustments that flow from treating GWA as the owner of the basket securities effected a change in the partnership's method of accounting that requires an adjustment under section 481(a) "to prevent amounts from being duplicated or omitted." The FPAA for 2009 includes a section 481(a) adjustment of $337,170,142. That figure presumably includes some amount attributable to the fact that GWA did not mark the basket securities to market annually. Because we have concluded that GWA did not make a valid mark-to-market election in 1998, we will direct the parties to address in their Rule 155 computations the section 481 adjustment that is consistent with our Opinion.

VI.  *Penalties*

For 2009 and 2010 the IRS determined accuracy-related penalties for negligence and (in the alternative) for substantial understatements of income tax. *See* § 6662(a) and (b)(1) and (2). Under TEFRA, whether penalties are applicable is determined at the partnership level. *See* §§ 6221, 6226(f); *Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018). "Once a partnership-level proceeding is final, the liability of the partners, if any, may be determined in a partner-level proceeding, which may involve a computational adjustment or a notice of deficiency." *Dynamo*, 150 T.C. at 233 (citing § 6230(a)). In a partnership-level proceeding such as this, the partnership bears the burden of production with respect to penalties. *See* § 7491(a), (c); *Dynamo*, 150 T.C. at 236–37.

A.  *Penalty Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." In *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020), we ruled that the "initial determination" of a penalty assessment is typically embodied in a letter by which the IRS formally notifies the taxpayer that it has made a definite decision to assert penalties. The Second Circuit has held that supervisory approval must be obtained at a time when "the supervisor has the discretion to give or withhold it." *Chai v. Commissioner*, 851 F.3d 190, 220

**[\*128]** (2d Cir. 2017), *aff'g in part, rev'g in part* T.C. Memo. 2015-42. Under this standard, supervisory approval will generally be timely if secured before the IRS issues the taxpayer an FPAA or a Notice of Deficiency.

Supervisory approval need not be recorded on any particular form or document. The only requirement is a writing that manifests the immediate supervisor's intent to approve the penalty. *Palmolive Bldg. Invs., LLC v. Commissioner*, 152 T.C. 75, 86 (2019) (citing *Deyo v. United States*, 296 F. App'x 157, 159 (2d Cir. 2008)). An email reflecting penalty approval satisfies the requirements of section 6751(b)(1). *Estate of Morrissette v. Commissioner*, T.C. Memo. 2021-60, 121 T.C.M. (CCH) 1447, 1473–74.

We find that supervisory approval of the penalties was timely secured. On December 17, 2014, Chief Counsel Attorney Phillip Yarberough, who was responsible for advising on GWA's examination, drafted a memorandum recommending that the IRS assert penalties for negligence and substantial understatements of income tax. His immediate supervisor, Mr. Guarnieri, approved this recommendation that same day by initialing the memorandum.

On December 19, 2014, Mr. Yarberough sent the approved memorandum via email to RA Chambers. Later that day RA Chambers emailed her immediate supervisor, Mr. Hetzel, attaching Mr. Yarberough's memorandum and requesting approval to assert the section 6662 penalties against GWA. Mr. Hetzel approved the assertion of both penalties by return email later that day. On March 3, 2015, RA Chambers sent Mr. Hetzel draft Forms 886–A that included the section 6662 penalties. He approved them on March 5, 2015.

All of these events occurred before June 22, 2015, the date on which the IRS issued 60-day letters to GWA, and before December 3, 2018, the date on which the IRS issued the FPAAs. Because those letters constituted the first formal communication to GWA that the IRS intended to assert the accuracy-related penalties, supervisory approval was timely secured.[60]

---

[60] The Petition in this case alleges that the IRS did not comply with section 6751(b), but petitioner offered no argument in support of that allegation.

**[*129] B.**     *Accuracy-Related Penalties*

Section 6662(a) imposes an accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return. Only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is penalizable on more than one of the grounds set forth in section 6662(b). *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at *46 n.21; Treas. Reg. § 1.6662-2(c). The determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level because partnerships do not pay tax. *See Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, 122 T.C.M. (CCH) 342, 343. However, we can determine at the partnership level *the applicability* of the penalty for a substantial understatement of income tax. *See Dynamo*, 150 T.C. at 233; *Corning Place Ohio*, T.C. Memo. 2024-72, at *45–46; *Plateau Holdings, LLC*, 122 T.C.M. (CCH) at 343.

An accuracy-related penalty will not be imposed to the extent the underpayment was attributable to "reasonable cause." § 6664(c). Reliance on the advice of a professional tax advisor may constitute "reasonable cause." *See* Treas. Reg. § 1.6664-4(a) through (c). Petitioner did not assert a "reasonable cause" defense in his Petition, and he confirmed in his Posttrial Brief that GWA "has not [raised] and is not raising a reasonable cause defense." Although petitioner has not urged reliance on professional advice as a defense in this proceeding, GWA's members remain free to assert any appropriate defenses in subsequent partner-level proceedings. *See Dynamo*, 150 T.C. at 233.

1.     *Negligence*

The Code imposes a 20% accuracy-related penalty upon the portion of any underpayment of tax that is attributable to negligence. § 6662(a) and (b)(1). Negligence includes "any failure to make a reasonable attempt to comply with the provisions of the [Code] or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1).

Whether a partnership has exercised "ordinary and reasonable care" must be assessed in the light of the relevant partners' sophistication, experience, and conduct. *Henry Schwartz Corp. v. Commissioner*, 60 T.C. 728, 740 (1973); *Palm Canyon X Invs., LLC v. Commissioner*, T.C. Memo. 2009-288, 98 T.C.M. (CCH) 574, 595 n.93, *aff'd*, No. 16-1334, 2018 WL 1326394 (D.C. Cir. Feb. 16, 2018). Negligence may be

**[\*130]** indicated where the results of a transaction would "seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1)(ii); *see Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 233 (finding negligence where taxpayers knew of a product's "extraordinary financial implications" but "did not make a proper investigation or exercise due diligence to verify the [product's] tax legitimacy").

GWA's key partners were sophisticated financial services professionals with decades of industry experience. When Mr. Weiss signed GWA's 2009 return he had been running a brokerage and trading business for more than 30 years and had managed assets totaling $1.7 billion. Mr. Doucette was a seasoned financial services professional who had worked with Mr. Weiss since 1990, serving as GWA's president, COO, and head of risk management. Mr. Gendreau, GWA's tax manager and later its tax director, is a licensed CPA who worked for decades as a tax accountant for investment companies.

Messrs. Weiss, Doucette, and Gendreau surely knew the differences between a genuine call option and a de facto prime brokerage account. Although the Barrier Contracts were labeled "options," Mr. Doucette understood that the Deutsche Bank product, like the RBC product, offered "all the benefits of prime brokerage with the benefits of tax deferral [and] long-term treatment." *See supra* pp. 20–21. Given their financial sophistication and experience, GWA's principals must have suspected that the product was "too good to be true." *See* Treas. Reg. § 1.6662-3(b)(1)(ii).

The Barrier Contracts promised to deliver "extraordinary financial implications" for GWA, but we discern little evidence that GWA "exercise[d] due diligence to verify the [product's] tax legitimacy." *Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 233. Mr. Gendreau supposedly reached a favorable conclusion "based on his research of the Code, including section 1234." But section 1234 simply specifies the tax treatment of "[g]ain or loss attributable to the sale or exchange of . . . an option." It has no bearing on whether the Barrier Contracts were "options" in the first place.[61]

---

[61] Petitioner contends that GWA exercised due diligence by obtaining tax opinions from two attorneys in 2009 and 2011 in connection with the Barrier Contracts. By Order served September 23, 2022, we granted respondent's Motion in Limine to exclude these opinions from evidence. Petitioner did not allege a reliance-on-

**[\*131]**  Two events that preceded the filing of GWA's 2009 and 2010 returns should have put it on high alert about the Barrier Contracts' questionable status as "options."  The first involved its negotiations with Deutsche Bank over the terms of "New MAPS."  Concerned about the Barrier Contracts' financial and legal risks, Deutsche Bank in 2007–2008 proposed revised terms that were intended to endow the MAPS product with features more characteristic of genuine options.  These features included a much shorter contract term (13–24 months), reduced premium refundability, the elimination of GWA's ability to pay additional premium to avert a knockout, and the incorporation of "optionality value" by providing that the bank would retain a portion of the premium in circumstances where "the purchaser of a 'true' option would not expect to receive back its premium."  *See supra* pp. 35–37.

The issuance of IRS Generic Legal Advice Memorandum No. AM2010-005 was a second event that should have alerted GWA to question the proper characterization of the Barrier Contracts.  The Memorandum addressed "Hedge Fund Basket Option Contracts" and involved a product whose features strongly resembled those of the Barrier Contracts.  The Memorandum concluded that the product was not an option and that the hedge fund in substance owned the underlying basket of securities.

The IRS issued the Memorandum on November 12, 2010, nearly ten months before GWA reported on its 2010 tax return long-term capital gain of $192,679,910 from the termination of Barrier Contracts #7 through #10.  In January 2011 Deutsche Bank officers met with Mr. Doucette, informing him that MAPS was in danger and that they were "under a lot of pressure from the tax people" at the bank to abandon the product.  A partnership exercising "ordinary and reasonable care" might have reconsidered its return positions vis-à-vis the Barrier Contracts in the light of these developments.  *See* Treas. Reg. § 1.6662-3(b)(1).

---

professional-advice defense in his Petition, and we concluded that admitting these documents into evidence would unfairly prejudice respondent.  During discovery petitioner had consistently asserted the attorney-client privilege to avoid disclosing to respondent any of GWA's subsequent communications with the attorneys who drafted the opinions, and we concluded that petitioner was inappropriately seeking to invoke the attorney-client privilege selectively.  The parties ultimately stipulated that GWA did in fact solicit and receive tax opinions in 2009 and 2011.  But because these opinions are not in the record, we are unable to ascertain the extent (if any) to which they could reasonably support GWA's tax return positions.

**[\*132]** The accuracy-related penalty for negligence does not apply to any return position that has a "reasonable basis." *Ibid.* "Reasonable basis" is a relatively high standard of tax reporting, significantly higher than "not frivolous" or "not patently improper." *Id.* subpara. (3). A return position that is merely arguable or colorable does not meet the "reasonable basis" standard. *Ibid.*

A return position will generally be regarded as having a "reasonable basis" if it is "based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii)." *See* Treas. Reg. § 1.6662-3(b)(3). Those authorities include statutes, regulations, judicial opinions, legislative history, revenue rulings, revenue procedures, and other published IRS pronouncements including information or press releases, notices, and announcements. *See* Treas. Reg. § 1.6662-4(d)(3)(iii).

Petitioner has presented no "authority" that could support treating the Barrier Contracts as genuine call options, and GWA seems to have known full well that no such authority existed. As it represented to investors in the July 2008 addendum to its PPM, it was "unaware of any case law, regulations or rulings of the [IRS] dealing with financial instruments similar to the barrier options." And in that document it warned investors "that the [IRS] or the courts could conclude that some other less favorable tax treatment [was] appropriate for" the Barrier Contracts.

Notwithstanding GWA's representations to investors, petitioner asserts that there *was* authority for GWA's return positions. He points to sections 1234 and 1234A, which address the taxation of proceeds following the exercise, termination, or lapse of an option. But these provisions provide no guidance as to whether the Barrier Contracts were actually "options," a term that is not defined in the Code. Petitioner simply assumes a conclusion that he has the burden of proving.

Finally, petitioner contends that *Frank Lyon* supplies authority for GWA's return positions. But the Supreme Court in that case addressed a sale-and-leaseback transaction, not a putative call option. And the analysis the Court conducted—considering the application of 20+ factors bearing on "the substance and economic realities of the transaction"—does not remotely support characterizing the Barrier Contracts as genuine call options. *See supra* pp. 45–92. Because the Barrier Contracts displayed none of the essential economic and legal

**[\*133]** characteristics of true options, their substance could not possibly be viewed as matching their form.[62]

In sum, we hold that GWA was negligent in treating the Barrier Contracts' proceeds as resulting from the exercise or termination of call options. GWA's members were highly sophisticated: They knew or should have known that the Barrier Contracts did not remotely resemble genuine call options and that the benefits of MAPS were "too good to be true." *See* Treas. Reg. § 1.6662-3(b)(1)(ii). When the time came for GWA to prepare its 2009 and 2010 returns, it failed to "exercise ordinary and reasonable care," *see id.* subpara. (1), heedless of the warning signs suggesting that it needed to rethink its position. It is unclear from the record how much "research" Mr. Gendreau actually conducted before the returns were filed. But we conclude in any event that there existed insufficient authority to supply a "reasonable basis" for GWA's return positions. *See id.* subpara. (3).

## 2. *Substantial Understatement of Income Tax*

The IRS asserted accuracy-related penalties on the alternative ground that each of GWA's 2009 and 2010 returns reflected a "substantial understatement of income tax." *See* § 6662(b)(2). An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. § 6662(d)(1)(A). Petitioner does not dispute that GWA's return positions might create a substantial understatement of income tax at the partner level. *See Plateau Holdings, LLC*, 122 T.C.M. (CCH) at 343.

For purposes of calculating this penalty, an understatement of income tax is reduced in two circumstances. First, the taxpayer may establish that "there is or was substantial authority for [its] treatment" of a particular item. § 6662(d)(2)(B)(i). "The substantial authority standard is less stringent than the more likely than not standard . . . , but more stringent than the reasonable basis standard." Treas. Reg. § 1.6662-4(d)(2). We have concluded above that GWA did not have a

---

[62] The parties disagree over whether the "reasonable basis" standard is a subjective or an objective one, i.e., whether petitioner must establish GWA's actual reliance on the authorities that allegedly supported GWA's return positions. *See Wells Fargo & Co. v. United States*, 957 F.3d 840, 852 (8th Cir. 2020) (finding that the standard is subjective); *TIFD III–E Inc. v. United States*, 8 F. Supp. 3d 142, 151 (D. Conn. 2014) (finding it objective), *rev'd on other grounds*, 604 F. App'x 69 (2d Cir. 2015). We need not resolve that disagreement here because none of the authorities cited by petitioner plausibly supports the positions GWA took on its returns, regardless of whether Mr. Gendreau or another GWA member actually relied on them.

[*134] "reasonable basis" for its treatment of the Barrier Contracts. *See supra* p. 132. A fortiori it lacked "substantial authority" for its position.

Second, an understatement of income tax is reduced for penalty purposes if "there is a reasonable basis for the tax treatment of [the relevant] item" and if "the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return." § 6662(d)(2)(B)(ii). GWA satisfied neither test. As discussed above, it lacked a "reasonable basis" for its return positions. And we conclude that it did not adequately disclose the relevant facts on its returns.

The tax treatment of an item is "adequately disclosed" if the treatment is disclosed on a properly completed Form 8275, Disclosure Statement, or Form 8275–R, Regulation Disclosure Statement, attached to the return or a qualified amended return. Treas. Reg. § 1.6662-4(f)(1). Disclosure on the face of a return may also be adequate if that manner of disclosure is permitted by an IRS revenue procedure applicable to the tax year in question. *Id.* subpara. (2). For 2009 and 2010 the latter form of disclosure was governed by Revenue Procedure 2010-15, 2010-7 I.R.B. 404, and Revenue Procedure 2011-13, 2011-3 I.R.B. 318, respectively.

For 2009 and 2010 GWA reported long-term capital gains from termination of the Barrier Contracts on Schedules D, Capital Gains and Losses. It did not include Form 8275 or 8275–R with either return. On the Schedules D it simply reported the dollar amounts of its gains, without disclosing the "relevant facts affecting the . . . tax treatment" of the Barrier Contracts. *See* § 6662(d)(2)(B)(ii)(I). And neither of the revenue procedures listed above permitted "adequate disclosure" to be accomplished simply by reporting the sale of an asset on the face of the return. *See* Rev. Proc. 2010-15; Rev. Proc. 2011-13. For all these reasons, we conclude that the 20% penalty imposed by section 6662(a) and (b)(2) applies without reduction under section 6662(d)(2)(B).[63]

C.    *Applicability of Penalties to Section 481(a) Adjustments*

In the FPAAs for 2009 and 2010 the IRS determined that GWA owned the basket securities in substance and was thus required to pay

---

[63] Respondent contends that section 6662(d)(2)(B) is inapplicable here by virtue of section 6662(d)(2)(C)(i), which provides that "[s]ubparagraph (B) shall not apply to any item attributable to a tax shelter." Given our disposition as set forth in the text, we need not decide whether the Barrier Contracts were "tax shelter[s]" for this purpose.

**[\*135]** tax on its annual trading gains under section 1001 and on its other securities-related income under the accrual method. The IRS determined that this change to GWA's method of accounting necessitated an aggregate adjustment of $337,170,142 under section 481 to reflect omissions from GWA's gross income for 2003–2008, the pre-2009 years during which it held one or more Barrier Contracts. We have held that a section 481 adjustment is required, in an amount to be determined. *See supra* p. 127.

Petitioner contends that the penalties we have sustained are inapplicable insofar as the underpayment of tax for 2009 is attributable to the section 481(a) adjustment. He notes that accuracy-related penalties apply to "any portion of an underpayment of tax *required to be shown on a return*." *See* § 6662(a) (emphasis added). In petitioner's view, a section 481(a) adjustment does not constitute tax "required to be shown on a return" because the adjustment "is being imposed . . . through an involuntary change" by the Commissioner.

We disagree. Adjustments to income under section 481(a) reflect the fact that income should have been recognized and reported by the taxpayer for a prior year. If the taxpayer had used a proper method of accounting, the tax arising from this income would clearly have been "required to be shown on a return," i.e., the return for that prior year. And if the taxpayer had used an improper method of accounting that the IRS corrected during an examination of that prior year, the resulting tax would likewise constitute tax that was "required to be shown on [the] return" for that prior year. But it often happens, as in this case, that the adjustments necessitated by a change in method of accounting cannot be made for the prior year because the period of limitations for that year is closed.

Section 481 was enacted to solve this problem. *See Graff Chevrolet*, 343 F.2d at 571–72 (summarizing the legislative history). It provides that, in computing a taxpayer's income for the year of the change, "there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change [in method]." § 481(a)(2). Because Congress has directed that such adjustments "shall be taken into account" for the year of the change, the adjustments necessarily constitute tax "required to be shown on [the] return" for the year of the change. Petitioner has offered no example of an income tax liability for a particular year that is not regarded as being "required to be shown on [the taxpayer's] return" for that year.

**[\*136]**  Nor do we find it compelling that the adjustment to income "is being imposed . . . through an involuntary change" by the Commissioner. Whenever the IRS adjusts a taxpayer's income under section 446(b) to reflect a change from an erroneous to a correct method of accounting, that change is presumably "involuntary" from the taxpayer's perspective.  If the period of limitations for the prior year is not closed, the IRS will adjust the return for the prior year.  If the period of limitations for the prior year is closed, the IRS will adjust the return for the "year of the change" under section 481(a).  In neither case does the supposed involuntariness of the change affect whether the underpayment was "required to be shown on a return" within the meaning of section 6662(a). *Cf.* § 446(f) ("[T]he absence of the [Commissioner's] consent . . . to a change in the [taxpayer's] method of accounting shall not be taken into account . . . to prevent the imposition of any penalty . . . .").

Petitioner cites no case law for the proposition that accuracy-related penalties—as a matter of law—cannot apply to section 481(a) adjustments.  The Second Circuit and this Court on prior occasions have sustained accuracy-related penalties arising from the Commissioner's change to a taxpayer's method of accounting and associated adjustments to income.  *See Boynton v. Pedrick*, 228 F.2d 745, 746 (2d Cir. 1955); *Basic Eng'g, Inc. v. Commissioner*, T.C. Memo. 2017-26, 113 T.C.M. (CCH) 1112, 1119–20, 1127 (sustaining penalties calculated on section 481(a) adjustments); *Welter v. Commissioner*, T.C. Memo. 2003-299, 86 T.C.M. 495, 497 (same).  Petitioner has not convinced us that we should reach a different result here.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

**[\*137]**                    APPENDIX

*Petitioner's Expert Witnesses*

1.    John Montgomery

Dr. Montgomery was Senior Managing Director at Ankura Consulting Group and has worked as a financial economist for more than 20 years.  He holds a B.A. from Yale University, an M.Sc. in Economics from the London School of Economics, and a Ph.D. in Economics from Princeton University.  He has previously served as an expert in several financial disputes, providing analysis of the structure and financing of investment portfolios, among other subjects.  He has also worked as an economist at the Federal Reserve Board, the International Monetary Fund, and other prominent finance and policy organizations.  The Court recognized Dr. Montgomery as an expert in financial economics, including financial modeling and risk.

2.    Fabio Savoldelli

Mr. Savoldelli is a consultant for the Alternatives Investment Institute, advising its CEO on a spectrum of hedge fund investments for retail and institutional clients.  He holds a B.A. in Economics from the University of Windsor (Canada) and a Post-Graduate Diploma in Business Studies from the London School of Economics.  He has over 25 years of experience advising on a range of hedge-fund focused issues, including as Chief Information Officer for Optima Fund Management, Merrill Lynch, Swiss Bank, and Chase Manhattan Private Bank.  He serves as a Contributing Editor on Bloomberg Television and as an adjunct professor at the Columbia Business School.  The Court recognized Mr. Savoldelli as an expert in the financial services and hedge fund industry.

3.    Timothy Weithers

Dr. Weithers has worked at options trading and marketmaking firms for 30 years.  He holds an A.B. in Economics from the College of the Holy Cross and a Ph.D. in Economics from the University of Chicago. He was the Executive Director of the Chicago Trading Company, an option trading firm, and held senior positions at UBS and other financial institutions.  He also served as Associate Director of the University of Chicago's Master's Program in Financial Mathematics and was faculty in the program.  He has authored a book on foreign-exchange derivatives and consults for securities trading firms and exchanges.  The Court

**[*138]** recognized Dr. Weithers as an expert in derivatives, economics, and the financial industry.

*Respondent's Expert Witnesses*

1.    Tanya Beder

Ms. Beder has more than 30 years of experience working in financial products risk management and in trading, structuring, and evaluating derivative transactions.  She obtained a B.A. in Mathematics from Yale University and an M.B.A., with a concentration in finance, from Harvard University.  Since 2006 she has been Chairman and CEO of SBCC Group, Inc., an advisor to financial institutions, and before that managed multiple hedge funds.  She also has served as Chair of the International Association of Financial Engineers, and as faculty at Yale, Columbia, and Stanford Universities.  The Court recognized Ms. Beder as an expert in derivatives, financial services, and the hedge fund industry.

2.    Paul Glasserman

Dr. Glasserman has been the Jack R. Anderson Professor of Business at the Columbia Business School since 1991.  He holds a B.A. in Mathematics from Princeton University and a Ph.D. in Applied Mathematics from Harvard University.  He is the author of *Monte Carlo Methods in Financial Engineering*, a widely used reference for valuing derivative securities.  He has also authored or co-authored two other books and dozens of scholarly articles in which he has applied statistical and probabilistic methodologies for financial applications.  Some of these publications discuss barrier options specifically.  Dr. Glasserman has also served on the boards of financial industry companies and on the editorial boards of several leading scholarly mathematics and statistics journals.  The Court recognized Dr. Glasserman as an expert in derivatives and financial engineering and risk analysis.

3.    Peter Tufano

Dr. Tufano is the Baker Foundation Professor at Harvard Business School and was previously the Peter Moores Dean at Saïd Business School (University of Oxford).  He holds a B.A. in Economics from Harvard College, an M.B.A. from Harvard Business School, and a Ph.D. in Business Economics from Harvard University.  He has published extensively in the fields of financial engineering, financial innovation, and investment management, and was named a Fellow of the Academy of

**[\*139]** Social Sciences in the U.K. for his academic contributions. He has served as a trustee of investment funds as well as on investment committees for public charities, nonprofits, and family foundations. The Court recognized Dr. Tufano as an expert in financial economics and financial engineering.